UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LISA LOCURTO, on behalf of herself and all others similarly situated,

                Plaintiff,

-against-

AT&T MOBILITY SERVICES LLC,

                Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/2016

13 Civ. 4303 (AT)

**ORDER**

ANALISA TORRES, District Judge:

        Plaintiff, Lisa LoCurto, brings this action on behalf of herself and other similarly situated current and former employees of Defendant, AT&T Mobility Services, LLC ("AT&T"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the New York Labor Law, § 650 *et seq.*, and the New Jersey Wage and Hour Law, N.J .Stat. Ann. § 34:11-56a *et seq*. LoCurto and the opt-in Plaintiffs[1] move for partial summary judgment. Mot. Partial Summ. J., ECF No. 141. AT&T moves for summary judgment, requesting that LoCurto's claims be dismissed with prejudice, and that the opt-in Plaintiffs' claims be dismissed without prejudice. Mot. Summ. J., ECF No. 142. For the reasons stated below, Plaintiff's motion for partial summary judgment is GRANTED in part and the Court's decision on the balance of the motion is held in abeyance. Defendant's motion for summary judgment is DENIED.

---

[1] *See* ECF Nos. 100, 113-133.

## BACKGROUND[2]

I. The Parties

In October 2006, Plaintiff Lisa LoCurto began working for AT&T as a regional account executive ("RAE"), serving AT&T's national retail accounts in New York and New Jersey.[3] Pl. 56.1 ¶ 7, ECF No. 155-1; LoCurto Aff. ¶¶ 7-8, ECF No. 34. LoCurto has a bachelor's degree in marketing, and previously worked as an account executive for one of AT&T's competitors. Def. 56.1 ¶ 15, ECF No. 157-1. AT&T's managers have praised LoCurto for her success as an RAE, and at one time labeled her as one of the "top five [RAEs for] two consecutive months." Aff. of Patrick W. Shea ("Shea Aff.") Ex. A ("LoCurto Dep.") 210:5-6, ECF No. 151-1; *see also* LoCurto Reply Aff. ¶ 8, ECF No. 102.

AT&T is a wholly owned subsidiary of AT&T Corp., which, by revenue, is the largest telecommunications holding company in the world. Pl. 56.1 ¶ 1, ECF No. 155-1. AT&T sells its products and services through both direct and indirect retail channels. Direct channels are retail stores owned and operated by AT&T and are not at issue here. Euratte Decl. ¶ 3, ECF No. 91. Indirect channels consist of partnerships and distribution agreements with local dealers (*i.e.*, independent dealers or agent stores) and non-exclusive relationships with national retail chains (*e.g.*, RadioShack, BestBuy, and Wal-Mart). Pl. 56.1 ¶¶ 2-4. The parties refer to the local dealer and national retail chain locations as "doors." *Id.* ¶ 19.

---

[2] In deciding a summary judgment motion, the Court views the record in the light most favorable to the nonmoving party. *See Hunter v. Bryant*, 502 U.S. 224, 233 (1991). Because LoCurto's motion is granted in part, the facts are set forth below in the light most favorable to AT&T.

[3] The record indicates that LoCurto was employed as an RAE as of November 11, 2013. *See* LoCurto Aff. ¶ 8 (dated November 11, 2013).

II.     Retail Account Executives

According to AT&T, LoCurto's "primary duty is to work with national retailers to promote and market AT&T's products and services, to help retailers deliver excellent customer service to retail customers on behalf of AT&T, and ultimately to increase AT&T's sales at those retailers." Def. 56.1 ¶ 1. A 2013 AT&T job advertisement explains that as an RAE, "you will partner with dealer store management and wireless sales personnel. You will conduct role-plays and mentor sales associates to ensure offers and/or promotions initiated by accounts/company are flawlessly executed." Reply Aff. of Michael S. Saffer, Ex. A at 1, ECF No. 162-1. The advertisement does not specify a required level of education, *id.*, and AT&T in fact hires RAEs without post-secondary education, *see, e.g.*, Aff. of Patrick W. Shea ("Shea Aff.") Ex. C ("Brooks Dep.") 242:8-10 (RAE with high school education), ECF No. 144; Shea Aff. Ex. D ("Amari Dep.") 326:16-327:6 (RAE with some college coursework but no degree).

RAEs' tasks include (1) teaching the salespeople at their assigned doors how to sell AT&T goods and services, Def. 56.1 ¶ 5; (2) motivating their doors to sell AT&T products via contests and personal discounts, *see* Pl. 56.1 ¶¶ 49-51; (3) acting as an initial point of contact for their doors when seeking AT&T guidance, *see* LoCurto Dep. 52:18-22; and (4) constructing non-binding sales goals and business plans, *id.* 204:16-208:15, 13:8-16:10 (describing RAE's main tasks). RAEs do not sell directly to customers, nor do they manage any other employees. *See* Pl. 56.1 ¶ 28. At any given time, RAEs are assigned approximately 20 doors. *See, e.g.*, LoCurto Dep. 214-217 (describing assigned doors in her 2013 year, involving nine RadioShacks, five Staples, two Targets, one Apple Store, one Wal-Mart, and one Costco).

RAEs are the lowest level sales employees assigned to AT&T's sales department. *See* Pl. 56.1 ¶¶ 13-15, 28. RAEs are compensated with a salary and "at-risk compensation," which is

tied to the door's sales of AT&T products that their doors achieve. Def. 56.1 ¶¶ 13-14. For example, LoCurto's base salary was between $42,000 and $44,000 annually, and she received approximately $20,000 extra in at-risk compensation. *Id.* AT&T does not pay RAEs overtime because it considers them as exempt from the FLSA's overtime pay requirements. Pl. 56.1 ¶ 10. Notwithstanding AT&T's classification, in 2009 AT&T sent a notice to RAEs titled "NOTIFICATION OF FLSA CLASSIFICATION" that stated that "[a] review has been completed and as a result, effective May 31, 2009, your job has been classified as Non-Exempt and is eligible to receive overtime pay." LoCurto Aff. Att. 1 at 12, ECF No. 34-1. Nevertheless, after distributing the notice, AT&T decided that the administrative exemption did in fact apply to RAEs, and thus continued to compensate RAEs as employees exempted from the FLSA's overtime pay requirements. *See* Decl. Curt Johnson ¶ 5, ECF No. 92.

   III.   AT&T's Scheduling, Monitoring, and Training of RAEs

As an RAE, LoCurto was "assigned" a "regular and set schedule." *See* LoCurto Aff. ¶ 17. For example, in 2013, LoCurto's assigned schedule was Tuesday through Saturday from 8:00 a.m. to 5:00 p.m., or 9:00 a.m. to 6:00 p.m., with Sundays and Mondays as days off. *Id.* ¶ 19. LoCurto also took calls from, and made calls to, her doors outside of her normal working hours. *See* LoCurto Dep. 234:22-239:2; *see also* LoCurto Aff. ¶ 24 ("[D]uring 2012, every evening, including my so-called days off, I was required to call the approximately twenty (20) stores whose accounts are assigned to me, compile their daily tallies and find out what they sold that day. I then had to report that information via a text or email to my supervisor.").

RAEs are generally required to visit their assigned doors at least twice per month. *See* Pl. 56.1 ¶ 17. LoCurto explains that at times she was obligated to visit all of her doors as soon as possible, such as when AT&T orders "blitz visits" for an "initiative" that had to be "addressed

4

immediately" such as "delivering fliers for a current promotion." LoCurto Dep. 62:2-7. Within this framework, RAEs "constructed their own store visit schedules based on their assessments of the needs of each store." Pl. 56.1 ¶ 17. In practice, LoCurto visited approximately 5 to 19 stores per week, with visits ranging from 15 minutes to 5 hours. LoCurto Dep. 60:2-25.

AT&T provides RAEs with training so that they can "prioritize" and visit the doors that are their "drainers" and "sustainers." LoCurto Dep. 66:4-9. In deciding which door to visit, LoCurto would prioritize the doors where "you're going to get the most bang for your buck." LoCurto Dep. 67:11-12; *see also* Def. 56.1 ¶¶ 1, 4, 13; Shea Aff. Ex. F ("Reyes Dep.") 65:10-13 ("In order to manage a territory, you know, you have to make a lot of judgment calls. You have to decide what doors, what stores you want to focus on. Some stores are busier than others. Obviously, I like to spend more time at the busier stores. That's where I am going to get most of my bang for my buck."), ECF No. 144-6.

AT&T monitors RAEs' visits to doors via three systems. First, RAEs must download a GPS tracking program that continually reports their location. Pl. 56.1 ¶ 40; *see also, e.g.*, Reyes Dep. 31:5-32:23 ("[T]he system pretty much just, you know, followed you around. It was easier for my manager to see that I was out there actually doing what I was supposed to be doing."). Second, RAEs are required to fill out electronic documentation after every store visit. Pl. 56.1 ¶ 40. One RAE states that completing this documentation took him around 5-10 minutes and that he was "required" to note the "merchandising" material levels, "who [he] trained," and any actions that he may have set-up with "the manager . . . [to] grow the business if they were struggling." Reyes Dep. 32:16-24. Third, "one to two times per month" an "RAE['s] immediate manager[] would perform 'ridealongs' whereby the manager[] [would] accompany the RAE[] to

their assigned stores to observe the RAE['s] performance." Pl. 56.1 ¶ 18. During a ridealong, the RAE and manager may visit multiple stores. *See, e.g.*, LoCurto Dep. 232:11-25.

Regarding training, RAEs are "required to undertake regular sales training on AT&T's products and services, both in-person and online throughout their employment." Def. 56.1 ¶ 20. Although training frequency varies per week, on average, LoCurto undertakes training "several times per week," LoCurto Dep. 80:5, with each training lasting "one to two hours," *id.* 81:5. Training topics include services and promotions, *id.* 89:22-23, codes of business conduct, and fraud prevention, *id.* 90:4-9; *see also* Shea Aff. Ex. J (listing the 261 training courses over the course of four years that an RAE took, including courses such as "Delivering an Extraordinary Experienc[e]," "Driving Innovation," and "AT&T's Cust[omer] Exp[erience] Workshop"), ECF No. 144-10.

IV. Teaching, Marketing, and Acting as a Liaison

RAEs increase sales in several ways. First and foremost, RAEs train the door's salespeople to effectively sell AT&T products via informative presentations, role-playing exercises, coaching,[4] and side-by-side selling.[5] *See* Def. 56.1 ¶ 5. On any given day, RAEs have discretion to decide the teaching technique that they use, but AT&T regulates the content of their lessons by assigning topical directives. As LoCurto explains, "management gives [RAEs] directives on what the initiatives are," LoCurto Dep. 35:22-23, and from that "bucket of topics" each RAE picks the appropriate training, *id.* 37:13-16; *see also* Brooks Dep. 27:17-25 (The "determination" about what kind of training to give "really depends on what [AT&T's] focus is

---

[4] Described as the RAE watching a door's salespeople sell and then giving "them feedback, what they did right, what they didn't do right, making them better sellers." Reyes Dep. 73:14-16.

[5] Described as "pretty much [the RAE] going into the store and helping them to sell to the customers while [the salesperson] shadow[s] [the RAE]." Reyes Dep. 70:25-71:2.

6

at that time . . . .  So if the focus was a data plan, then that weekend where I know the reps would [need more] education . . . [then] I would go there" and "teach them.").

LoCurto also states that choosing the appropriate training requires an assessment of the recipient's skill level because "[e]veryone is different," thus in order to be effective one has "get to know them and understand their different personalit[ies] and figure out how best to acclimate to that."  LoCurto Dep. 130:21-25; *see also id.* 35:4-6 ("If they're a slow learner, I'll speak a little more slowly.  That's customizing to their ability to learn, but it's the same message.").  Some RAEs customize PowerPoint presentations and handouts to aid in their training.  *See, e.g.*, Decl. of Michael A. Saffer Ex. D ("Figuereo Dep.") 100:3-103:20, ECF No. 151-4.  Notwithstanding the range of possible delivery techniques, the range of content that LoCurto teaches is uniform because AT&T's products are "consistent with each [door]."  LoCurto Dep. 34:10-11; *accord id.* 34:5-12 ("[Question: So you] are saying you don't try to customize the training you give to the needs of each retailer, you give the same training to each retailer regardless of their needs? [LoCurto Answers:] The product is consistent with each retailer; so, yes.").

Second, RAEs increase sales by working to ensure that AT&T's marketing initiatives and in-store displays are effectively implemented.  For example, LoCurto explains that she asked the "associates" at Wal-Mart if she could move the AT&T products to the end of an aisle so as to provide a more favorable location; Wal-Mart permitted this move.  LoCurto Dep. 164:5-16.  She also states that she did not have any authority to make her own marketing materials, and that "anything that's displayed in the stores has to be approved."  *Id.* 137:24-138:7; *see also, e.g.*, Toni Bryant Affirmation ¶ 7 ("I was mandated by my supervisor to ensure that all [AT&T] marketing and promotional materials were set up in the retail stores in my territory in strict

7

compliance with the instructions contained in the 'Planogram' created solely by AT&T . . . ."), ECF No. 165; Aldo Martino Affirmation ¶ 9 (similar), ECF No. 166. But the record also contains evidence that some RAEs would make individual flyers and signs. *See, e.g.*, Reyes Dep. 55:6-12 ("If we don't have any signage specifically set up, I would create one myself and make sure that's displayed so the customers are aware that there is an activation fee waiver going on and gain some visibility and, hopefully, that visibility turns into conversations and eventually turns into sales.").[6]

Finally, RAEs act as a point of contact for their doors to communicate with AT&T. *See* Pl. 56.1 ¶¶ 38-39, 53. As LoCurto explains, RAEs "serve[] as a liaison between the retailer store and [AT&T]." LoCurto Dep. 53:4-8; *see also id.* 26:12-20 ("[A salesperson might call an RAE] if they're having an issue with a customer that they can't figure out," "[i]f they're having issues contacting credit and activations," or with a "system outage."); Brooks Dep. 39:2-40:22 (recounting doors calling about system problems, customer billing issues, and failed activations). While in this role, RAEs do not have the "authority to set prices on AT&T's products," nor do they have the ability to waive any fees. Pl. 56.1 ¶ 38. Thus, in order to address a customer issue that implicates a monetary solution, RAEs need to involve other AT&T employees. *See* Pl. 56.1 ¶ 39.

V.  Contests and Discounts

Beyond training salespeople to sell AT&T products, RAEs also incentivize them via contests and discounts. AT&T strictly regulates the RAEs' budget for these events. Specifically, prior to April 2014, RAEs had no formal budget but required pre-approval for all events; after April 2014, AT&T allotted RAEs a $100 monthly budget. Pl. 56.1 ¶¶ 49-50. RAEs

---

[6] The RAE that made flyers also states that, in his opinion, his flyers were not advertising. *See* Reyes Dep. 54:1-2 ("Creating local flyers for the stores, I don't know if that would fall under advertising.").

8

are permitted to use their monthly budget on one door or spread it out among various doors in their territories. *Id.* ¶ 51.

As an example of a motivational contest, LoCurto recounts that she came up with the idea of offering a "reward[]" to the Best Buy salesperson with the "most new activations added to an account." LoCurto Dep. 114:7-8. LoCurto's plan was implemented, and the reward was, at various times, a "pizza," a "pizza and an ice cream cake", a "$25 gift card," or "$100 gift card." *Id.* 114:22-115:3. In order to implement these contests, RAEs were also at times required to obtain approval from the management at their doors. *See, e.g.*, *id.* 115:15-18 (recounting that she got "approval from the [Best Buy] general manager and from the management at AT&T" for larger prizes than Best Buy usually permitted).

AT&T offers its services to the door's employees at discounted rates. RAEs are responsible for informing their doors of this option and ensuring that any lines are properly activated. *See id.* 13:25-14:7; *see also id.* 30:20-25 ("[Getting salespeople to use AT&T products] gives a slight advantage to AT&T" because "if they're using the service, they're more familiar with the service.").

VI.  AT&T Revenue Targets and RAE Business Plans

AT&T assigns to each door monthly revenue and sales targets—*e.g.*, telephone re-activations, activations, and upgrades. Pl. 56.1 ¶¶ 30-31. If a door exceeds these targets, the RAE becomes eligible to receive rewards and bonuses. *See, e.g.*, Pl. 56.1 ¶ 22-23; Reyes Dep. 16:21-23 ("[T]here are targets every month I had to hit. The more I exceed the target, the better the compensation."); Brooks Dep. 31:16-22 (describing the "Top Gun" reward for exceeding AT&T sales targets).

9

In addition to AT&T's set targets, RAEs have access to sales metrics and use this information to set their own sales goals. LoCurto states that to set her goals she "guesstimate[d] according to what [the doors] have done and where [she] kind of think[s] that they could go." LoCurto Dep. 203:11-13. LoCurto also explains that she creates her targets before she visits a door by (1) "tak[ing] an hour to two hours to review the [door's] numbers" and "compile[] information that might be helpful," and (2) taking another five minutes to refresh herself before she walks into the door. *Id.* 78:22-79:22; *see also* Reyes Dep. 29:11-15 (describing his preparation for four doors as taking a "[h]alf hour in total. It is quick prep work especially after you have been doing it for a while."). After developing these targets, RAEs at times communicate them to door employees in order to assist them in "determin[ing] [their] areas of focus." LoCurto Dep. 50:10; *see also* Figuereo Dep. 84:2-87:6 (explaining that as an RAE he would increase sales by building an individual roadmap that, in part, targeted individual sales associates). Importantly, AT&T cites no evidence suggesting that an RAE-developed target is binding on AT&T, the door, or the RAE, nor does AT&T cite evidence suggesting that these targets have any direct bearing on an RAE's compensation. *See* Def. 56.1 ¶ 7 (describing RAE's goal setting); Reyes Dep. 60:16-64:24 (describing multi-layered review process for modifying AT&T sales targets); Pl. 56.1 ¶ 22 (describing at-risk compensation).

RAEs also play a role in AT&T's data gathering. Specifically, they regularly gather and report their doors' production numbers; the "[RAE] job duties in this regard are more akin to data gathering and reporting than analyzing." LoCurto Aff. ¶ 15; *see also id.* ¶ 24 (testifying that she was required to call doors and compile their "daily tallies").

Finally, once every six months RAEs create a "business plan" for each of their doors, consisting of a trend analysis, a merchandising and marketing review, an assessment of the

10

door's strengths and opportunities for improvement, a description of major action items implemented during the prior six-month period, a list of opportunities and objectives, and a recommendation on how the objectives could be achieved.  *See* LoCurto Dep. 204:16-207:11.  The record does not contain an example of one of these business plans.  LoCurto states that creating each business plan takes her around one and one-half hours, and involves "pulling numbers from one place to another and copy[ing] and pasting a lot," and more recently, the numbers "populate automatically."  *Id.* 201:2-8; *see also* Brooks Dep. 138:22-25 ("[As an RAE] I remember copying and pasting a lot that has to do with the business plan, but I don't remember the details that [were] emailed in the business plan.").  Another RAE describes the creation of the business plan as one where he would work on it over several weeks and construct it "alongside with the store manager so [that they] can both agree on some of the action items and just create growth of the business."  Reyes Dep. 107:3-5.  The record contains testimony that these plans were sometimes shared with other RAEs, the RAE's managers, and doors, *see e.g.*, *id.* 111:1-19; however, LoCurto denies having discussed her business plans with anyone at AT&T,  *see* LoCurto Dep. 208:12-15.

## DISCUSSION

I.  Summary Judgment

Summary judgment may be granted only if the court concludes that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  A dispute is genuine when there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those which may affect the outcome of a case. *Id.*

The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing to particulars in the record. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317, 322-25; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). The movant may satisfy his burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(B). If the nonmoving party has the burden of proof on specific issues, the movant may also satisfy his own initial burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex*, 477 U.S. at 322-23; *PepsiCo Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). In deciding the motion, the court views the record in the light most favorable to the nonmoving party. *Hunter v. Bryant*, 502 U.S. 224, 233 (1991); *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 61 (2d Cir. 2002).

If the moving party meets his initial burden, the burden then shifts to the opposing party to establish a genuine issue of fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). The opposing party may not avoid summary judgment by relying solely on conclusory allegations or denials that are unsupported by factual data. Fed. R. Civ. P. 56(c); *Amaker v. Foley*, 274 F.3d 677, 680-81 (2d Cir. 2001). Instead, the opposing party must set forth "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). A nonmoving party demonstrates a "genuine issue for trial" by presenting evidence about a material fact, such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248.

II. The FLSA Exemption

The parties' legal dispute is whether AT&T was exempted from paying the RAEs overtime pursuant to 29 C.F.R. § 541.200(a).  *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) (holding that whether "particular activities exclude[] [an employee] from the overtime benefits of the FLSA is a question of law").  Pursuant to this exemption, an exempt employee is one (1) "[whose compensation is] not less than $455 per week"; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).

Two "special" principles apply to this exemption.  *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010).  First, "[b]ecause the FLSA is a remedial law, [the Court] must narrowly construe its exemptions."  *Id.*  Second, the employer invoking the exemption bears the burden of proving that its employees fall within the exemption.  *Id.*

Here, the Court concludes that LoCurto is not an employee whose "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." Therefore, the third prong of the exemption cannot be satisfied.  The FLSA regulations contain guidance for evaluating an employee's discretion and independent judgment.  The regulations state that the exemption must be examined "in the light of all the facts involved in the particular employment situation in which the question arises," 29 C.F.R. § 541.202(b), and that "[i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," *id.* § 541.202(a).  Moreover, the regulations state that "[t]he

13

term 'matters of significance' refers to the level of importance or consequence of the work performed," *id.*, and that "[the] exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c). Finally, the regulation lists ten non-exclusive factors to consider when determining whether an employee satisfies the discretion and independent-judgment prong of the exemption:

1. Whether "the employee has authority to formulate, affect, interpret, or implement management policies or operating practices";
2. Whether "the employee carries out major assignments in conducting the operations of the business";
3. Whether "the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business";
4. Whether "the employee has authority to commit the employer in matters that have significant financial impact";
5. Whether "the employee has authority to waive or deviate from established policies and procedures without prior approval";
6. Whether "the employee has authority to negotiate and bind the company on significant matters";
7. Whether "the employee provides consultation or expert advice to management";
8. Whether "the employee is involved in planning long- or short-term business objectives";
9. Whether "the employee investigates and resolves matters of significance on behalf of management"; and
10. Whether "the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

29 C.F.R. § 541.202(b);[7] *see also Pippins v. KPMG, LLP*, 759 F.3d 235, 240-41 (2d Cir. 2014) (analyzing and adopting, in part, the regulation's ten-factor list); 29 C.F.R. § 541.202(e)

---

[7] *See also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,144 (Apr. 23, 2004) ("Other factors which federal courts have found relevant in assessing whether an employee exercises discretion and independent judgment include the employee's freedom from direct supervision, personnel responsibilities, troubleshooting or problem-solving activities on behalf of management, use of personalized communication techniques, authority to handle atypical or unusual situations, authority to set budgets, responsibility for assessing customer needs, primary contact to public or customers on behalf of the employer, the duty to anticipate competitive products or services and distinguish them from

(outlining jobs that do not require the employee to exercise discretion and independent judgment).

### III. Application to LoCurto's FLSA Claim

The Court finds that AT&T is not exempt from the payment of overtime wages to LoCurto because AT&T has not shown that LoCurto's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. To the extent that LoCurto exercises a modicum of discretion—such as her decision on how to allocate her $100 monthly budget for awarding pizza and cake to door staff—such decisions are insignificant. AT&T's arguments to the contrary are without merit. AT&T contends, in effect, that it has met its burden because LoCurto exercises discretion with respect to scheduling, teaching, marketing, and planning long- and short-term business objectives. *See* Def. Mem. Law in Supp. of Mot. Summ. J. at 17 (listing RAEs purported areas of discretion), ECF No. 145; Def. Opp. to Pl. Mot. for Summ. J. ("Def. Opp.") at 18 (same), ECF No. 155. But, AT&T's claims are not supported by the record because the undisputed facts show that AT&T has circumscribed LoCurto's exercise of judgment in these areas.

Regarding scheduling, although LoCurto is free to arrange aspects of her schedule, her discretion is limited by the requirements that she (1) visit each of her doors a minimum of twice per month, *see* Pl. 56.1 ¶ 17; (2) record her movements on GPS, *id.* ¶ 40; and (3) record the details of each visit, *id.* Moreover, AT&T teaches LoCurto how to prioritize which doors she should visit, and occasionally mandates that LoCurto visit all of her doors as soon as possible. *See* LoCurto Dep. 62:2-7. Given these layers of control, the Court finds that AT&T has not

---

competitor's products or services, advertising or promotion work, and coordination of departments, requirements, or other activities for or on behalf of employer or employer's clients or customers.").

demonstrated that LoCurto exercises independent judgment with respect to her scheduling.  *Cf. Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 3-4 (1st Cir. 1997) (finding independent judgment when the "marketing representatives" prioritized between contacting 500-600 sellers and were also responsible for culling from and adding to their seller list).

Similarly, the discretion exercised by LoCurto while teaching salespeople and deploying marketing is de minimis because she is "applying well-established techniques, procedures [and] specific standards,"  29 C.F.R. § 541.202(e), as demonstrated by the facts that AT&T trains LoCurto for several hours per week, LoCurto Dep. 80:5-81:5; observes her in regular "ridealongs," *id*. 232:11-24; and sets "directives" for her to teach, *id.* 35:22.  Indeed, as the Eighth Circuit held for employees engaged in similar brand advocacy, when employees "simply follow set scripts and well-established techniques, procedures or specific standards described in manuals or other sources," their "conduct" "is insufficient to fall within the administrative exemption."  *Beauford v. ActionLink, LLC*, 781 F.3d 396, 404 (8th Cir. 2015); *see also* Aff. Tony Bryant ¶ 7 ("I was mandated by my supervisor to ensure that all [AT&T] marketing and promotional materials were set up in the retail stores in my territory in strict compliance with the instructions contained in the 'Planogram' . . . .").

Finally, the Court rejects AT&T's contention that LoCurto is involved in planning long- and short-term business objectives.  LoCurto's development of business plans and other goals is not tantamount to planning business objectives because AT&T first dictates to LoCurto detailed targets and goals that determine her compensation.  *See* Pl. 56.1 ¶¶ 30-31.  This conclusion is reinforced by the cursory nature of these tasks, and the fact that LoCurto has never discussed her business plans with anyone at AT&T.  *See, e.g.*, LoCurto Dep. 201:2-8 (creating "business plans" consist of "pulling numbers from one place to another and copy[ing] and pasting a lot");

*id.* 208:12-15 ("[Q: Has] anyone ever discussed with you your business plans? [LoCurto Answers:] No, they have not."); *see also* 29 C.F.R. § 541.202(e) ("An employee who simply tabulates data is not exempt, even if labeled as a 'statistician.'").

In sum, AT&T cannot meet its burden of showing that the exemption applies to LoCurto because it has not raised a genuine issue of material fact as to whether LoCurto exercises independent judgment with respect to "matters of significance." 29 C.F.R. § 541.202(a).

IV.     Application to Opt-In Plaintiffs

By Memorandum and Order dated August 18, 2014, the Court conditionally certified a collective action under 29 U.S.C. § 216(b). Mem. and Order, ECF No. 111. Subsequently, twenty-two RAEs opted into this action. *See* ECF Nos. 100, 113-133. AT&T argues that summary judgment for the opt-in Plaintiffs is premature because class-wide discovery has not yet occurred. Def. Opp. at 25. The parties did not fully brief the issue of whether more discovery is needed. Accordingly, by **October 15, 2016**, the parties shall submit a joint letter indicating whether further discovery is necessary or, if the parties disagree, proposing a briefing schedule on that issue. Decision on Plaintiff's motion for summary judgment as to opt-in Plaintiffs' claims is, therefore, held in abeyance.

## CONCLUSION

Plaintiff's motion for partial summary judgment is GRANTED with respect to LoCurto's FLSA claim, and held in abeyance with respect to the opt-in Plaintiffs. Defendant's motion for summary judgment is DENIED. Defendant's request for oral argument is DENIED as moot. The Clerk of Court is directed to terminate the motions at ECF Nos. 141, 142, and 154.

SO ORDERED.

Dated: September 30, 2016
New York, New York

_____
ANALISA TORRES
United States District Judge

17