PATRICK W. SHEA
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
patrickshea@paulhastings.com
(212) 318-6000 (telephone)
(212) 319-4090 (facsimile)

*Attorneys for Defendant*
AT&T Mobility Services LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LISA LO CURTO, *on behalf of herself and all others similarly situated*,<br><br>    Plaintiff,<br><br>  -against-<br><br>AT&T MOBILITY SERVICES LLC,<br><br>    Defendant. | 13 Civ. 04303 (AT)(KNF) |

## DEFENDANT AT&T MOBILITY SERVICES LLC'S MOTION FOR DECERTIFICATION

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  RELEVANT PROCEDURAL HISTORY ........................................................... 2

III. THE CLASS SHOULD BE DECERTIFIED BECAUSE PLAINTIFFS HAVE NOT SHOWN THEY ARE SIMILARLY SITUATED TO EACH OTHER. ................ 4

    A.   Plaintiffs Must Prove That They Are Similarly Situated and the Court Must Decertify the Class If Plaintiffs Cannot Meet This Burden......................... 4

    B.   There is Great Disparity in the Pertinent Facts and Employment Settings of the Individual Plaintiffs Warranting Decertification. ........................................ 6

        1.   The Opt-In Plaintiffs are not Similarly Situated Because Their Day-To-Day Job Duties Varied Significantly Under the Relevant Statutory Exemption Criteria. ................................................................... 7

        2.   Decertification Is Appropriate Because Plaintiffs Had Varying Accounts Regarding On Call Time........................................................... 18

    C.   Decertification is Appropriate Because AT&T's Defenses Must Be Individually Applied to Each Collective Action Member. ................................. 21

    D.   Fairness and Procedural Considerations Require Decertification. ..................... 24

IV.  CONCLUSION.................................................................................................... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aquilino v. Home Depot, U.S.A., Inc.*,
  No. CIV. A. 04-04100 (PGS), 2011 WL 564039 (D.N.J. Feb. 15, 2011) ....................8, 23, 24

*Armour & Co. v. Wantock*,
  323 U.S. 126 (1944)..........................................................................................................18

*Bayles v. Am. Med. Response of Colo., Inc.*,
  950 F. Supp. 1053 (D. Colo. 1996)...................................................................................19

*BNSF Ry. Co. v. Tyrrell*,
  137 S. Ct. 1549 (2017).................................................................................................25, 26

*Bradford v. CVS Pharmacy, Inc.*,
  308 F.R.D. 696 (N.D. Ga. 2015).......................................................................................13

*Gardner v. W. Beef Props., Inc.*,
  No. 07-CV-2345 (NGG)(JMA), 2013 WL 1629299 (E.D.N.Y. Mar. 25, 2013),
  *report and recommendation adopted sub nom. White v. W. Beef Props., Inc.*,
  No. 07 CV 2345 (RJD)(JMA), 2013 WL 1632657 (E.D.N.Y. Apr. 16, 2013) ........................7

*Green v. Harbor Freight Tools USA, Inc.*,
  888 F. Supp. 2d 1088 (D. Kan. 2012).........................................................................11, 25

*Harper v. Gov't Emps. Ins. Co.*,
  No. CV 09-2254(LDW)(GRB), 2015 WL 9673810 (E.D.N.Y. Nov. 16, 2015),
  *report and recommendation adopted*, No. 2:09-CV-02254(LDW)(GRB), 2016
  WL 98516 (E.D.N.Y. Jan. 6, 2016) .............................................................................11, 22

*Hinterberger v. Catholic Health Sys.*,
  299 F.R.D. 22 (W.D.N.Y. 2014)..........................................................................................6

*Hoffman-La Roche Inc. v. Sperling*,
  493 U.S. 165 (1989)............................................................................................................4

*Hundt v. DirectSat USA, LLC*,
  294 F.R.D. 101 (N.D. Ill. 2013).....................................................................8, 21, 22, 25

*Johnson v. Big Lots Stores, Inc.*,
  561 F. Supp. 2d 567 (E.D. La. 2008) ..............................................................................5, 8

*Knott v. Dollar Tree Stores, Inc.*,
  897 F. Supp. 2d 1230 (N.D. Ala. 2012)........................................................................22, 24

*Llolla v. Karen Gardens Apt. Corp.*,
   No. 12-CV-1356 (MKB)(JO), 2014 U.S. Dist. LEXIS 44884 (E.D.N.Y. Mar.
   10, 2014) ................................................................................................................19

*Miner v. B&C Equip., Inc.*,
   No. 93-35401, 1994 WL 198692 (9th Cir. 1994) ..............................................19

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010).............................................................................5, 6

*Ramirez v. Yosemite Water Co. Inc.*,
   20 Cal. 4th 785 (Cal. 1999)...............................................................................23

*Reimer v. Champion Healthcare Corp.*,
   258 F.3d 720 (8th Cir. 2001) .......................................................................18, 19

*Reyes v. Texas Ezpawn, L.P.*,
   No. CIV. A. V-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007).............8, 11, 24

*Scott v. Chipotle Mexican Grill, Inc.*,
   No. 12-CV-8333 (ALC)(SN), 2017 WL 1287512 (S.D.N.Y. Mar. 29, 2017).........22

*Singh v. City of New York*,
   524 F.3d 361 (2d Cir. 2008)...............................................................................18

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)...............................................................................18, 19, 20

*Stevens v. HMSHost Corp.*,
   No. 10 CV 3571(ILG)(VVP), 2014 WL 4261410 (E.D.N.Y. Aug. 27, 2014) ...........6, 24

*Williamson v. Cook Composites & Polymers Co.*,
   No. CV 08-8069 AHM, 2009 WL 4730887 (C.D. Cal. Dec. 7, 2009) ...................23

*Zavala v. Wal Mart Stores Inc.*,
   691 F.3d 527 (3d Cir. 2012)................................................................................6

*Zhong v. Zijun Mo*,
   No. 10-CV-0806 (RER), 2012 U.S. Dist. LEXIS 99966 (E.D.N.Y. July 18,
   2012) ......................................................................................................................18

*Zivali v. AT&T Mobility, LLC*,
   784 F. Supp. 2d 456 (S.D.N.Y. 2011)...........................................................6, 21

**Statutes**

29 U.S.C. § 216(b) ........................................................................................................4

**Other Authorities**

29 C.F.R. § 541.200 ...................................................................................................................7, 9

## I.      INTRODUCTION

The central issue presented by Defendant AT&T Mobility Services LLC's (AT&T")
motion for decertification is simple:  whether Plaintiff Lisa LoCurto can meet the burden of
demonstrating that all fifteen (15) National Retail Account Executives ("NRAEs") and Retail
Account Executives ("RAEs") who joined and remain in this action have similar enough job
duties to allow the Court to determine that all of these individuals are exempt or non-exempt
based solely on representative evidence.  Plaintiff cannot meet this burden.

Discovery reflects that the individuals who joined this action are a diverse group who
performed a wide range of different job duties, over different periods of their respective work
weeks, with different levels of responsibility and, therefore, with varying amounts of discretion
and judgment.  In other words, their job duties vary from individual to individual such that it is
not possible to make a class-wide exemption determination using generalized proof.  These
differences are apparent from the opt-in plaintiffs' testimony regarding the four areas that the
Court highlighted when it denied AT&T and granted LoCurto summary judgment on her claims:
scheduling, training, marketing, and setting long- and short-term business objectives, *see* Dkt.
No. 173.  For example:

- Scheduling:  Opt-In Plaintiff Eugene Cascioli testified that his schedule was
  dictated by his manager, while Opt-In Plaintiff John Walker testified that he did
  not recall his manager setting his schedule and that he visited his stores as he saw
  fit.

- Training:  Opt-In Plaintiff Angela Runnels denied customizing trainings, while
  Opt-In Plaintiff Toni Bryant testified that she created her own training materials.

- Marketing: Opt-In Plaintiff Erick Henton testified that his only merchandising responsibility was to make sure his assigned locations followed a corporate planogram, while Opt-In Plaintiff Aldo Martino testified that he used his merchandising expertise to make suggestions to improve merchandising at Radio Shack.

- Setting long- and short-term business objectives: Opt-In Plaintiff Toni Bryant admitted to drafting business plans that included action plans and opportunities for improvement that she presented to management, while Opt-In Plaintiff Marla Yowell testified that she did not create business plans.

Because of this wide variation in job duties, whether LoCurto (or any other opt-in plaintiff) is misclassified under the Fair Labor Standards Act ("FLSA") based on *her* actual job duties is not probative of whether *other* opt-in plaintiffs are properly classified as exempt. An individual, employee-by-employee analysis of the actual job duties of each opt-in plaintiff against the relevant statutory exemption criteria through fifteen individual trials is the only way to assess their proper exempt/non-exempt status. Cases may not proceed on a collective basis where individual trials are required; instead, those opt-in plaintiffs who wish to pursue such claims must bring an individual action in the jurisdiction where he or she worked. Accordingly, for all of the reasons discussed in detail below, the Court should grant AT&T's motion to decertify the FLSA collective action.

## II.    RELEVANT PROCEDURAL HISTORY

LoCurto filed the Complaint in this action on June 20, 2013 alleging that AT&T wrongfully classified her as exempt from the overtime pay requirements of the FLSA and New York and New Jersey wage and hour laws. LoCurto claims her actual job duties are those of

2

"non-exempt" employees, thereby entitling her to overtime pay for all hours worked in excess of forty (40) hours per week. (*See* Compl., ¶¶ 43, 53.)  In addition to her individual claim, LoCurto brought an "opt-in" collective action under the FLSA, (*see id.,* ¶¶ 58-60), as well as a purported class action under Fed. R. Civ. P. 23 on her New York and New Jersey wage and hour claims. (*See id.*, ¶¶ 61-78.)

On November 13, 2013, LoCurto moved the Court to conditionally certify a collective action under the FLSA.  (*See* Dkt. Nos. 32-36.)  On August 18, 2014, the Court granted LoCurto's motion for conditional class certification under the FLSA and provided for a 60-day opt-in period.  (*See* Dkt. Nos. 111, 112.)  In granting conditional certification, the Court explicitly relied on the fact that LoCurto's burden at the first conditional certification stage was "minimal," noting that "the second step allows for a full review of the factual record developed during discovery to determine whether opt-in plaintiffs are actually 'similarly situated' to the named plaintiffs." (Dkt. No. 111, at 12.)  The Court explained: "To the extent that RAEs who work primarily with local dealers were subjected to overtime policies different from RAEs who work with national retailers, that issue can be more appropriately evaluated following discovery, when, if warranted, the Court can decertify the class." (*Id.*)

During the opt-in period, Plaintiff sent individualized notice to approximately 347 NRAEs and RAEs, informing them of their right to join the FLSA collective action.  Out of the 347 RAEs and NRAEs who received individualized notice, only nineteen (19) of them joined the FLSA collective action (in addition to LoCurto).  Four of the 19 Opt-In Plaintiffs have

3

subsequently withdrawn their consent – leaving, to date, 15 Opt-In Plaintiffs and LoCurto as part of the FLSA collective action.[1]

On October 20, 2015, AT&T and LoCurto moved for summary judgment on her claims. (Dkt. Nos. 141-142, 144-146.)  The Court denied AT&T's motion and granted LoCurto's on September 30, 2016, finding that LoCurto did not exercise sufficient discretion and independent judgment to satisfy prong three of the administrative exemption analysis based on her testimony that she performed her job in a uniform and rote manner.  (*See* Order at 15.)

Discovery has since been taken from the Opt-In Plaintiffs including, in nearly all instances, discovery by deposition.  As set forth below, discovery has shown the actual job duties of Plaintiffs vary from individual to individual, making it impossible to apply the one-size-fits-all, class-wide exemption analysis sought by LoCurto.

## III.   THE CLASS SHOULD BE DECERTIFIED BECAUSE PLAINTIFFS HAVE NOT SHOWN THEY ARE SIMILARLY SITUATED TO EACH OTHER.

### A.   Plaintiffs Must Prove That They Are Similarly Situated and the Court Must Decertify the Class If Plaintiffs Cannot Meet This Burden.

The collective action procedure under the Fair Labor Standards Act ("FLSA") exists to facilitate the "efficient resolution ... of [material] common issues of law and fact."  *Hoffman-La Roche Inc. v. Sperling,* 493 U.S. 165, 170 (1989).  Accordingly, the FLSA only allows an employee to pursue a collective action "for other employees *similarly situated*."  29 U.S.C. §

---

[1]     The remaining opt-ins are:  Reysan Almonte ("Almonte"), Jasmine Briscoe ("Briscoe"), Toni Bryant ("Bryant"), Eugene Cascioli ("Cascioli"), Dustin Daily ("Daily"), Cheryl Foster ("Foster"), Erick Henton ("Henton"), Devin Lombard ("Lombard"), Aldo Martino ("Martino"), Holly Smith ("Smith"), Anthony Renzi ("Renzi"), Angela Runnels ("Runnels"), Holly Smith ("Smith"), John Walker ("Walker"), Cortland Ward ("Ward"), and Marla Yowell ("Yowell") (collectively, "Opt-In Plaintiffs" and, together with Plaintiff, "Plaintiffs").  Of these fifteen, AT&T has moved for summary judgment on Renzi's claims because he signed a severance agreement waiving his right to participate in a collective action against AT&T, and has also moved to dismiss the claims of Almonte for failure to prosecute.

216(b) (emphasis added).   In other words, collective treatment may be appropriate when a sample of opt-in plaintiffs who are similarly situated can testify and provide representative proof about the uniform day-to-day duties and responsibilities of a larger group of employees allegedly misclassified by their employer.   In a case where there is homogeneity among class members, the fact-finder can determine, based on the testimony of the representative employees, whether the group as a whole is entitled to overtime compensation, without hearing from each member of the collective class.   If, however, the day-to-day work duties of those in the putative class are materially *different* in ways relevant to the exemption question, the "collective action" process is unsustainable.   *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 573 (E.D. La. 2008) (decertifying a collective action and noting "[t]he more dissimilar plaintiffs' job experiences are from one another and the more individuated an employers' defenses are, the less appropriate the matter is for collective treatment.")

Courts within the Second Circuit apply a two-stage process to determining whether a case is appropriate for treatment as a collective action under the FLSA.   *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).   The first stage is more lenient and "involves the court making an initial determination to send notice to potential opt-in plaintiffs ***who may be*** "similarly situated" to the named plaintiffs." *Id.* (emphasis added).   Plaintiffs can satisfy "the low standard of proof" at this stage by making "a ***modest*** factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Id.* (emphasis added) (internal citations omitted).   This Court previously determined Plaintiff met this minimal burden when it granted Plaintiff's motion for conditional class certification. (*See* Dkt. No. 111.)

This case is now at the second stage, where the district court must decide, with the advantage of discovery and a fuller record, "whether a so-called 'collective action' may go

forward." *Myers*, 624 F.3d at 555.  This second stage involves a more "stringent standard of proof." *See Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011) (internal citation omitted).  Plaintiffs cannot merely point to blanket classification decisions or uniform corporate policies to satisfy their burden at this stage. *See Stevens v. HMSHost Corp.*, No. 10 CV 3571(ILG)(VVP), 2014 WL 4261410, at *5 (E.D.N.Y. Aug. 27, 2014).  Rather, Plaintiffs must prove by a preponderance of the evidence that "the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers*, 624 F.3d at 555; *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012) (applying a preponderance of the evidence standard and holding that workers were not similarly situated for certification of a collective action); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 55 (W.D.N.Y. 2014) (same).  If Plaintiffs fail to meet their burden of proving that they are similarly situated, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims." *Zivali*, 784 F. Supp. 2d at 460; *Myers*, 624 F.3d at 555.

Courts look to three factors when evaluating whether members of a class are similarly situated at this stage: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]." *Zivali*, 784 F. Supp. 2d at 460.  As discussed in detail below, these factors weigh unequivocally in favor of decertification.

### B.   There is Great Disparity in the Pertinent Facts and Employment Settings of the Individual Plaintiffs Warranting Decertification.

When assessing whether opt-in plaintiffs are similarly situated, courts look to the nature of the claims asserted.  Here, Plaintiffs allege that they worked in excess of forty hours per week, including time that they were on call, performing activities that are non-exempt, and that AT&T

did not pay them overtime because it misclassified them as exempt employees.  AT&T's liability

on those claims turns on facts that differ greatly between the Plaintiffs.  The material differences

in the Plaintiffs' testimony in areas fundamental to the Plaintiffs' claims makes proceeding with

this case as a collective action unsustainable.

> 1.   The Opt-In Plaintiffs are not Similarly Situated Because Their Day-To-Day Job Duties Varied Significantly Under the Relevant Statutory Exemption Criteria.

In determining if the Opt-In Plaintiffs are similarly situated, the Court must consider the

job duties relevant to an exemption analysis.  *See Gardner v. W. Beef Props., Inc.*, No. 07-CV-

2345 (NGG)(JMA), 2013 WL 1629299, at *5 (E.D.N.Y. Mar. 25, 2013), *report and*

*recommendation adopted sub nom. White v. W. Beef Props., Inc.*, No. 07 CV 2345 (RJD)(JMA),

2013 WL 1632657 (E.D.N.Y. Apr. 16, 2013) ("In collective actions involving misclassification

claims . . . courts look to whether the opt-ins have similar duties.")  Under the FLSA, an

employee is exempt from overtime pursuant to the administrative exemption (the exemption

applicable here) where she: 1) is compensated on a salary basis not less than $455 per week;[2] 2)

her primary duty is the performance of office or non-manual work directly related to the

management or general business operations of the employer or the employer's customers; and 3)

her primary duty includes the exercise of discretion and independent judgment with respect to

matters of significance.  29 C.F.R. § 541.200(a).  The regulations provide a lengthy, non-

---

[2]   The salary requirement changed as of December 1, 2016, but this change was enjoined and has not gone into effect.  *See* 29 C.F.R. § 541.200 (defining "employee employed in a bona fide administrative capacity" to include individuals "[c]ompensated on a salary or fee basis pursuant to § 541.600 at a rate per week of not less than the 40th percentile of weekly earnings of full-time non-hourly workers in the lowest-wage Census Region (or 84 percent of that amount per week, if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities."  However, all of the Opt-In Plaintiffs except for one (Lombard) separated from AT&T before December 2016.

exhaustive list of factors to consider in determining exempt status.  Thus, analysis of whether the

requirements of the administrative exemption are met is a necessarily fact-intensive inquiry,

which in this case would require this Court to make detailed individual fact-finding on a

plaintiff-by-plaintiff or job-by-job basis.  *See Johnson*, 561 F. Supp. 2d at 575 (noting that

"whether an employee's job duties satisfy the regulatory criteria is a highly fact-intensive inquiry

that must be made on a case-by-case basis in light of the totality of the circumstances").

Recognizing the factually-intensive nature of this inquiry, courts regularly decertify

collective actions where the day-to-day duties of a group of employees vary significantly,

because such cases require individual analysis of each plaintiff's job responsibilities.  *See e.g.,*

*Reyes v. Texas Ezpawn, L.P.*, No. CIV. A. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8,

2007) (granting motion for decertification; "Although the Court does not express an opinion as to

the merits of the Plaintiffs' misclassification claims, the relevant statutory exemption criteria will

require an individual, fact-specific analysis of each ASM's job responsibilities."); *Hundt v.*

*DirectSat USA, LLC*, 294 F.R.D. 101, 105 (N.D. Ill. 2013) (decertifying collective action where

"evidence of variations in the plaintiffs' job duties will require individualized inquiries into

whether each plaintiff was exempt, and therefore this factor favors decertification of this

collective proceeding"); *Aquilino v. Home Depot, U.S.A., Inc.*, No. CIV. A. 04-04100 (PGS),

2011 WL 564039, at *7 (D.N.J. Feb. 15, 2011) (decertifying collective action; "Because the

underlying issue is whether Home Depot properly classified MASMs as exempt from the FLSA,

deciding whether members of the MASM collective action are similarly situated requires an

individual, fact-specific analysis of each employee's job responsibilities under the relevant

statutory exemption criteria." (internal quotation and citation omitted)).

This is precisely a case where individual variations in job duties that are relevant to an exemption determination make collective action treatment inappropriate. Here, the Court will have to make the following factual determinations to decide whether each Opt-In Plaintiff satisfies prong three of the exemption analysis: (1) an analysis of the employee's primary duties; (2) a more complex analysis of whether the employee exercises discretion and independent judgment; and (3) a determination of whether the discretion and independent judgment is exercised "with respect to matters of significance." *Id.* § 541.200(a). When ruling on LoCurto's motion for summary judgment, the Court considered several facts dispositive of the issue of whether the administrative exemption applied. Specifically, the Court highlighted the following areas in the Order: scheduling, teaching, marketing, and setting long- and short-term business objectives. (*See* Order at 15.) While LoCurto's testimony in these areas persuaded the Court that the administrative exemption did not apply to her,[3] discovery has revealed that LoCurto's experience is not representative of other Opt-In Plaintiffs. Indeed, the Opt-In Plaintiffs told widely varying accounts regarding their overall duties, their level of supervision, and their authority in the areas on which the Court focused. These variations, which are set forth in detail below, make it impossible for the Court to make a collective exemption determination without considering each individual separately, therefore warranting decertification.

a.     *Varying Accounts Regarding Authority to Schedule*

The Court held LoCurto did not exercise sufficient independent discretion and judgment in the area of scheduling because her discretion was limited in various ways, including AT&T teaching her how to prioritize visits. (*See* Order at 17.) However, LoCurto's alleged experience is not representative of all of the Opt-In Plaintiffs. Indeed, Martino specifically testified that he

---

[3]     To be clear, AT&T respectfully disagrees with the decision and reserves its rights to challenge it on appeal.

9

made the determination of when to visit stores by choosing to visit stores with equal frequency

(as opposed to visiting a "sustainer" more frequently than a "drainer," or vice versa).  (Martino

Depo., 82:12-83:11.)[4]  The remaining Opt-In Plaintiffs generally told widely varying accounts

regarding their authority to schedule.  For example, Cascioli testified that management told him

how to schedule store visits.  (Cascioli Depo., 87:9-25.)  On the other hand, Walker did not recall

any similar oversight and instead, he "visited his stores according to how [he] felt [he] needed

to."  (Walker Depo., 45:3-19.)  Likewise, Foster set her own schedule and deviated from it all the

time.  (Foster Depo., 36:14-25.)

   The Opt-In Plaintiffs told varying accounts regarding their level of supervision generally.

As explained by Erick Henton, a former RAE:

> Some of the details [regarding how he communicated his schedule]
> changed depending on the manager. . . .Some micromanage, some
> don't.  Some [would] say you have to go to seven locations, not
> five.  Some said, you know, you have to send certain reports
> throughout the day.  Some said you had to send it after being in the
> field.  The details changed depending on the manager.

(Henton Depo., 72:15-72:24.)  Similarly, Cortland Ward recalled the level of supervision he

received varying by supervisor.  Ward worked under seven different managers who exercised

varying levels of control over his day-to-day activities.  According to his testimony, his

managers' styles ranged from a "micro-manager" who would tell Ward "what times to be at [his]

locations . . . which locations to be at. . . [h]ow long [he] need[ed] to spend at that location and

when [he could] leave that location," to hands-off managers who Ward would just update on

"major events."  (*See* Ward Depo., 43:23-46:20; 48:6-51:21; 57:3-58:12; *see also* Henton Depo.,

53:10-13;73:4-74:6 (one of his managers was a  micro-manager who "decided every single thing

---

[4] All transcripts of deposition testimony cited in this motion are attached as exhibits to the
Affirmation of Patrick W. Shea, filed concurrently herewith, and are cited throughout this motion
in the following format: "[Deponent's Last Name] Depo., [Page]:[Line(s)]."

no matter what" and another did not micro-manage and "gave [him] the freedom to go to doors

unless he needed to get involved").)

Such variation requires decertification.  In *Harper v. Gov't Emps. Ins. Co.*, the court

found that "the varying accounts of the degree to which various supervisors oversaw the work of

TCRs, were involved with TCRs' negotiations, and [controlled] their interaction with ClaimIQ

raise[ed] questions about whether plaintiffs are 'similarly situated' in these relevant respects"

and weigh in favor of decertification.  No. CV 09-2254(LDW)(GRB), 2015 WL 9673810, at *4

(E.D.N.Y. Nov. 16, 2015), *report and recommendation adopted*, No. 2:09-CV-

02254(LDW)(GRB), 2016 WL 98516 (E.D.N.Y. Jan. 6, 2016).  Multiple other courts have

reached the same conclusion.  *See Reyes*, 2007 WL 101808, at *3 (decertifying collective action;

"The extent of an ASM's discretion and authority largely depended on the store manager in

charge of that particular store. The management style of individual store managers often dictated

the nature of the duties an ASM was required to perform."); *Green v. Harbor Freight Tools USA,

Inc.*, 888 F. Supp. 2d 1088, 1101–02 (D. Kan. 2012) (because the level of control and discretion

are "crucial factors to be considered in an FLSA exemption analysis," the "lack of uniformity"

among the opt-ins regarding the level of supervision weighs against the action continuing as a

collective one).

b.      *Varying Accounts Regarding Training*

This Court also held that LoCurto did not exercise sufficient discretion and judgment

with regards to training, relying on her testimony that she provided a standard training to all of

her retailers, regardless of the needs of the retailer, and that the topics she presented during her

trainings were largely dictated by management.  (Order at 7, 16.)  Although LoCurto described

her job as relying on scripts to provide training in a uniform and rote manner which suggested

that she lacked sufficient discretion and independent judgment, (LoCurto Depo., 33:20-34:23),

11

the Opt-In Plaintiffs reported exercising varying levels of discretion and independent judgment in this regard.

Some Opt-In Plaintiffs described their training duties in a similar fashion to LoCurto. For example, Runnels, Yowell, and Cascioli admitted they trained associates at their locations, but denied customizing those trainings (or creating their own training materials).  (Runnels Depo., 39:1-7; Yowell Depo., 59:9-60:4; Cascioli Depo., 63:17-64:5; 65:15-23; 66:8-16.)  In contrast, Bryant, Walker, and Briscoe admitted to customizing trainings by tailoring their training to their accounts, creating their own training materials, and using their judgment to determine what topics to present.  (*See* Bryant Depo., 49:5-51:23 (was not "required to use a certain training material" and, therefore, used a combination of AT&T-provided trainings and her own trainings, such as questions and answers; she determined what trainings to deliver based on her own personal observations and getting to know the employee); Walker Depo., 51:4-53:4; 67:21-68:19 (created a monthly newsletter regarding certain features of various products, which he provided to sales associates as a guide and also provided to other NRAEs, who would further customize them for their own particular accounts; he decided what trainings to provide by analyzing sales metrics and store performance, and observing individual employees); Briscoe Depo., 60:20-61:14; 79:13-80:3; 80:22-81:11 (developed games to provide information to associates in a fun fashion; created "one-sheeters" that compiled answers to frequent questions, listed advantages of using AT&T products, and described certain promotions; and also just had conversations with employees about being a good salesperson).)

Other Opt-In Plaintiffs also reported customizing trainings, but to a lesser degree than Walker, Briscoe, or Bryant.  (*See* Foster Depo., 45:18-46:19 (she sometimes varied the content of training depending on the dealer, and she provided different, informal trainings to one of her

dealers that did not exclusively sell AT&T products and already had a lot of knowledge);
Lombard Depo., 25:23-27:5 (he would select trainings based on his personal observations of
employees but his training was consistent between all of his locations); Martino Depo., 47:14-
48:11; 102:9-103:7 (he determined what trainings to give based on his analysis of sales reports,
and he trained two associates by reminding them that they had to work towards goals); Henton
Depo., 80:4-10; 140:24-143:2 (he would select appropriate trainings by watching employee sales
performance and analyzing metrics and would provide customized examples to employees, but
did not customize training materials); Smith Depo., 47:19-48:13 (she "had to kind of tailor [her]
training to whatever associate [she was] working with and their knowledge"); Ward Depo.,
87:22-90:19 (he mostly used corporate training materials, but also sometimes created his own
materials and would tailor the content of the training for particular locations).)

The great disparity between the Opt-In Plaintiffs experiences with regard to conducting
trainings and preparing training materials weighs in favor of decertification.  *See Bradford v.*
*CVS Pharmacy, Inc.*, 308 F.R.D. 696, 699 (N.D. Ga. 2015) (decertifying collective action where
some opt-in plaintiffs "exercised very little discretion in training other employees," while
another "created his own training materials, and held weekly training calls for loss prevention").

c.   *Varying Accounts Regarding Marketing Duties*

This Court also held that LoCurto did not exercise sufficient discretion and judgment
with regard to marketing, reasoning that any discretion exercised regarding sales contests did not
concern matters of significance.  (*See* Order at 15.)  Unlike LoCurto, several Opt-In Plaintiffs
described their NRAE/RAE role as instrumental to increasing sales at their locations.  (*See e.g.,*
Lombard Depo., 17:18-18:8 (he generated action plans to increase sales, his accounts typically
followed his action plans, and his plans led to increased sales); Bryant Depo., 36:22-37:6 (sales
at her locations increased while she was assigned to them "because of the work that she did with

13

them").)  Moreover, the Opt-In Plaintiffs reported varying degrees of discretion exercised with

regarding to marketing.  For example, Martino reported using his merchandising expertise to

make suggestions to Radio Shack managers to improve merchandising of the wireless section,

while other NRAEs and RAEs claimed they closely followed corporate-provided planograms.

(*Compare* Martino Depo., 65:15-66:2 *with* Henton Depo., 114:22-115:16 (his only

merchandising responsibility was to make sure his locations followed the relevant planogram);

*and with* Briscoe Depo., 96:6-16 (while she followed the planogram for phone displays, she

came up with her own designs for tables because "there wasn't . . . like a real guideline to it.").)

Depositions also revealed differences in the Opt-In Plaintiffs' authority to create contests

or promotions.  While Smith and Martino testified that they devised various promotions on their

own, other Opt-In Plaintiffs reported collaborating with their managers, retail locations, or other

RAEs to create contests and promotions.  (*Compare* Smith Depo., 54:5-55:18; 69:8-70:11 (she

created the "Dive into Summer" contest where she would reward the highest seller and also

found other creative ways to promote AT&T products, such as creating notecards with gold

stars) *and* Martino Depo., 70:13-71:22; 86:2-88:22 (he created the "Benjamin Franklin Club,"

where he would offer a prize to associates who exceeded $100 in sales) *with* Briscoe Depo.,

94:18-95:20 (she usually came up with promotions in collaboration with her managers) *and with*

Foster Depo., 57:22-58:9 (she devised promotions with another RAE who had similar stores in

another location).)  In addition, Lombard, Runnels and Walker testified that they only ran

promotions at the direction of their supervisors or AT&T.  (*See* Lombard Depo., 67:3-15 (he ran

promotions at the direction of his supervisor and he never suggested any on his own); Runnels

Depo., 44:4-10 (she was not encouraged to come up with promotions or contests at assigned

locations, and only ran a promotion if it was approved by AT&T); Walker Depo., 95:12-22 (any

sales contests were directed from AT&T.)  Whereas Cascioli reported that he did not recall running promotions at all.  (Cascioli Depo., 108:5-18.)

Notably, Henton uniquely described a vastly different marketing role than the other RAEs.  He testified that he acted as a "small business account manager" during the limitations period (instead of an RAE).  (*See* Henton Depo., 16:12-18:25 (his manager told him that he considered him a small business account manager who was responsible for selling more business-to-business services).)  According to Henton, he focused on creating small business accounts (instead of just individual accounts), and identified opportunities to do so by building relationships with individual customers, visiting small businesses in his area to promote AT&T, and attending trade shows to connect with account executives from other companies.  (Henton Depo., 20:15-21:11; 24:2-26:7.)  No other Opt-In Plaintiff testified to these or similar duties.

> d.  *Varying Accounts Regarding Setting Long- and Short-Term Business Objectives*

Finally, the Court held that LoCurto did not exercise sufficient discretion and independent judgment in solving long- and short-term business objectives, specifically highlighting LoCurto's claim that she prepared her business plans in a cursory nature (by copying and pasting) and did not discuss them with anyone at AT&T or the stores she serviced.  (*See* Order at 16-17.)  As with all of the other facts, the Opt-In Plaintiffs testimony in this regard varied widely.

In sharp contrast to LoCurto, some of the Opt-In Plaintiffs proudly described their job duties in an exempt fashion.  For example, Martino, a former NRAE and RAE, testified that, as an NRAE, he successfully managed approximately 36 national retail locations (the largest territory in the national retail channel) by "promot[ing] sales to be successful."  (*See* Martino Depo., 44:4-45:21; 103:24-104:5.)  He recalled using several techniques to position AT&T over

15

competitor networks sold by his national retail locations.  Martino testified that he:  (1) discussed

the advantages of AT&T with associates while training them in subjects he himself identified (by

analyzing sales metrics and personally observing associates); (2) attended monthly dinners with

district managers (which he could decide to pay for on a company credit card), where he would

answer questions and present materials he adjusted to suit his market; and (3) provided feedback

to district managers and other executives regarding strengths and weaknesses of particular stores,

including personnel decisions, inventory distributions, and merchandising.  (Martino Depo.,

47:4-49:19; 52:3-8; 52:20-57:13; 58:16-61:8; 63:1-67:3.)  In addition, Martino admitted he

created business plans twice per year for his locations (in which he described operational

challenges and proposed action plans) that he presented to a Vice President of AT&T.  He also

described two promotions he developed and implemented.  (Martino Depo., 70:13-71:22; 86:2-

88:22.)  Notably, Martino performed these duties with minimal supervision, and made several

decisions on his own.  Indeed, he testified that his manager only accompanied him to locations

"once in a while . . . [m]aybe once every two months, three months."  (Martino Depo., 75:8-

76:5.)

Likewise, Lombard, a former RAE, readily agreed his main duty as an account executive

was to manage his locations to increase sales.  (*See* Lombard Depo., 40:12-41:2; 59:10-25.)  He

also described his significant discretion and his contribution to AT&T sales in detail.  For

example, Lombard explained that, while he worked as an RAE, he led his 17 retail accounts to

"success" by analyzing sales metrics and suggesting action plans to improve sales, which were

typically followed.  (Lombard Depo., 17:3-18:8.)  He also confirmed that he evaluated store

personnel and provided customized training to address their deficiencies, and that he strategized

with store management regarding how new AT&T product offerings would affect their business.

(Lombard Depo., 25:23-27:5; 29:15-31:20.)  Moreover, Lombard reported he regularly provided

feedback to management at his retail accounts regarding coaching and training needs, the

performance of their sales personnel, and staffing needs.  (Lombard Depo., 42:21-46:25.)

      In addition to generally describing their work in an exempt manner, a number of Opt-In

Plaintiffs reported using analytical judgment in preparing their business plans, and reported

sharing their plans with their supervisors, others at AT&T, and representatives at their assigned

locations.  (*See* Bryant Depo., 56:5-59:9 (her business plan included a trend analysis, identified

operational challenges, provided an assessment of sales and opportunities for improvement, and

identified the objectives of AT&T with an action plan (amongst other things) and she shared the

plans with her manager and store owners); Ward Depo., 80:7-84:4 (same); Martino Depo., 86:2-

87:7 (he drafted semi-annual business plans and presented them to a vice president).)  Others,

like LoCurto, claimed they created their business plans in a rushed or cursory nature, but, unlike

LoCurto, admitted they shared them with superiors or with representatives at assigned locations.

(*See* Foster Depo., 50:14-23; 51:8-52:17 (she just filled in blanks to create business plans, but

she shared them with her own managers and then store principals); Cascioli Depo., 79:20-87:8

(he filled in business plans and shared them with his managers and a vice president); Walker

Depo., 39:6-9 (he discussed his business plans with each of his accounts); Briscoe Depo., 98:2-

25 (she drafted business plans and shared them with her managers).)  And Yowell uniquely

testified that she did not even create business plans.  (Yowell Depo., 64:19-21.)

      Finally, testimony regarding setting business objectives varied outside the business plan

context as well. While Yowell did not even recall analyzing sales metrics, several Opt-In

Plaintiffs admitted to analyzing sales metrics and setting action plans pursuant to their analysis.

(*Compare* Yowell Depo. 53:20-22 (she did not recall analyzing business reports for trending)

*with* Daily Depo., 37:18-38:13 (analyzed trends in business reports and then responded by identifying the root cause of any increases with store management and encouraging them to share best practices); *with* Briscoe Depo., 73:2-74:4 (reviewed store performance metrics and devised strategies for sales performance at her locations based on the review) *and with* Lombard Depo., 50:20-51:2 (agreeing with a statement in his performance review praising him for "look[ing] at results and the underlying reasons for success or failure at multiple levels and us[ing] data analysis as well to clearly point out the underlying drivers").)

       2.    <u>Decertification Is Appropriate Because Plaintiffs Had Varying Accounts Regarding On Call Time.</u>

Decertification is also appropriate in light of Plaintiffs' request for compensation for all of their so-called "on-call" time in this case, *including* time when they were potentially subject to being called but not otherwise required to do any work for AT&T.  On-call liability requires yet another individualized, fact-specific analysis which further demonstrates Plaintiffs are not similarly situated.

Indeed, the question of on-call liability requires the Court to perform a completely separate legal analysis if it determines an RAE or NRAE is non-exempt.  "On-call" time is generally considered 'work' and, thus, compensable if it is spent "predominantly for the employer's benefit." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); S*kidmore v. Swift & Co.*, 323 U.S. 134, 136–37 (1944); *Singh v. City of New York*, 524 F.3d 361, 368 (2d Cir. 2008) ("whether an employee's expenditure of time is considered work under the FLSA turns in part on whether that time is spent predominantly for the benefit of the employer or the employee"); *Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001).  "[W]hether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." *Zhong v. Zijun Mo*, No. 10-CV-0806 (RER), 2012 U.S.

Dist. LEXIS 99966, at *15 (E.D.N.Y. July 18, 2012) (quoting *Armour & Co. v. Wantock*, 323
U.S. 126, 133 (1944))

   In analyzing whether on-call time is spent primarily for the employer's or employee's
benefit, courts have examined a multitude of factors, including but not limited to whether the
frequency of calls received during the on-call period was unduly restrictive, whether the response
time was unduly restrictive, and, perhaps most significantly, the extent to which employees were
able to engage in personal activities while on-call.  *See e.g.*, *Skidmore*, 323 U.S. at 138
(examining "the degree to which the employee is free to engage in personal activities during
periods of idleness when he is subject to call"); *Reimer*, 258 F.3d at 724 (examining the
"flexibility in [the employees'] activities," the required response time, and the actual number of
calls per on-call period); *Llolla v. Karen Gardens Apt. Corp.*, No. 12-CV-1356 (MKB)(JO),
2014 U.S. Dist. LEXIS 44884, at *23 (E.D.N.Y. Mar. 10, 2014) (examining the plaintiff's level
of freedom during on-call time); *Miner v. B&C Equip., Inc.*, No. 93-35401, 1994 WL 198692, at
*2-5 (9th Cir. 1994) (applying 8-factor test for whether on-call time was unduly restrictive such
that it was spent predominantly for employer's benefit).

   Notwithstanding the fact that AT&T does not believe any RAEs or NRAEs are entitled to
on-call pay above their regular salaries, the Plaintiffs' deposition testimony indicates the level of
"restrictiveness" of on-call time varied significantly from RAE/NRAE to RAE/NRAE such that
on-call liability cannot be addressed through generalized proof.  *See Bayles v. Am. Med.
Response of Colo., Inc.*, 950 F. Supp. 1053, 1061-67 (D. Colo. 1996) (decertifying FLSA
collective action because discovery revealed that individualized issues predominated with respect
to plaintiffs' mealtime and sleep-time claims; analysis of both issues depended on same
"predominant benefit" test applied to assess on-call liability and the degree to which each

plaintiff was able to get uninterrupted sleep, making it "oxymoronic to use a [collective action] device in a case where proof regarding each individual plaintiff is required to show liability").

Here, "the degree to which the employee is free to engage in personal activities during periods of idleness when he is subject to call," *Skidmore*, 323 U.S. at 138, varied significantly among the Opt-In Plaintiffs.  Bryant claimed she did not have time to pursue various hobbies during on-call time while working as an RAE.  (Bryant Depo., 90:12-92:17 (testifying that she did not have time to garden or go for walks while on-call).)  Other Plaintiffs, however, reported they were able to leave home for various activities, including going to dinner, attending sporting events, hiking, sailing, skiing, and snowboarding.  (*See e.g.*, LoCurto Depo., 254:2-257:14 ("absolutely" engaged in other activities while on call, including making dinner, doing laundry, cleaning her house, going out for dinner, and attending church); Daily Depo., 84:6-85:7 (believes he should be paid for on-call time while hiking);  Lombard Depo., 73:22-75:13 (believes he should be paid for on-call time while skiing and snowboarding).)

The call frequency, another relevant factor under the case law, also varies among RAEs and NRAEs.  Indeed, it varies day-to-day for several of the Plaintiffs.  For example, when asked what the average number of calls she received outside of business hours was, LoCurto explained "every day [was] different" – some days she got zero calls, other days she got eight.  (LoCurto Depo., 254:2-20.)  Lombard claimed his call volume was "variable," although he "regularly" received calls when on-call, more than once per day.  (*See* Lombard Depo., 69:20-70:13.)  Walker reported receiving calls five or more times per week (but not every single day), and also said the frequency varied.  (*See* Walker Depo., 84:20-85:25.)  Henton, similarly, was unable to provide an estimate, reporting instead that his hours varied by manager—"sometimes it was throughout the day . . . [s]ometimes it was a few hours that day."  (Henton Depo., 53:10-13;

59:5-12.)  Other RAEs/NRAEs reported spending significantly less time on-call.  For example,

Foster reported spending a total of approximately 45 hours working per week, most of which was

attributed to store visits.  (*See* Foster Depo., 64:17-69:6.)

In short, Plaintiffs describe their on-call responsibilities in starkly different terms.  The

issue as to whether the on-call time of the Plaintiffs is spent predominantly for AT&T's benefit is

therefore not subject to generalized proof, and is yet another reason that the Plaintiffs are not

similarly situated.

### C.   Decertification is Appropriate Because AT&T's Defenses Must Be Individually Applied to Each Collective Action Member.

In determining whether a case should be decertified, courts also examine "whether

[defendant's] defenses could be applied across the board to plaintiffs' claims and potential

plaintiffs' claims or whether many and perhaps disparate defenses could be raised. Where the

court must engage in individualized inquiries to determine the applicability of a defense, this

factor favors decertification." *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 105 (N.D. Ill.

2013) (internal citation omitted); *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460

(S.D.N.Y. 2011).  AT&T intends to present several defenses at trial, three of which require

individualized inquiries and make this action particularly ill-suited for collective treatment.

First, AT&T's principal defense is that the Opt-In Plaintiffs were "employed in a bona

fide administrative capacity" and were, therefore, properly classified as exempt.  As discussed

above, this defense is highly individualized, necessarily requiring the Court to conduct a fact-

intensive inquiry regarding each Opt-In Plaintiff.  The assertion of this defense alone warrants

decertification in cases, such as here, where representative testimony is insufficient.  As Judge

Carter recently held:

> "The myriad of accounts from opt-in plaintiffs and named
> plaintiffs weighs against certification of the collective action,

> because it would be difficult for Chipotle to rely on 'representative
> proof' while asserting its defenses . . . To find otherwise would
> reduce Section 216(b)'s requirement that plaintiffs be 'similarly
> situated' to a mere requirement that plaintiffs share an employer, a
> job title, and a professed entitlement to additional wages."

*Scott v. Chipotle Mexican Grill, Inc.*, No. 12-CV-8333 (ALC)(SN), 2017 WL 1287512, at *9

(S.D.N.Y. Mar. 29, 2017); se *also Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230,

1240–41 (N.D. Ala. 2012) ("While Dollar Tree applied its executive exemption across-the-

board, the defense is individuated in this case as Plaintiffs' job duties and employment

experiences vary dramatically. . . . Furthermore, Dollar Tree may be able to apply the

exemption to different Plaintiffs based on different circumstances. . . . Thus, a one-size-fits-all

determination is impossible."); *Harper v. Gov't Emps. Ins. Co.*, No. CV 09-2254 (LDW)(GRB),

2015 WL 9673810, at *4 (E.D.N.Y. Nov. 16, 2015), *report and recommendation adopted*, No.

2:09-CV-02254 (LDW)(GRB), 2016 WL 98516 (E.D.N.Y. Jan. 6, 2016) (decertifying collective

action because "the defenses available to the defendant appear to be highly individualized. In

particular, the question as to whether each plaintiff is subject to the administrative exemption

under the FLSA—the principal defense in this case—appears to require case-by-case

determinations ill-suited to a collective action."); *Hundt*, 294 F.R.D. at 105–06  (decertifying

collective action of 18 opt-in plaintiffs where the court would have to make individualized

determinations; "The defendants have asserted the executive and administrative exemptions as

defenses to the plaintiffs' FLSA claims. Determining whether an employee falls under one of

these exemptions normally requires a thorough, fact-intensive analysis of the employee's

employment duties and responsibilities.") (internal quotation and citation omitted).

Second, AT&T will challenge the credibility of many Opt-In Plaintiffs' claims relatint to

their descriptions of job duties and hours by pointing to inconsistencies between their testimony

and their job applications, performance reviews, and affidavits.  For example, Henton admitted

that he lied in his employment application, even though he had certified at the time that he had accurately and truthfully completed it. (Henton Depo., 41:24-48:17.) Foster, similarly, implied that she embellished her resume. (*See* Foster Depo., 37:13-14 ("Remember this is a résumé. This is what I said I did.")) And Martino's testimony describing his job duties materially differed from statements he made in sworn affirmations submitted in this litigation. (*Compare e.g.*, Martino Depo., 65:15-66:2; 105:15-18 (testifying that he made merchandising solutions at RadioShack and that he customized trainings); *with* Dkt. No. 159 at ¶¶ 8 (affirming that RAEs cannot deviate from AT&T policies or planograms and that RAEs simply execute); Martino Depo., 100:22-101:8 (testifying that his merchandising duties differed when he was an RAE from when he was an NRAE); *and with* Dkt. No. 100 at ¶ 13 (affirming that NRAE and RAE duties were essentially the same).) "Such individual questioning would likely make it difficult and confusing for the fact finder to make both credibility determinations and to discern whether each individual Opt–In is exempt under the FLSA." *Aquilino v. Home Depot, U.S.A., Inc.*, No. CIV. A. 04-04100 (PGS), 2011 WL 564039, at *9 (D.N.J. Feb. 15, 2011).

Finally, AT&T intends to argue that the NRAE and RAE positions were designed to be exempt, and that any Opt-In Plaintiff who performed in a non-exempt manner was misperforming the job. Because a plaintiff cannot evade being exempt and earn overtime through substandard performance, AT&T is entitled to elicit and offer evidence of such misperformance. *Ramirez v. Yosemite Water Co. Inc.*, 20 Cal. 4th 785, 802 (Cal. 1999); *see Williamson v. Cook Composites & Polymers Co.*, No. CV 08-8069 AHM (VBKx), 2009 WL 4730887, at *8 (C.D. Cal. Dec. 7, 2009) ("[T]he trial court should also consider whether the employee's practice diverges from the employer's realistic expectations."). This argument will, again, require individual questioning ill-suited for collective treatment (for example, regarding,

job expectations communicated to the Opt-In Plaintiffs' and the Opt-In Plaintiffs' work performance). *See Reyes v. Texas Ezpawn, L.P.*, No. CIV. A. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007) (decertifying collective action where defendant intended to "present . . . unsatisfactory performance reviews for certain Plaintiffs to demonstrate that those Plaintiffs had exempt duties but either failed or refused to exercise those duties, thereby convert[ing] an exempt job into a non-exempt one"; "These defenses require individualized evidence, making it difficult for EZPawn to defend all of Plaintiffs' claims with generalized proof." (citation omitted)).

### D.     Fairness and Procedural Considerations Require Decertification.

Finally, the third factor—fairness and procedural considerations—weighs heavily in favor of decertification.  As discussed above, Plaintiffs are not similarly situated; indeed, they have testified regarding a wide array of duties, varying work hours, differing levels of supervision, and a range of discretion and independent judgment.  AT&T is entitled to question each plaintiff regarding these varying duties, and to impeach each plaintiff with their conflicting statements. *See Aquilino*, 2011 WL 564039, at *9.

To deny AT&T this opportunity by allowing a collective action to proceed would be "fundamentally unfair" and would violate AT&T's due process rights. *Knott*, 897 F. Supp. 2d at 1241 (finding that it would be "fundamentally unfair" and violate due process rights if the class were to remain certified where differences existed that directly affect an assessment of the executive-exemption for each individual Plaintiff).  However, respecting AT&T's right to examine each Plaintiff would result in fifteen mini-trials, thereby not affording any judicial economy. *See Stevens v. HMSHost Corp.*, No. 10 CV 3571 (ILG)(VVP), 2014 WL 4261410, at *8 (E.D.N.Y. Aug. 27, 2014) (finding that proceeding as a collective action would "either prejudice defendants' ability to present their defenses or require mini-trials for each of the opt-in

plaintiffs" where there were material variances in plaintiffs testimony and defendants' exemption defenses were not amenable to generalized or representative proof); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1104 (D. Kan. 2012) (decertifying collective action where proceeding as a class would not be efficient because it would likely result in two trials, one to establish liability and a second to determine damages).  Accordingly, decertification is the proper path, and the low number of Opt-In Plaintiffs does not require a different result.  *See Hundt*, 294 F.R.D. at 108 (decertifying collective action of 18 opt-in plaintiffs; "Because the plaintiffs have not shown that they are similarly situated, the interests of judicial economy would not be served by allowing their claims to proceed collectively.").

Moreover, 10 of the 15 opt-in plaintiffs worked in jurisdictions outside New York (including states as far away as Alabama, Arizona, Florida, Kentucky, and Louisiana) and have no connection with this forum.[5]  In the ordinary course, these individuals would have been required to bring their claims in their home jurisdictions where they worked, close to the witnesses who can testify about their job duties.  Indeed, in recent years, the United States Supreme Court has made clear that the Due Process Clause substantially limits the jurisdictions where a corporation can be sued based on conduct or injuries that occurred outside the jurisdiction.  In the absence of such a basis for exercising so-called specific jurisdiction, a corporation can only be sued under principles of general jurisdiction "'when [the corporation's] affiliations with the [forum] State are so 'continuous and systematic' as to render them essentially at home in the forum State.'"  *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1552, (2017)

---

[5]     Specifically, Almonte and Lombard worked in Massachusetts, Briscoe worked in Maryland, Bryant worked in Alabama, Daily worked in Arizona, Foster and Walker worked in Florida, Runnels worked in Louisiana, Smith worked in Kentucky, and Yowell worked in Mississippi.

(quoting *Daimler*, 571 U. S., at ___ (slip op., at 8) (quoting *Goodyear*, 564 U. S., at 919)).  In the absence of "exceptional circumstances," a corporation is only "at home" in the state where it is incorporated or has its principal place of business."  *Id.*

In this case, AT&T is not "at home" in New York.  But for resort to a collective action that requires across the board proof of a violation based on representative testimony, AT&T would not be required to defend, and a New York Court would not be required to hear, the individual claims of 11 plaintiffs from around the country who have no connection to New York. Because Plaintiff cannot show that she and the Opt-In Plaintiffs are similarly situated, the claims of the Opt-In Plaintiffs should be dismissed and they should be required to bring their claims in their home jurisdictions.

## IV.    CONCLUSION

Discovery has revealed that the 15 remaining Opt-In Plaintiffs do not have similar enough job duties to support a one-size-fits-all exemption determination based solely on representative evidence.  Rather, the Opt-In Plaintiffs' testimony regarding their job duties, hours, and supervision differed in material respects from each other's, and from LoCurto's. Consequently, the Court should grant AT&T's Motion for Decertification of Plaintiffs' FLSA Collective Action and dismiss the claims of each Opt-In Plaintiff.

Dated:   September 22, 2017          Respectfully submitted,
         New York, New York


                                     By: _____
                                          Patrick W. Shea


                                     PAUL HASTINGS LLP
                                     200 Park Avenue
                                     New York, New York 10166
                                     (212) 318-6000
                                     patrickshea@paulhastings.com

                                     *Attorneys for Defendant*