PATRICK W. SHEA
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
patrickshea@paulhastings.com
(212) 318-6000 (telephone)
(212) 319-4090 (facsimile)

*Attorneys for Defendant*
AT&T Mobility Services LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LISA LO CURTO, *on behalf of herself and all others similarly situated*, | |
| Plaintiff, | 13 Civ. 04303 (AT)(KNF) |
| -against- | |
| AT&T MOBILITY SERVICES LLC, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR RULE 23 CLASS CERTIFICATION OF NYLL AND NJWHL CLAIMS**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 2

III.    RULE 23 PRECLUDES CERTIFICATION OF PLAINTIFF'S STATE LAW
        CLAIMS. ............................................................................................................. 7

        A.      Rule 23 Sets a High Bar for Class Certification. .................................... 7

        B.      Plaintiff Cannot Meet Her Rule 23(a) Burdens of Establishing
                Commonality and Typicality. ............................................................... 11

                1.      The Putative Class Members Performed Their Jobs in Significantly
                        Different Ways................................................................................. 14

                2.      The RAE and NRAE Jobs Differ Significantly. ..................................... 22

                3.      Plaintiff's Motion Fails to Prove Commonality and Typicality. ............. 24

        C.      Plaintiff Cannot Meet Her Rule 23(b) Burden.................................... 29

                1.      Individual Issues Predominate. .......................................................... 30

                2.      A Class Action Is Not the Superior Method of Litigating Plaintiff's
                        State Law Claims ......................................................................... 32

IV.     CONCLUSION.................................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
   568 U.S. 455, 133 S. Ct. 1184 (2013) ........................................................................8

*Comcast Corp. v. Behrend*,
   569 U.S. 27, 133 S. Ct. 1426 (2013) .........................................................................8

*Cuevas v. Citizens Fin. Grp., Inc.*,
   526 F. App'x 19 (2d Cir. 2013) .............................................................9, 10, 11, 27

*Damassia v. Duane Reade, Inc.*,
   250 F.R.D. 152 (S.D.N.Y. 2008) ............................................................................31

*Dauphin v. Chestnut Ridge Transp. Inc.*,
   No. 06 Civ. 2730 (SHS), 2009 WL 2596636 (S.D.N.Y. Aug. 20, 2009) ...............13

*Dean v. Priceline.com, Inc.*,
   No. 3:00CV1273 (DJS), 2001 U.S. Dist. LEXIS 24982 (D. Conn. 2001) ........22, 30

*Dunnigan v. Metro. Life Ins. Co.*,
   214 F.R.D. 125 (S.D.N.Y. 2003) ............................................................................33

*Evancho v. Sanofi-Aventis U.S. Inc.*,
   Civil Action No. 07-2266 (MLC), 2007 U.S. Dist. LEXIS 93215
   (D.N.J. Dec. 18, 2007) ...........................................................................................34

*Gregory v. Stewart's Shops Corp.*,
   No. 7:14-CV-33 (TJM/ATB), 2016 WL 8290648 (N.D.N.Y. July 8, 2016),
   *report and recommendation adopted*, No. 7:14-CV-00033, 2016 WL 5409326
   (N.D.N.Y. Sept. 28, 2016) .........................................................................................8

*Holt v. Rite Aid Corp.*,
   333 F. Supp. 2d 1265 (M.D. Ala. 2004) .................................................................30

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) .................................................................................8, 27

*In re Linerboard Antitrust Litig.*,
   305 F.3d 145 (3d Cir. 2002) ....................................................................................30

*Meyers v. Crouse Health Sys., Inc.*,
   274 F.R.D. 404 (N.D.N.Y. 2011) .............................................................................7

## TABLE OF AUTHORITIES

(continued)

Page

*Moeck v. Gray Supply Corp.*,
   Civ. No. 03-1950 (WGB), 2006 U.S. Dist. LEXIS 511 (D.N.J. Jan. 5, 2006) ......................33

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)..................................................................30

*Morisky v. Pub. Sev. Elec. & Gas Co.*,
   111 F. Supp. 2d 493 (D.N.J. 2000) ....................................................13, 22, 29, 30

*Morris v. Ernst & Young, LLP*,
   No. 12 CV 0838 (KMW), 2012 U.S. Dist. LEXIS 129414
   (S.D.N.Y. Sep. 10, 2012) ....................................................................12

*Myers v. Hertz Corp.*
   2007 U.S. Dist. LEXIS 53572 (E.D.N.Y. 2007), *aff'd*, 624 F.3d 537
   (2d Cir. 2010)..........................................................................26, 27, 28

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010).......................................................... *passim*

*Otto v. Pocono Health Sys.*,
   457 F. Supp 2d 522 (M.D. Pa. 2006) ..........................................................33

*Pippins v. KPMG LLP*,
   921 F. Supp. 2d 26 (S.D.N.Y. 2012), *aff'd*, 759 F.3d 235 (2d Cir. 2014) ..............................11

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)...................................................................8

*Romero v. H.B. Auto. Grp., Inc.*,
   No. 11 Civ. 386(CM), 2012 WL 1514810 (S.D.N.Y. May 1, 2012).....................................13

*Ruggles v. WellPoint, Inc.*,
   272 F.R.D. 320 (N.D.N.Y. 2011)...........................................................13, 32

*Spann v. AOL Time Warner, Inc.*
   219 F.R.D. 307 (S.D.N.Y. 2003) .............................................................32

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338, 131 S. Ct. 2541 (2011)................................................. *passim*

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ..............................................................13, 32

## **TABLE OF AUTHORITIES**
### (continued)

Page

*White v. W. Beef Props., Inc.*,
   No. 07 CV 2345(RJD)(JMA), 2011 WL 6140512 (E.D.N.Y. Dec. 9, 2011) .........................12

**Other Authorities**

Fed. R. Civ. P. 23(a) ...........................................................................................................7

Fed. R. Civ. P. 23(b)(3)...........................................................................................7, 8, 30, 31

## I.    INTRODUCTION

Plaintiff has failed to meet the rigorous requirements established by Federal Rule of Civil Procedure 23 with respect to her class claims under the New York Labor Law and the New Jersey Wage and Hour Law. Plaintiff's burden on her motion is high: First she must demonstrate that the class meets the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. Next, she must meet the requirements of Rule 23(b)(3) by proving that common questions predominate over individualized ones, and that the class action is the superior method for resolving disputed claims. She cannot meet either burden.

First, Plaintiff cannot satisfy the commonality and typicality requirements of Rule 23(a). The record reveals that the Retail Account Executives ("RAEs") and National Retail Account Executives ("NRAEs") who worked in New York and New Jersey performed different duties and exercised widely varying degrees of discretion and independent judgment. Accordingly, the allegedly common question presented by Plaintiff's claims—whether every RAE and NRAE who worked in New York and New Jersey is entitled to overtime because they did not satisfy the requirements of the administrative exemption—will not yield a common answer applicable to all class members. For the same reasons, Plaintiff, who testified that as an NRAE she exercised limited discretion and independent judgment compared to other alleged class members, has failed to establish that her claims are typical of the claims of the alleged class.

Plaintiff also has fallen far short of establishing that her alleged common questions predominate over any individualized questions. Tellingly, Plaintiff does not even attempt to show that she has met this burden in her moving papers. Instead, she simply asserts that because she has satisfied the requirements of Rule 23(a)—which she has not—she has necessarily satisfied the requirements of Rule 23(b)(3). This conclusory argument asks the Court to read Rule 23(b)(3) as meaningless. The Supreme Court and Second Circuit routinely stress that the

Rule 23(b)(3) predominance test is stricter than the Rule 23(a) commonality test. Plaintiff's claims fail both.

Challenges to the exempt status of employees covered by the administrative exemption are only properly brought on a class-wide basis where the plaintiff can show the court, based on the rigorous analysis required by Rule 23, that all employees have the same duties and exercise the same level of discretion and judgment so as to allow the court or a jury to conclude that all members of the alleged class are either exempt or non-exempt. The record here demonstrates emphatically that is not the case; indeed, based on their very different individual testimony, this Court has already concluded that Plaintiff LoCurto is non-exempt, while Arbitrator Michael Young has concluded that three other NRAEs and RAEs who worked in New York and New Jersey are exempt. This underscores the need for individualized analysis to resolve the predominant factual questions in this case—*i.e.*, what job duties each class member performed and what degree of discretion and independent judgment they exercised. This need for individual inquiry renders class action proceedings completely unworkable here. The motion for class certification should be denied.

## II.    FACTUAL BACKGROUND

AT&T Mobility is a leading provider of wireless communications in the United States. (Euratte Decl. ¶ 3.)[1] AT&T sells its products and services through various distribution channels, including a direct and an indirect retail channel. (*Id*. ¶ 3.) The direct channel, not at issue in this lawsuit, consists of Company-owned retail stores. (*Id*. ¶ 3.) The indirect channel consists of two components: distribution arrangements that are primarily exclusive with independent dealer or

---

[1]      All sworn declarations cited in this brief are attached as exhibits to the Affirmation of Patrick W. Shea, filed concurrently herewith, and are cited throughout this motion in the following format: "[Declarant's Last Name] Decl., ¶ [Paragraph Number]."  Deposition testimony is cited as "[Deponent's Last Name] Dep. [Page]:[Line(s)].

agent stores (*e.g.*, small business owners) called the local dealer channel, and non-exclusive distribution arrangements with national retail chain stores (*e.g.*, Best Buy, Wal-Mart, Costco, etc.) called the national retail channel. (Euratte Decl. ¶ 4; McCormick Decl. ¶ 3.) Managers of RAEs and NRAEs have great latitude to make decisions affecting the way that their indirect account executives perform their jobs, based on competitive and other strategic issues unique to their territory. (Euratte Decl. ¶ 14; McCormick Decl. ¶ 5; Bailey Decl. ¶ 8.)

AT&T employed RAEs to partner with local dealers and NRAEs to partner with national retailers. AT&T properly classified NRAEs and RAEs as exempt from overtime under administrative exemption to the Fair Labor Standards Act, the New York Labor Law, and the New Jersey Wage and Hour Law.[2] NRAEs and RAEs were charged with working closely with their assigned stores (sometimes referred to as "doors") to help them effectively promote, market and sell AT&T's products and services and deliver excellent customer service to retail customers on behalf of AT&T. (Euratte Decl. ¶ 5; McCormick Decl. ¶ 4). While the primary duty of NRAEs and RAEs was the same, there were significant differences between these jobs, as well as within each job, depending on the market and the approach of AT&T management, as

---

[2]     Plaintiff's claim that "AT&T acknowledged in May 2009 that all RAEs were non-exempt employees" but "continued to treat LoCurto and the other RAEs as exempt employees" is baseless and tellingly cites to no support from the record. (Dkt. No. 268 at 22.) To the contrary, the evidence in the record is clear that AT&T decided to classify the RAE and NRAE positions as exempt from overtime under the administrative exemptions after a careful analysis of the duties performed by RAEs and NRAEs. (*See* Johnson Decl. ¶ 5.) Based on an understanding that some individuals in either role could perform the job differently from the company's expectation, the compensation team initially considered classifying the position as non-exempt out of an abundance of caution. (Johnson Dep. 37:9-38:18.) The sales organization leadership provided clear feedback to the compensation team that the individuals in both roles were the primary contacts and liaisons representing AT&T to its clients and were required to regularly make decisions that required the exercise of discretion and independent judgment in significant matters. (Johnson Dep. 37:9-38:18; Johnson Decl. ¶ 4.) Based on this feedback, the compensation team conducted a close review of the actual duties performed by individuals in both jobs and determined that RAEs and NRAEs were properly classified as exempt. (*See* Johnson Decl. ¶ 5.)

described in Section III.B.1, *infra*.

AT&T currently has approximately 2,700 local dealer locations across the country, almost all of which are exclusive dealers of AT&T. (McCormick Decl. ¶ 4). Because the vast majority of local dealers do not sell competitor wireless services, most RAEs focused exclusively on promotional, marketing, and consulting activities designed to increase their stores' overall sales and success. (McCormick Decl. ¶¶ 4, 10; Wang Decl. ¶¶ 3, 4; Cascioli Dep. 68:2-19 (Giving associates feedback on how to sell more effectively "was definitely a way to increase sales.").) This included analyzing sales, setting goals and creating business plans to meet those goals, evaluating the knowledge of sales associates and providing customized training or role-playing exercises where needed, and assisting in merchandising. (McCormick Decl. ¶¶ 4, 8; Wang Decl. ¶¶ 3, 4; Henton Dep. 111:11-112:6 ("You would look at their trends and metrics… but it was more than just that."); Cascioli Dep. 69:12-15 (used role-playing to train the employees at his doors to more effectively sell AT&T products); Martino Dep. 65:15-23 (provided suggestions to store managers as to how they could improve merchandising of AT&T products).)

Moreover, the size of local dealers varies considerably, from small businesses that own and operate only one retail store to others who own and operate multiple locations across a region or regions. (McCormick Decl. ¶ 7.) Some local dealer business owners are directly involved in day-to-day operations of their stores, and worked directly with AT&T's RAEs to develop goals and strategies for promoting and selling AT&T wireless products and services in their stores. (McCormick Decl. ¶ 7.) Other RAEs worked primarily with store managers or district managers who cover several stores. (McCormick Decl. ¶ 7.) RAEs working with local dealers typically were assigned to a large number of locations, although the numbers varied from

market to market. (McCormick Decl. ¶ 11; Henton Dep. 22:15-23:4 (assigned to 60 accounts

during 2009), 68:10-16 (assigned to 150 doors when he started as an RAE).) The mix of accounts

for RAEs could include multiple locations owned by the same local dealer, or different

independent dealers with different owners. (See McCormick Decl. ¶ 7.)

By contrast, the national retail channel includes almost 13,000 national retail locations

nationwide, and is comprised of national chain retailers such as RadioShack, Best Buy, and Wal-

Mart, as well as large regional retailers. (Euratte Decl. ¶ 4.) In contrast to the local dealer

channel, AT&T's national retail contracts are non-exclusive; retailers in the national retail chain

also sell competing products and services of other wireless carriers, such as Verizon, Sprint, or

T-Mobile. (*Id*. ¶ 4.) National retailers typically have more layers of management than local

dealers, which may include regional managers, district managers, store managers, assistant store

managers, department managers, and zone managers. (*Id*. ¶ 7.) As described in more detail in

Section III.B.1, *infra*, NRAEs interacted with different levels of management in different ways.

(Euratte Decl. ¶ 7; Bailey Decl. ¶ 7; LoCurto Dep. 46:3-48:2 (met with Radio Shack store

managers several times per week, with Target wireless manager once a week, with Costco

wireless manager every other week, and never with Costco store managers), 20:25-23:7 (only

spoke to district managers a few times a year when she ran into them in stores); Martino Dep.

52:16-53:13 (had monthly meetings with Radio Shack district managers, where he gave

presentations and answered questions), 58:16-59:12 ("once in awhile" discussed strengths and

weaknesses of stores with higher-level Radio Shack executives).) Unlike local dealers, retail

chain owners are not directly involved in the day-to-day operations of national chain stores and

typically do not interact with NRAEs. (Euratte Decl. ¶ 7.) The number of retail accounts assigned

to NRAEs varied based on geography and market differences. (Euratte Decl. ¶ 5; e.g., O'Brien

Decl. ¶ 3 (28 stores in Manhattan); LoCurto Dep. 213:20-214:11 (19 stores in New Jersey).)
Some worked solely with multiple locations of a single retail chain. (Euratte Decl. ¶ 7.) Most had
a mix of accounts at different retailers. (*See, e.g.*, Medrano Decl. ¶ 3 (RadioShack, Best Buy,
Target, Wal-Mart, and Staples); LoCurto Dep. 214:13-216:16 (RadioShack, Target, Costco, Best
Buy, Staples, Wal-Mart, Apple).)

Each national retailer has its own culture, its own rules of engagement, its own prices, its
own compensation and incentive system for its employees, and its own ever-changing sets of
promotions. (Euratte Decl. ¶¶ 12-13; Wang Decl. ¶ 5.) An NRAE whose accounts included
different retailers had additional challenges and responsibilities to adapt to these requirements.
(Euratte Decl. ¶¶ 12-13.) Some of the differences between retailers included: the time allowed in
store for visits, training time allowed, varied levels of access to information by the retailer, and
varied levels of engagement permitted with retailer employees. (Euratte Decl. ¶ 12; LoCurto
Dep. 45:16-46:6 ("Q. And how frequently do you have those meetings with store management at
the accounts you've been assigned? A. Some retailers are more frequent than others. Some
retailers it's a forbidden topic.").) Most, but not all retail sales associates were paid on a
commission or bonus structure. (Euratte Decl. ¶ 12.) It was therefore the NRAE's responsibility
to determine how to best motivate and leverage relationships with the retailers and retail sales
associates to promote the sale of AT&T products and services in light of these diverse factors.
(Euratte Decl. ¶¶ 9, 12; Wang Decl. ¶¶ 5, 6.)

Not only are the NRAE and RAE jobs different from one another, but as is explained
more thoroughly below, discovery has revealed substantial variation in the duties performed by
the alleged class members in New York and New Jersey—even within the RAE and NRAE job
groups. These differences span nearly every aspect of the RAEs' and NRAEs' responsibilities,

including marketing, training, setting business goals, scheduling, and resolving customer issues. Given these substantial disparities, the one-size-fits-all, class-wide analysis sought by Plaintiff on these claims cannot proceed.

## III.  RULE 23 PRECLUDES CERTIFICATION OF PLAINTIFF'S STATE LAW CLAIMS.

### A.    Rule 23 Sets a High Bar for Class Certification.

Plaintiff's burden on her motion for class certification is substantial. Class certification is only appropriate if a plaintiff can meet the requirements under both Rule 23(a) and 23(b).  Rule 23(a) requires a plaintiff to prove that: (1) the claimed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the entire class; (3) the plaintiff's claims are typical of those of the class; and (4) the class representative adequately represents the interests of the class. Fed. R. Civ. P. 23(a). Courts also require sufficient "ascertainability with respect to the class definition" such that members can be identified by "reference to objective criteria." *Meyers v. Crouse Health Sys., Inc.*, 274 F.R.D. 404, 413-416 (N.D.N.Y. 2011) (citations and quotations omitted). These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S. Ct. 2541, 2550 (2011) (internal citations and quotations omitted).

Rule 23(b)(3) prohibits certification unless: (1) questions of law or fact common to all class members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Predominance is only satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the

issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (citations and quotations omitted). "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, at 350 (citation omitted). The Supreme Court instructs district courts to consider damages questions at the certification stage when analyzing predominance. *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426 (2013). If the Court were to find the predominance test satisfied, Plaintiff must then show that the class action format "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met," *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006), and "[t]he party seeking certification must establish the Fed. R. Civ. P. 23 requirements by a preponderance of the evidence." *Gregory v. Stewart's Shops Corp.*, No. 7:14-CV-33 (TJM/ATB), 2016 WL 8290648, at *10 (N.D.N.Y. July 8, 2016), *report and recommendation adopted*, No. 7:14-CV-00033, 2016 WL 5409326 (N.D.N.Y. Sept. 28, 2016) (citations omitted). "Rule 23 does not set forth a mere pleading standard ...", and courts must undertake a "rigorous analysis" to ensure that the requirements of Rule 23 have been satisfied. *Dukes*, 564 U.S. at 350-51. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id*. at 351. However, in its Rule 23 analysis, the court should not make any factual findings or merits determinations which are unnecessary to the issue of class certification. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 1195, (2013) ("[m]erits questions may be considered to the extent—but only to the extent—that they

8

are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied").

Two recent Second Circuit decisions address how a court should evaluate whether to certify a class under Rule 23. *See Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010); *Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013). In *Myers*, the Second Circuit affirmed the lower court's denial of Hertz station managers' motion for Rule 23 certification of a class to whom the company allegedly failed to pay overtime under the NYLL. The court began by stressing that the question of whether employees were exempt from overtime requirements "is a complex, disputed issue, and its resolution turns on exemption, which in turn will require the district court to decide a number of subsidiary questions involving whether plaintiffs fall within" the relevant criteria. *Myers*, 624 F.3d at 548. Those questions must be "resolved by examining the employees' actual job characteristics and duties." *Id.*

The station managers argued that class treatment was appropriate due to: (1) Hertz's blanket classification of all station managers as exempt; and (2) the testimony of Hertz representatives that all station managers have "similar responsibilities" and that their jobs were "more or less the same." *Id.* at 549-50. The Second Circuit rejected these arguments, first noting that the blanket exemption classification "does not establish whether all plaintiffs were actually entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions," but that rather "the question of entitlement to overtime pay is answered by examining the employee's actual duties." *Id.* Turning to the testimony from Hertz representatives, the court found that the statements regarding similarities among different station managers were "quite general and largely inconclusive" and also supported the fact that variations existed between different Hertz locations which may affect

station managers' job duties. *Id.* at 550. Finally, the Second Circuit rejected the station managers' argument that other, uncontested fact questions predominated. *Id.* at 550-51. The court held that these conceded issues (*e.g.*, whether plaintiffs worked overtime, were paid overtime, and were classified in common) were "clearly less substantial . . . when compared to the ultimate (contested) question the district court would have to decide in any potential class action—whether plaintiffs were legally entitled to the overtime they were not paid." *Id.* at 551.

Likewise, in *Cuevas*, the Second Circuit vacated and remanded a district court's decision to grant Rule 23 certification to a class of assistant branch managers at Citizens who, Cuevas alleged, had been wrongfully misclassified as exempt from overtime under the NYLL. The court first stressed that, pursuant to the Supreme Court's *Dukes* decision, a district court must undertake "a rigorous analysis" to determine whether the Rule 23(a) prerequisites are satisfied. *Cuevas*, 526 F. App'x at 21 (citations omitted). The record included some evidence, such as policy documents and job descriptions, suggesting that the managers performed primarily the same duties across the company. *Id.* However, the record also included evidence that the managers' primary duties varied "in respects material to whether they were exempt or non-exempt employees." *Id.* The court held that "[t]hese factual disputes are relevant to the determination whether Cuevas has presented a claim that is capable of classwide resolution, and, to the extent they are material, *must be resolved before a Rule 23(a) determination may be made*." *Id.* (emphasis added). Because the district court failed to "analyze rigorously the conflicting evidence before it and resolve the material disputed facts" regarding the variations in the managers' duties, the Second Circuit found that it abused its discretion. *Id.*

Turning to the predominance requirement of Rule 23(b), the Second Circuit held that there, too, the district court abused its discretion by failing to conduct the required rigorous

analysis. *Id.* at 21-22. Based on the company's blanket exemption of all the managers, together with common policies applicable to them companywide, the district court held that Cuevas had satisfied the predominance test. *Id.* at 22. The Second Circuit, however, deemed this an abuse of discretion, stressing the district court's failure "to address all of the evidence before it and resolve the material factual disputes arising from the conflicting" evidence in the record. *Id.* That thorough review, which the Second Circuit instructed the district court to undertake on remand, "is essential to determining whether [the managers] share primary duties such that common issues predominate over individual ones." *Id.*

### B. Plaintiff Cannot Meet Her Rule 23(a) Burdens of Establishing Commonality and Typicality.

Plaintiff has not met her Rule 23(a) burdens of proving that common questions, which are likely to yield common answers, apply to all class members. Indeed, the record reveals exactly the opposite: RAEs and NRAEs generally perform different duties and individual RAEs and NRAEs perform their primary duties with widely varying degrees of discretion and independent judgment, even relative to their peers. Further, for the same reasons, because Plaintiff claims that she exercised far less discretion and independent judgment than the vast majority of her peers in a manner that was contrary to what was expected of her role, she cannot prove that her claims are typical of all class members.

Plaintiff argues, incorrectly, that all of the class members' job duties were "largely defined by AT&T's comprehensive corporate policies and procedures" and claims that district courts "routinely" certify classes based on such policies, despite individualized differences in the actual job duties performed by class members. (Dkt. No. 268 at 25.) This is emphatically not the law. *See Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 42 (S.D.N.Y. 2012) ("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's

11

characterization of those activities[.]") (internal citations and quotations omitted), *aff'd*, 759 F.3d

235 (2d Cir. 2014); *Morris v. Ernst & Young, LLP*, No. 12 CV 0838 (KMW), 2012 U.S. Dist.

LEXIS 129414, at *11 (S.D.N.Y. Sep. 10, 2012) ("[A]lthough Plaintiffs contend that their FLSA

claim will turn on nationwide policies regarding the role of Staff employees, it is well-

established that courts must evaluate FLSA exemptions based on the duties that the employee

actually performed.").

Tellingly, Plaintiff cites exclusively to authority that pre-dates the Supreme Court's

recent clarification of the commonality element in *Dukes*. (Dkt. No. 268 at 24-26.) As the

Supreme Court explained, "commonality requires the plaintiff to demonstrate that the class

members have suffered the same injury," not that they have merely suffered a violation of the

same law. *Dukes,* 564 U.S. at 349-50 (internal citation and quotations omitted). Further, the

claims must depend on a "common contention," the resolution of which can determine the

validity of each of the claims "in one stroke." *Id.* at 350. The relevant issue for class certification

is not the "common questions" but the ability of the class to "generate common *answers* ..." *Id.*

at 349-50 (*quoting* Negareda, *Class Certification in the Age of Aggregate Proof*, 84

N.Y.U.L.Rev. 97, 132 (2009)) (emphasis in the original); *White v. W. Beef Props., Inc.,* No. 07

CV 2345(RJD)(JMA), 2011 WL 6140512, at *2 (E.D.N.Y. Dec. 9, 2011). "Dissimilarities within

the proposed class are what have the potential to impede the generation of common answers."

*Dukes*, 564 U.S. at 350.

Whether class members will generate common answers regarding their exempt status

depends on whether, with respect to their primary duties, they exercised the same degree of

discretion and independent judgment. *See Myers,* 624 F.3d at 549 (affirming denial of motion for

class certification where evidence revealed individualized differences between class members);

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (district court abused its discretion in certifying class of employees claiming wrongful exemption in reliance on a common exemption policy, to the virtual exclusion of other issues potentially requiring individualized proof); *Romero v. H.B. Auto. Grp., Inc.*, No. 11 Civ. 386(CM), 2012 WL 1514810, at *16 (S.D.N.Y. May 1, 2012) (denying motion for Rule 23 class certification because a "determination of exempt status requires an inquiry into the specifics of Plaintiffs job and a similarly individualized inquiry into the specifics of each allegedly misclassified employee whom Plaintiff is seeking to join."); *Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 341 (N.D.N.Y. 2011) ("Because individualized proof is required to determine the correctness of Defendant's categorizing putative class members as exempt, a class action is not a superior mechanism for adjudicating their claims."); *Dauphin v. Chestnut Ridge Transp. Inc.*, No. 06 Civ. 2730 (SHS), 2009 WL 2596636, at *3 (S.D.N.Y. Aug. 20, 2009) (denying motion for Rule 23 certification of class purportedly misclassified as exempt "because defendants' liability for unpaid overtime pay depends heavily on individualized proof."); *Morisky v. Pub. Sev. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (denying motion for class certification; "[t]o determine which employees are entitled to overtime compensation . . . depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria").

Without a single citation to any testimony or documents, Plaintiff asserts in conclusory fashion that the "voluminous" record shows that "all RAEs [and NRAEs]. . . are required to perform similar duties in a similar way." (Dkt. No. 268 at 26.) Discovery has laid Plaintiff's position bare. The record here unequivocally establishes that RAEs and NRAEs in New York and New Jersey performed different duties, and even within those roles exercised widely varying levels of discretion and independent judgment. In light of these differences, no common answer

13

to the exemption question is possible as demonstrated by the varying determinations that have already been made with respect to the exempt status of individuals in these jobs.

        1.    The Putative Class Members Performed Their Jobs in Significantly Different Ways.

The RAE and NRAE jobs are not "cookie cutter." The roles required the incumbent to exercise his or her own individual judgment, to improvise, to think creatively, to build relationships, and to analyze issues and recommend effective business solutions. The record here emphatically demonstrates that how each individual approached the role varied greatly depending on the individual in question. This individualized variation touched on all aspects of the RAE and NRAE job, including (1) marketing, (2) training, (3) setting business goals, (4) scheduling, and (5) resolving customer issues.

        a.    *Variation in Setting Business Goals*

The alleged class members took widely varied approaches to setting business goals for each of their stores. In sharp contrast to Plaintiff, who claimed that she exercised no independent discretion or judgment in setting business goals for her stores, some of the class members candidly described their job duties in an exempt fashion.

For example, Martino, a former NRAE and RAE, testified that, as an NRAE, he successfully managed approximately 36 national retail locations (the largest territory in the national retail channel) by "promot[ing] sales to be successful." (*See* Martino Dep., 44:4-45:21; 103:24-104:5.) He used several techniques to position AT&T over competitor networks sold by his national retail locations, including: (1) discussing the advantages of AT&T with associates while training them in subjects he himself identified (by analyzing sales metrics and personally observing associates); (2) attending monthly dinners with district managers (which he could decide to pay for on a company credit card), where he would answer questions and present

materials he adjusted to suit his market; and (3) providing feedback to district managers and other executives regarding the strengths and weaknesses of particular stores, including personnel decisions, inventory distributions, and merchandising. (Martino Dep., 47:4-49:19; 52:3-8; 52:20-57:13; 58:16-61:8; 63:2-67:3.) In addition, Martino created business plans twice per year for his locations (in which he described operational challenges and proposed action plans) that he presented to a Vice President of AT&T. (Martino Dep. 86:2-20.) He also described two promotions he developed and implemented. (Martino Dep., 70:13-71:22; 86:2-88:22.) Martino performed these duties with minimal supervision, and made several decisions on his own. His manager only accompanied him to locations "once in a while . . . [m]aybe once every two months, three months." (Martino Dep., 75:8-76:5.)

A number of other alleged class members from whom discovery was taken admitted that they used analysis and judgment to prepare their business plans, and that they shared their plans with their supervisors, others at AT&T, and representatives at their assigned locations. (*See* Cascioli Dep. 64:6-10 (part of the job was analyzing business reports for trends and communicating them to doors); Henton Dep. 70:13-71:24 (reviewed metrics, identified doors in need of improvement, decided best method to improve metrics via side-by-side selling, explaining promotions, and providing feedback to owners about employee performance); O'Brien Decl. ¶ 11 (created business plans reflecting each store's trends and opportunities, showed them to store management and discussed how he could help them reach their goals); Medrano Decl. ¶ 4 (created cards with high level summaries of sales goals, progress toward goals, and prior-year metrics to discuss with managers and motivate them to achieve goals); ¶ 10 (developed business plans, identifying trends, and discussed them with store management).)

      b.    *Variation in Training Duties*

Alleged class members performed their training duties in varied ways. Plaintiff and at least one other alleged class member admitted that they trained associates at their locations, but denied customizing those trainings or creating their own training materials. (Cascioli Dep., 63:17-64:5; 65:15-23; 66:8-16.) In contrast, several RAEs and NRAEs who worked in New York and New Jersey admitted to customizing trainings by tailoring training to their accounts, creating their own training materials, and using their judgment to determine what topics to present. (Martino Dep., 105:15-18 (customized and delivered training that would fit the needs of each retailer); 47:14-48:11 (determined what training to give based on his analysis of sales reports); O'Brien Decl. ¶ 8 (provided training on a range of topics that varied from employee to employee based on their strengths, weaknesses, and learning styles) ¶ 9 (compiled information from different sources to create training documents customized to the retailer or focused on information that he wanted to present); *see also* McCormick Decl. ¶ 8 (RAEs are responsible for selecting and customizing training based on their observations of the store's opportunities and challenges).)

### c.   *Variation in Marketing Duties*

For RAEs and NRAEs alike, marketing duties were a key component of achieving the goal of increasing AT&T's sales. Managers expected RAEs and NRAEs to exercise their discretion in making recommendations concerning marketing and merchandizing within their assigned doors. (*See* Wang Decl. ¶¶ 4(c), 6(c) ("NRAEs could always make recommendations to the store or department manager of the retailer of ways to improve displays' locations in order to enhance the customer experience. In my observation, NRAEs were often able to influence store or department managers at retailers in this way based on their personal relationship.").)

Here, too, discovery has already revealed that RAEs and NRAEs who worked in New York and New Jersey performed their marketing duties in substantially varied ways. For

example, unlike Plaintiff, Martino reported using his merchandising expertise to make suggestions to Radio Shack managers to improve merchandising of the wireless section (Martino Dep., 65:15-66:2.) Henton testified that he acted as a "small business account manager" during the limitations period (instead of an RAE). (Henton Dep., 16:12-18:25 (his manager told him that he considered him a small business account manager who was responsible for selling more business-to-business services).) Henton focused on creating small business accounts (instead of just individual accounts), and identified opportunities to do so by building relationships with individual customers, visiting small businesses in his area to promote AT&T, and attending trade shows to connect with account executives from other companies. (Henton Dep., 20:15-21:11; 23:20-26:7.)

Depositions also revealed differences in the RAEs' and NRAEs' authority to create contests or promotions. While Cascioli does not recall ever running a promotion or contest, Martino devised various promotions on his own. (*Compare* Cascioli Dep. 108:5-18 (refusing to run a promotion with his own money; does not recall running or being supposed to run promotions) *with* Martino Dep., 70:13-71:22 (created the "Benjamin Franklin Club," where he would offer a prize to associates who exceeded $100 in sales).) Others collaborated with their managers, retail locations, or other RAEs to create contests and promotions. (*See, e.g.,* O'Brien Decl. ¶ 4 (worked with owners of stores to devise incentive contests for associates).)

> d.     *Variation in Authority to Schedule*

Individual RAEs and NRAEs reported dissimilar degrees of authority to set their own store visitation schedules as account executives. Martino determined when to visit stores by choosing to visit stores with equal frequency (as opposed to visiting a "sustainer" more frequently than a "drainer," or vice versa). (Martino Dep., 82:12-83:11.) Cascioli testified that management told him how to schedule store visits. (Cascioli Depo., 87:9-25.) Others had

complete or substantial autonomy over setting their schedules. (*See* O'Brien Decl. ¶ 13 (did not

have a set schedule and was able to modify his hours if necessary to handle personal

commitments); Medrano Decl. ¶ 11 (hours changed depending on what she needed to do;

sometimes worked from home, sometimes prepared reports while watching television in the

evening); *see also* Wang Decl. ¶ 7 ("RAEs and NRAEs reporting to me had the freedom to set

their own schedules, subject to it making good business sense, and to come up with their own

plans to maximize sales in their doors.").)

An RAE's or NRAE's ability to set their own schedule also varied based on the manager

to whom they reported. (*See* McCormick Decl. ¶ 5 (different managers employ different styles;

some make suggestions regarding RAEs' schedules and others do not); Euratte Decl. ¶ 14

(NRAEs set their own schedules; in some markets managers may establish certain parameters or

minimum store visit expectations, but it is the NRAEs' responsibility to determine when and

how long they should visit each store based on their determination that a store or relationship

would benefit from additional attention and assistance).) Henton confirmed that different

managers took different approaches regarding scheduling:

> Some of the details [regarding how he communicated his schedule]
> changed depending on the manager. . . .Some micromanage, some
> don't. Some [would] say you have to go to seven locations, not
> five. Some said, you know, you have to send certain reports
> throughout the day. Some said you had to send it after being in the
> field. The details changed depending on the manager.

(Henton Dep., 72:15-24.)

e.    *Variation in Authority to Resolve Customer Issues*

Some alleged class members testified about contrasting degrees of authority to resolve

customer issues at their assigned stores. Some could not issue customer credits on their own.

(*See* Cascioli Dep. 111:20-22 (could not issue customer credits at all); Bailey Decl. ¶ 8 (authority

18

granted to RAEs and NRAEs varies by market; in his market, NRAEs and RAEs do not issue customer credits).) On the other hand, some did have the authority to issue customer credits. (*See* Euratte Decl. ¶ 14 (NRAEs in some markets have discretion to issue customer credits, whereas NRAEs in other markets need the approval of an ARSM or RAM); *see also* Henton Dep. 136:8-16 (could send discount cards for owners and salespeople to give to some of their frequent customers).)

RAEs and NRAEs also experienced substantial variation in the degree to which they could exercise discretion and independent judgment in addressing customer issues more broadly. (*See* Euratte Decl. ¶ 14 (Some NRAEs can waive activation or upgrade fees for customers, while others cannot).) Some RAEs and NRAEs felt that their authority to address customer issues was limited. (*See, e.g.,* Martino Dep. 106:19-107:12 (dealt with customers disgruntled by defective products, but referred billing issues to employees in receivables).) On the other hand, others reported that they regularly addressed customer issues, including customer billing issues, by enforcing or seeking waivers from AT&T policies and procedures and making escalation decisions. (*See* Henton Dep. 143:19-144:2 (served as the point of escalation for customer issues and ensured timely and appropriate resolution of all customer's issues); Cascioli Dep. 64:16-25 (same); McCormick Decl. ¶ 4 (RAEs handled customer escalations, including sometimes crediting a customer's account).)

f.      *Varied Experiences With "On-Call" Time*

RAEs and NRAEs who worked in New York and New Jersey also reported a range of experiences regarding their so-called "on-call" time—that is, time outside of the normal business hours during which store employees could call Plaintiffs about various issues.  While RAEs and NRAEs sometimes responded to calls and emails from their assigned stores if they were available, they had the discretion to set their own expected response time and to make other

19

arrangements when they were unavailable and had the option to forego responding until the next business day.  (*See* Ex. PP to Saffer Decl. (Dkt. 264-42) at RESP0031206 ("You should set what an expected response time is, *whether it is a few hours or one business day* for you to respond to their request. If you do not have an answer in the expected response time, you should contact the Dealer and provide status update [sic]. Note: If you are on vacation, in a meeting, or out sick, your Dealers should know who they can contact in your absence.") (emphasis added); Ex. MM to Saffer Decl. (Dkt. 264-39) at RESP0032799 ("If you are on vacation, in a meeting or out sick, your store locations should know who they can contact when you are unavailable."); O'Brien Decl. ¶ 4 (was not required to answer calls at night or on weekends).)

The call frequency also varied generally among individual RAEs and NRAEs, and even varied significantly from day to day. When asked what the average number of calls she received outside of business hours was, LoCurto explained "every day [was] different" – some days she got zero calls, other days she got eight. (LoCurto Dep., 254:2-20; *see also* Medrano Decl. ¶ 11 (some days she received no calls from retailers; other days received multiple calls.) Henton was unable to provide an estimate, reporting instead that his hours varied by manager—"sometimes it was throughout the day . . . [s]ometimes it was a few hours that day." (Henton Dep., 53:10-13; 59:5-12.)

Even the alleged class members themselves do not agree on whether they should be paid overtime for the hours that they might be called by one of their doors. (*Compare* Henton Dep. 156:3-157:2 (does not believe he should be paid overtime while watching basketball at home merely because a door might call him) *with* LoCurto Dep. 248:4-249:3 (believes she should be paid overtime for time that she was asleep at home but could have been called) *and* Cascioli Dep.

123:2-124:24 (believes he should be paid for time spent restoring old cars, hunting, fishing, and going to church and meals with his wife).)

>    g.    *These Variations Have Already Led Fact Finders to Different Conclusions Regarding Individual Account Executive's Exempt Status*

Due to the many variations in the job duties performed by individual RAEs and NRAEs, each alleged class member's exempt status can only be determined based on an analysis of their unique approach to the job.  Indeed, fact finders have already reached different conclusions regarding the exempt status of four different indirect account executives (one RAE and three NRAEs) based on the job duties they performed and the degree to which they exercised discretion and independent judgment in their role.

In May 2015, AT&T prevailed on cross-motions for summary judgment in three related arbitration matters involving the same jobs, the same counsel, and the same facts.  (*See* May 2015 Arbitration Decision, attached as Exhibit U to the Shea Aff.) Arbitrator Michael Young held that an RAE and two NRAEs were properly classified as exempt under the FLSA, NYLL, and NJWHL. (*Id.*) Analyzing their job duties, Arbitrator Young found that these three account executives exercised direction and independent judgment when setting their own schedules, tailoring their strategies and communications to the needs of their assigned doors, and assisting with the resolution of customer service issues. (*Id.* at 9-10.)

Subsequently, in September 2016, this Court analyzed the job duties performed by LoCurto and held that she was not exempt under the same federal and state laws. (Dkt. No. 173.)[3] In contrast to the three indirect account executives who arbitrated their claims, the Court found that LoCurto had minimal discretion to set her own schedule, did not meaningfully tailor

---

[3]    AT&T reserves its rights to challenge this finding on appeal.

her training of salespeople, and did not plan long-term or short-term business objectives. (*Id.* at 15-17.)

These decisions are not necessarily inconsistent; individual RAEs and NRAEs perform their primary job duty in widely varying manners. Representative evidence cannot resolve or address these differences. Rather, each RAE and NRAE must be analyzed independently based on their unique job duties and the manner in which they perform them. *See Morisky v. Pub. Sev. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("[t]o determine which employees are entitled to overtime compensation . . . depends on an individual, fact specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria"); *Dean v. Priceline.com, Inc.*¸ No. 3:00CV1273 (DJS), 2001 U.S. Dist. LEXIS 24982, at *7 (D. Conn. 2001) ("[d]etermining whether an employee is exempt is extremely individual and fact-intensive").

2.      The RAE and NRAE Jobs Differ Significantly.

Plaintiff worked in New York and New Jersey only as an NRAE. She never worked as an RAE. There are fundamental differences between the RAE role and the NRAE role due to the different types of businesses they support.  Like the individual differences between the manner in which *each* RAE and NRAE performs their duties, these broad differences between the two positions preclude class certification here.

As explained above, because nearly all[4] local dealers have an exclusive arrangement with AT&T and do not sell other wireless brands, RAEs did not have to compete to earn their store's business relative to other carriers the way that NRAEs did. (McCormick Decl. ¶ 10; Wang Decl. ¶ 5.) Further, at local dealers, because sales associates were exclusively assisting AT&T

---

[4]      All but approximately 60 of the 2,700 local dealer locations have an exclusive arrangement with AT&T. (McCormick Decl. ¶ 10.)

customers, RAEs tended to engage in more observation and coaching of sales associates to ensure AT&T customers receive the same customer experience they would if they were in an AT&T owned store. (McCormick Decl. ¶ 8; 10; Bailey Decl. ¶ 6; Cascioli Dep. 67:3-18 (used side-by-side selling and role-playing techniques to coach sales associates and increase AT&T sales).) As a result, RAEs consistently worked with owner-operators, local dealer store management, and district managers, and enjoyed more opportunity to provide feedback to the dealer on sales associate skills and performance, potential reassignment of management, and promotions. (McCormick Decl. ¶¶ 4, 7; Bailey Decl. ¶ 6; Cascioli Dep. 68:15-19 (Giving associates feedback on how to sell more effectively "was definitely a way to increase sales.").) RAEs also helped local dealers create customer-facing promotional events, such as staffing booths at local trade shows, and advised dealers on issues like merchandising and other promotional opportunities. (McCormick Decl. ¶ 4.)

Some local dealers offered additional AT&T products and services not typically offered by national retailers, which also affected the job duties required of RAEs. For instance, some local dealers also sold "wireline" products and services, such as the Company's U-Verse offerings, a combination of high-speed internet, data, voice and television services distributed through AT&T's digital network, and Digital Life, a home security and automation system. (McCormick Decl. ¶ 12; Bailey Decl. ¶ 9.) These services were not available in some local dealer markets, while dealers in other markets are heavily engaged in this business. (McCormick Decl. ¶ 12; *see also* Bailey Decl. ¶ 9.) RAEs in markets selling such products had to understand these additional products and be able to support them at their retailers. (McCormick Decl. ¶ 12; Bailey Decl. ¶ 9.)

23

By contrast, AT&T's national retail contracts are non-exclusive; retailers in the national retail chain also sell competing products and services of other wireless carriers. (Euratte Decl. ¶ 4). Staffing levels and displays at national retailers are often covered by pre-existing contracts or standardized rules and therefore require substantially less attention from NRAEs. (Euratte Decl. ¶ 9.) Because national retailers tend to have more layers of management than local dealers, national retail chain owners are not directly involved in the day-to-day operations of national chain stores and generally do not interact with NRAEs. (Euratte Decl. ¶ 7.)

Although the fundamental purpose of the RAE and NRAE positions—to promote and market AT&T—was the same, the jobs were not. Plaintiff's so-called common question of whether putative class members are properly classified under the administrative exemption is unlikely to yield a common answer with respect to RAEs, NRAEs, and those who performed both roles.

3.    <u>Plaintiff's Motion Fails to Prove Commonality and Typicality.</u>

The only alleged facts Plaintiff points to (albeit without citation) to support her conclusion that "all RAEs [and NRAEs]. . . are required to perform similar duties in a similar way" is: (1) the claim that allegedly uniform policies dictate all RAEs' and NRAEs' tasks and the manner in which they must perform those tasks; and (2) the fact that all RAEs and NRAEs were classified as exempt from overtime.[5] (Dkt. No. 268 at 26.) The discovery record squarely contradicts the former, and the latter is irrelevant to the certification decision.

---

[5]    Throughout her motion, Plaintiff relies on testimony from RAEs and NRAEs who did not work in New York or New Jersey. She provides no basis for the court to conclude that any of these individuals have first-hand knowledge of the job duties performed by RAEs and NRAEs in either state, or of their unique markets and managers. This Court should disregard their testimony. Specifically, Almonte and Lombard worked in Massachusetts, Briscoe worked in Maryland, Bryant worked in Alabama, Daily worked in Arizona, Foster and Walker worked in Florida, Runnels worked in Louisiana, Smith worked in Kentucky, and Yowell worked in Mississippi.

First, AT&T policies did not dictate all RAEs' and NRAEs' tasks or the manner in which they performed those tasks. Indeed, tasks performed by RAEs and NRAEs varied significantly. As noted in Section III.B.1 above, some created business plans and identified action items based on their multilayered analyses of sales trends, associate performance, operational challenges, and marketing efforts, while others adopted Company-provided sales goals and relied heavily on AT&T templates. Some provided training tailored to the sales associates' specific needs as identified through in-depth observation, utilizing materials that the account executives created on their own. Others provided standardized training using AT&T materials and reported minimal room for meaningful discretion. Some invented new and unique marketing practices, contests, and promotions, while others reported that they were limited to implementing AT&T-created marketing plans and ensuring that stores are in compliance with Company planograms. Some were subject to minimal supervision and exercised complete autonomy over crafting their schedules, while others reported micromanagement and the need for supervisor approval for schedules; those with multiple supervisors reported substantial variation in their roles under each. Some had the authority to issue customer credits and exercised discretion in resolving customer issues, while others reported that they did not have the authority to issue credits and did not recall addressing any customer issues directly. As these variations show, Plaintiff's claim that all duties and manner of performance were dictated by Company policy is false.[6]

----

[6] AT&T previously argued that all RAEs and NRAEs were required to exercise discretion and independent judgment and that exempt status should be determined based on the requirements of the job, even for alleged class members who misperformed their duties and failed to meet their job requirements.  The court did not address this argument in its summary judgment decision thereby apparently rejecting it.  (See Dkt. No. 173.)  But this determination makes it all the more necessary to make exempt status determinations on an individual basis.

Second, while Plaintiff may phrase the question—whether RAEs and NRAEs are exempt from overtime—in a way common to all class members, "[a]ny competently crafted class complaint literally raises common questions . . . [and] reciting these questions is not sufficient to obtain class certification." *Dukes,* 564 U.S. at 349-50 (citations and quotations omitted). The commonality of the *answers* to these questions is the crux of the commonality requirement. *Id.* Because the degree to which RAEs and NRAEs exercise independent discretion and judgment varies significantly even among the Opt-In Plaintiffs (*i.e.*, the small subset of employees who opted in with the belief that their jobs were non-exempt), the *answer* to the question of whether RAEs and NRAEs are exempt requires an individualized analysis. *See Myers v. Hertz Corp.* 2007 U.S. Dist. LEXIS 53572, at *13-14 (E.D.N.Y. 2007) (rejecting as "superficial" the argument that because employer's policy classified all putative class members as exempt, the overtime issue was common to them all; stressing that "proof of liability will not turn on what [the employer] did or did not to vis-à-vis the entire class, but rather what each member of the class does on a daily basis"), *aff'd*, 624 F.3d 537 (2d Cir. 2010).

Plaintiff attempts to muddy the water by introducing three other so-called "common questions" that have already been answered, are duplicative, or are circular. Plaintiff's first "common question" is "[w]hether Plaintiff and class members were denied overtime under the NYLL and/or NJWHL." (Dkt. No. 268 at 25.) The answer to this question is not disputed: Plaintiff and the putative class members were not paid overtime for any hours they may have worked in excess of 40 in any given week. To the extent that the word "denied" is meant to incorporate the issue of whether AT&T's classification of the RAEs and NRAEs as exempt was *proper*, the question is duplicative of Plaintiff's second question and should be disregarded. (Dkt. No 268 at 25) ("Whether AT&T's blanket classification of all RAEs under the administrative

26

exemption violates the class members' statutory rights such that they are entitled to overtime compensation."); *see Myers*, 2007 U.S. Dist. LEXIS 53572, at *11 ("[D]efendant does not deny that no overtime was paid. The real issue in this case, however, is whether any of the putative class members were ever entitled to overtime wages under the FLSA.")

Plaintiff's next question—"[w]hether all RAEs are required to perform similar duties in a similar way"—is before the Court on the instant motion; it is not held in abeyance pending resolution of the certification issue. (Dkt. No 268 at 25.) If RAEs and NRAEs did not perform similar duties in a similar way—which they did not—then class certification is inappropriate. If they were required to perform similar duties in a similar way, then class certification would be appropriate provided the other requirements of Rule 23 are met. The "rigorous analysis" required by Rule 23 calls for the resolution of "factual disputes relevant to each Rule 23 requirement" *In re IPO Sec. Litigation*, 471 F.3d 24, 37-41 (2d Cir.2006) (citations omitted). At this stage then, "the district court should resolve the factual disputes to the extent they are material to the commonality question." *Cuevas,* 526 F. App'x at 21 (vacating district court's grant of class certification where district court "did not analyze rigorously the conflicting evidence before it and resolve the material disputed facts"); *see also In re IPO Sec. Litig.*, 471 F.3d at 42 (the "district judge is to assess all of the relevant evidence admitted at the class certification stage" and resolve all material disputed facts). Here, where the commonality question turns on whether the answer to the exemption question will be common for all class members, the district court is required to analyze evidence regarding whether putative class members' "primary duties varied in respects material to whether they were exempt or non-exempt employees." *Cuevas*, 526 F. App'x at 21.

Plaintiff's final question—whether AT&T's classification of RAEs and NRAEs was done knowingly—is also not in dispute. AT&T knowingly made the classification decision based on its understanding of the job requirements derived from input from sales leadership and a review of individual RAEs and NRAEs job duties. (*See* Johnson Decl. ¶ 5.) But as the Second Circuit has made clear, a knowing classification decision in no way suggests the existence of a common question with a common answer that may give rise to liability. *See Myers*, 624 F.3d at 549-50 (a common exemption classification "does not establish whether all plaintiffs were actually entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions") (citations and quotations omitted).

As described above, the alleged class members performed their duties in widely varying ways, and in respects material to whether the Court would determine whether they were exempt from overtime under New York or New Jersey law. In deciding Plaintiff's individual motion for summary judgment, this Court focused on four areas that it deemed pertinent to the exemption analysis: scheduling, teaching, marketing, and setting long- and short-term business objectives. (*See* Dkt. No. 173 at 15.) The many class members who have testified in this matter told widely varying accounts regarding their overall duties, their level of supervision, and their authority in the areas on which the Court focused. Other RAEs and NRAEs similarly provided testimony by declaration regarding the variations in their job duties. These variations render it impossible for the Court to make a collective exemption determination without considering each individual separately.

In addition to revealing that the answers to Plaintiff's so-called common questions would differ among class members, these substantial differences also reveal that Plaintiff cannot show that her claims are typical with respect to others in the class. *See Myers*, 2007 U.S. Dist. LEXIS

53572, at *18 ("Although the legal claims alleged and the sole defense to them is the same throughout the class, proof of liability will require individual factual analysis. Therefore, for the same reason that plaintiffs fail to meet the commonality requirement, they likewise fail to meet the typicality requirement."). Plaintiff's argument that AT&T's mere classification of class members as exempt from overtime is sufficient to satisfy the typicality requirement is legally untenable. *See Morisky*, 111 F. Supp. 2d at 500 (alleging "common scheme" of misclassifying workers insufficient to show typicality under Rule 23(a) given individualized nature required to determine an employee's exemption status). While Plaintiff's testimony in these areas persuaded the Court that the administrative exemption did not apply to her, discovery has revealed that Plaintiff's experience is not representative of other RAEs and NRAEs. Relative to the other RAEs and NRAEs deposed, Plaintiff performed her duties with the least amount of discretion and independent judgment of the group. (*Compare* LoCurto Dep. 121:9-11 ("I was not allowed by corporate agreement to ever discuss compensation in any way with BestBuy employees."), *with* Martino Dep. 70:13-71:6 (took high performers out to dinner as an incentive and implemented a promotion of his own design; "If anyone, back then, exceeded $100 in sales in certain features, they would get a special prize from me."), *and* LoCurto Dep. 104:5-14 (testifying that side-by-side selling is prohibited at her accounts), *with* Cascioli Dep. 68:2-19 (testifying that side-by-side selling was "was definitely a way to increase sales").) Far from proving that her experience was typical of the putative class, Plaintiff's unique underperformance reveals that she is an outlier.

### C.   Plaintiff Cannot Meet Her Rule 23(b) Burden.

Even if she could establish commonality and typicality, Plaintiff cannot succeed on her motion because she has not met—or even meaningfully attempted to meet—her burden of proving that common questions predominate over the myriad questions affecting only individual

members. Because the alleged class members' claims raise individualized issues regarding the

duties they performed and the manner in which they performed them, Plaintiff cannot establish

that a class action is superior to other available methods for the fair and efficient adjudication of

those claims. For these reasons, Plaintiff's motion for class certification of her State Law claims

should be denied.

1.    Individual Issues Predominate.

Plaintiff must also show that "questions of law or fact common to class members

predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

Plaintiff's burden here is "more demanding" than the commonality inquiry under Rule 23(a),

because it requires not only that there be disputed issues that can be resolved though

"generalized proof," but also that "these particular issues are more substantial than the issues

subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.

2002); *see In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002) ("Clearly, if proof

of the essential elements of the cause of action require individual treatment, then there cannot be

a predominance of 'questions of law and fact common to the members of the class.' "); *Holt v.

Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1272 (M.D. Ala. 2004) ("the status as non-exempt cannot

be litigated through representative proof"); *Morisky*, 111 F. Supp. 2d at 498 ("[t]o determine

which employees are entitled to overtime compensation . . . depends on an individual, fact-

specific analysis of each employee's job responsibilities under the relevant statutory exemption

criteria"); *Dean,* 2001 U.S. Dist. LEXIS 24982, at *7 ("[d]etermining whether an employee is

exempt is extremely individual and fact-intensive").

Ignoring her heavy burden here, Plaintiff concludes without analysis that she satisfies

Rule 23 simply because she meets the Rule 23(a) commonality criteria and therefore also meets

the requirements of Rule 23(b)(3). (Dkt. No. 268 at 29-30.) Even if Plaintiff could satisfy her

Rule 23(a) burden of showing that there are common questions with common answers for the

alleged class (which she cannot), she is unable to show that such questions "*predominate* over

any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added).

Plaintiff cites to just one case, *Damassia v. Duane Reade*, which is inapposite. (Dkt. No.

268 at 30.) As the *Damassia* court stressed in its predominance analysis, the employer "conceded

that the business practices at issue in this case are uniform among its stores" and that the duties

and responsibilities are "centrally derived." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 159

(S.D.N.Y. 2008) (citations omitted). Moreover, in *Damassia*, the plaintiffs' argument that all

alleged class members performed the same duties was "corroborated by a store manager, who

has worked in five different stores, and states that '[t]here was no significant variation in the job

duties of assistant managers in any of the five stores I worked in.' " *Id.*

Here, the voluminous record establishes that the class members' experiences varied

widely with respect to the key issue in this case: the degree to which RAEs and NRAEs

exercised discretion and independent judgment in the performance of their primary duties. Here,

AT&T has made no admission analogous to that made by Duane Reade in *Damassia*. To the

contrary, several class members have conceded that their own job duties in the areas this Court

deemed relevant to the administrative exemption with respect to Plaintiff varied widely between

RAEs and NRAEs, among RAEs and NRAEs, and even for any given account executive from

day to day and month to month.

Plaintiff's motion is centered on a flawed theory: that a common decision to classify

employees as exempt automatically renders a dispute over that classification appropriate for class

treatment under Rule 23. As noted above, the Second Circuit has squarely rejected this position.

*See Myers*, 624 F.3d at 549-50 (affirming denial of motion for class certification; stressing that a

31

common exemption classification "does not establish whether all plaintiffs were actually entitled to overtime pay or whether they were covered by the applicable administrative regulations defining FLSA's exemptions" and is not "determinative of the main concern in the predominance inquiry: the balance between individual and common issues") (citations and quotations omitted); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d at 957 (holding that district court abused its discretion in certifying class of employees claiming wrongful exemption in reliance on a common exemption policy, to the virtual exclusion of other issues potentially requiring individualized proof).

Common questions likewise do not predominate because of the myriad issues that arise based on claims by the alleged class for "on call" time.

### 2. A Class Action Is Not the Superior Method of Litigating Plaintiff's State Law Claims

Similar to the predominance analysis, a plaintiff cannot establish that a class action is superior to other available methods for the fair and efficient adjudication of the matter where the claims of class members raise individualized issues. *Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 341 (N.D.N.Y. 2011) ("Because individualized proof is required to determine the correctness of Defendant's categorizing putative class members as exempt, a class action is not a superior mechanism for adjudicating their claims."); *Spann v. AOL Time Warner, Inc.* 219 F.R.D. 307, 324 (S.D.N.Y. 2003) (class action not superior under Rule 23(b)(3) where "Plaintiffs have not shown that it will be unnecessary to conduct highly individualized, fact-intensive inquiries"). Thus, Plaintiff's claims fail the superiority analysis for the same reasons they do not satisfy the predominance standard.

Plaintiff's bare statement that class members would be disadvantaged by having to pursue claims individually against AT&T based on her supposition that the putative class members "do

not possess the knowledge or resources to prosecute a lawsuit" is entirely unsupported by any facts. Plaintiff also asserts with no support whatsoever that "[g]iven the number of potential class members"—a number which she does not specify—a class action is a superior method of adjudication. (Dkt. No. 268 at 31.) Numerosity alone, however, does not render a class action the superior method of litigating claims, particularly where the court would need to conduct individualized inquiries with respect to each class member. *See Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 142 (S.D.N.Y. 2003) (where the court would be required to conduct a series of mini-trials in order to determine whether each putative class member is entitled to relief, "a class action is not a feasible, let alone superior, method for the fair, efficient, and manageable adjudication of the putative class's claims for interest.") (citation omitted). Because the broad variation in duties performed by putative class members requires an individualized analysis of each member, it would be neither surprising nor inappropriate for different class members to obtain different results. That is precisely why class treatment is not appropriate here.

It is also worth noting that all class members were given the opportunity to opt in to the FLSA collective action. Only 19 individuals chose to do so. By pressing a Rule 23 proceeding, Plaintiff is essentially seeking to sweep into this case the many other individuals who chose not to dispute their exempt status, but who may become members of the class automatically by simply overlooking an opt-out form. That is contrary to the procedural mechanism Congress deemed superior when it adopted the FLSA. *See Moeck v. Gray Supply Corp.*, Civ. No. 03-1950 (WGB), 2006 U.S. Dist. LEXIS 511, at *15 (D.N.J. Jan. 5, 2006) ("Congress created the opt-in procedure under the FLSA for the purpose of limiting private FLSA plainitffs to employees who asserted claims in their own right and freeing employers from the burden of representative actions."); *Otto v. Pocono Health Sys.*, 457 F. Supp 2d 522, 524 (M.D. Pa. 2006) ("It is clear that

Congress labored to create an opt-in scheme when it created Section 216(b) specifically to alleviate the fear that absent individuals would not have their rights litigated without their input or knowledge"; *accord Evancho v. Sonofi-Aventis U.S. Inc.*, Civil Action No. 07-2266 (MLC), 2007 U.S. Dist. LEXIS 93215, at *16 (D.N.J. Dec. 18, 2007) (dismissing state-law claims because "plaintiffs . . . are not permitted to 'circumvent the opt-in requirement and bring unnamed parties into federal court by calling upon state statutes similar to the FLSA', as this would 'undermine Congress's intent to limit these types of claims to collective actions.'"). At the very least, in considering the superiority of other procedural mechanisms, the court should consider that only 19 individuals have opted to participate in the FLSA collective action (only 15 of whom still remain) and limit the state law claims to those individuals.

## IV.    CONCLUSION

Discovery has revealed that the proposed class does not satisfy Rule 23's commonality, typicality, predominance, or superiority requirements. The answer to the key factual question here—whether the administrative exemption is appropriate—will turn on facts that differ from one putative class member to another. Thus, the Court should deny Plaintiff's Motion for Rule 23 Certification of a NYLL and NJWHL Class.

Dated:   October 27, 2017              Respectfully submitted,
           New York, New York


By:     s/ Patrick W. Shea
         Patrick W. Shea


PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
patrickshea@paulhastings.com

*Attorneys for Defendant*