PATRICK W. SHEA
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
patrickshea@paulhastings.com
(212) 318-6000 (telephone)
(212) 319-4090 (facsimile)

*Attorneys for Defendant*
AT&T Mobility Services LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LISA LOCURTO, *on behalf of herself and all others similarly situated*,

        Plaintiff,

      -against-

AT&T MOBILITY SERVICES LLC,

        Defendant.

13 Civ. 04303 (AT)(KNF)

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

Page

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT PROCEDURAL HISTORY ......................................................... 1

III.    GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
        JUDGMENT ON THE ADMINISTRATIVE EXEMPTION DEFENSE....................... 2

      A.      The record is replete with evidence that disputes the claim that the Opt-In
        Plaintiffs did not exercise discretion and independent judgment with
        respect to matters of significance.......................................................... 5

            1.      The record squarely contradicts Plaintiff's claim that the Opt-In
                Plaintiffs delivered standardized and prescribed training. ......................... 6

            2.      The level of supervision of the Opt-In Plaintiffs also is disputed.............. 8

            3.      There is a genuine issue of material fact regarding whether the
                Opt-In Plaintiffs exercised substantial discretion with respect to
                marketing and merchandizing.................................................... 11

            4.      The Opt-In Plaintiffs developed their own performance goals and
                customized business plans for stores. .......................................... 13

            5.      The Opt-In Plaintiffs exercised managerial responsibilities and the
                authority to address store and customer issues. ................................. 16

      B.      There is substantial evidence that the Opt-In Plaintiffs performed work
        directly related to the management or general business operations of
        AT&T............................................................................................... 20

      C.      The Opt-In Plaintiffs' reliance on Beauford is inapposite. ................................. 24

      D.      Plaintiff's reliance on a proposed and unimplemented reclassification is
        misplaced. ......................................................................................... 26

      E.      Plaintiff Lisa LoCurto is not entitled to summary judgment on her state
        law claims. ........................................................................................ 27

IV.     CONCLUSION.................................................................................................. 28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505 (1986) .................................................................. 2, 3

*Beauford v. ActionLink, LLC*,
   781 F.3d 396 (8th Cir. 2015) ................................................................... 24, 25, 26

*Blanchar v. Standard Ins. Co.*,
   736 F.3d 753 (7th Cir. 2013) ......................................................................... 22

*Brady v. Colchester*,
   863 F.2d 205 (2d Cir. 1988) ............................................................................ 3

*Bryant v. Maffucci*,
   923 F.2d 979 (2d Cir. 1991) ............................................................................ 3

*Carlson v. C.H. Robinson Worldwide, Inc.*,
   Nos. 02-3780, 02-4261, 2005 U.S. Dist. LEXIS 5677 (D. Minn. Mar. 30,
   2005) ...................................................................................................... 5

*Chambers v. TRM Copy Ctrs. Corp.*,
   43 F.3d 29 (2d Cir. 1994) .............................................................................. 3

*Cruz v. Lawson Software, Inc.*,
   764 F. Supp. 2d 1050 (D. Minn. 2011) ............................................................... 11

*Gordon v. Kaleida Health*,
   299 F.R.D. 380 (W.D.N.Y. 2014) .................................................................... 3

*Grage v. N. States Power Co.*,
   813 F.3d 1051 (8th Cir. 2015) ....................................................................... 24

*Gummo v. Vill. of Depew*,
   75 F.3d 98 (2d Cir. 1996), *cert. denied*, 517 U.S. 1190 (1996) ................................. 3

*Hines v. State Room, Inc.*,
   665 F.3d 235 (1st Cir. 2011) ......................................................................... 22

*Ozawa v. Orsini Design Assocs., Inc.*,
   No. 13-CV-1282 (JPO), 2015 U.S. Dist. LEXIS 29933 (S.D.N.Y. Mar. 11,
   2015) ..................................................................................................... 20

*Piscione v. Ernst & Young, L.L.P.*,
  171 F.3d 527 (7th Cir. 1999), *overruled on other grounds by Hill v.
  Tangherlini*, 724 F.3d 965 (7th Cir. 2013)..................................................................10

*Pray v. Long Island Bone & Joint, LLP*,
  No. 14-CV-5386 (SJF)(SIL), 2016 U.S. Dist. LEXIS 107171 (E.D.N.Y. Aug.
  11, 2016), *adopted by* 2016 U.S. Dist. LEXIS 125094 (E.D.N.Y. Sep. 14,
  2016) ........................................................................................................................20

*Reich v. John Alden Life Ins. Co.*,
  126 F.3d 1 (1st Cir. 1997)..................................................................10, 20, 21

*Reiseck v. Universal Commc'ns of Miami, Inc.*,
  591 F.3d 101 (2d Cir. 2010)...................................................................22, 23

*Robinson-Smith v. Gov't Emps. Ins. Co.*,
  590 F.3d 886 (D.C. Cir. 2010) .......................................................................5

*Sec. Ins. Co. v. Old Dominion Freight Line, Inc.*,
  391 F.3d 77 (2d Cir. 2004)..............................................................................3

*Sexton v. Am. Golf Corp.*,
  No. 13-CV-873 (RJD)(SMG), 2015 WL 5884825 (E.D.N.Y. Oct. 8, 2015)...........5

*Spinden v. GS Roofing Prods. Co.*,
  94 F.3d 421 (8th Cir. 1996) .......................................................................5, 6

*Stevens v. HMSHost Corp.*,
  No. 10-CV-3571 (ILG)(VVP), 2015 WL 4645734 (E.D.N.Y. Aug. 5, 2015)..........5

*Viola v. Comprehensive Health Mgmt., Inc.*,
  441 F. App'x 660 (11th Cir. 2011) ...............................................................22

**Other Authorities**

29 C.F.R. § 541.200(a)....................................................................................3

29 C.F.R. § 541.202(b) ..................................................................................19

69 Fed. Reg. 22,122 ...................................................................5, 19, 20, 22

Fed. R. Civ. P. 56(a) .......................................................................................2

I.      **INTRODUCTION**

In moving for summary judgment, Plaintiff bears the burden of persuading the Court that there is no genuine issue of material fact and that she is entitled to judgment as a matter of law. This burden is high: the Court must accept all the evidence in the record in the light most favorable to AT&T, the non-moving party, in making this determination.

Plaintiff here asks the Court to ignore the substantial evidence in the record that fully supports a finding that the Opt-In Plaintiffs were properly classified as exempt from overtime requirements. Indeed, the Opt-In Plaintiffs' own testimony directly contradicts Plaintiff's assertions in her motion concerning how they performed their primary duty, including with respect to the amount of discretion and independent judgment they used when training and coaching, scheduling, marketing and merchandizing, preparing performance goals and business plans, exercising managerial responsibilities, and addressing store and customer issues, as well as the level of supervision they received from their managers. The administrative exemption test turns on a fact-intensive analysis of the nature of an employee's primary duty. Because the facts underlying this analysis remain very much in dispute, summary judgment would be improper here.

II.     **RELEVANT PROCEDURAL HISTORY**

On August 18, 2014, the Court granted Plaintiff's motion for conditional class certification under the FLSA. (*See* Dkt. No. 111.) Only nineteen individuals (out of a group of 347) elected to challenge their exempt classification by consenting to join the action. Four of them subsequently withdrew consent or dismissed their claims, leaving, to date, fifteen Opt-In Plaintiffs as part of the conditionally certified collective action.[1] On October 20, 2015, Plaintiff

---

[1] AT&T has filed a motion to dismiss the claims of Opt-In Plaintiff Reysan Almonte and a motion for summary judgment on the claims of the estate of Opt-In Plaintiff Anthony Renzi III.

moved for partial summary judgment as to AT&T's liability for overtime compensation with respect to her claims alone, and AT&T filed a cross-motion for summary judgment on the individual claims of Plaintiff Lisa LoCurto. (*See* Dkt. Nos. 141–48.) On September 30, 2016, this Court granted summary judgment on Plaintiff Lisa LoCurto's individual FLSA claim but expressly held in abeyance its decision on summary judgment with regard to the claims of Opt-In Plaintiffs, pending further discovery. (*See* Dkt. No. 173, at 17.) [2]

The parties have since engaged in substantial discovery, including depositions of nearly all the Opt-In Plaintiffs. Because discovery revealed substantial differences in the way that the Opt-In Plaintiffs performed their jobs, AT&T moved to decertify the collective on September 22, 2017. (*See* Dkt. No. 262.) That motion currently is pending. Discovery also revealed substantial evidence that would support a finding that the Opt-In Plaintiffs are exempt under the FLSA. Accordingly, genuine issues of material fact remain in dispute and summary judgment is not warranted.

## III.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ADMINISTRATIVE EXEMPTION DEFENSE.

The existence of a "genuine dispute as to any material fact" renders summary judgment improper. Fed. R. Civ. P. 56(a) (emphasis added). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and, at this stage, the evidence "must be construed in the light most favorable to the party opposing summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 261 n.2, 106 S. Ct. 2505, 2510, 2516 n.2 (1986) (emphasis added). A fact is material if it "might affect the outcome of the suit

Should AT&T succeed on these motions, there will be a total of thirteen Opt-In Plaintiffs in the conditionally certified collective action.

[2] This Court rendered no judgment regarding Plaintiff's claims under New York and New Jersey state laws. (*See* Dkt. No. 173.)

under the governing law." *Id*. at 248 (emphasis added). Summary judgment is only proper "when reasonable minds could not differ as to the import of the evidence." *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (emphasis added).

When deciding a motion for summary judgment, a court's role is not to "weigh the evidence and determine the truth of the matter," but rather to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Gummo v. Vill. of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (emphasis added), *cert. denied*, 517 U.S. 1190 (1996); *accord Sec. Ins. Co. v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *Brady v. Colchester*, 863 F.2d 205, 211 (2d Cir. 1988); *see also Gordon v. Kaleida Health*, 299 F.R.D. 380, 387 (W.D.N.Y. 2014) (denying plaintiffs' motion for summary judgment on liability under the FLSA and state law).

As Plaintiff acknowledges in her motion for summary judgment, "[d]isputes regarding the nature of an employee's duties" (Dkt. No. 292, at 22 (quoting *Jarrett v. ERC Props*., 211 F.3d 1078, 1081 (8th Cir. 2000))) and "how [employees] spent their working time" (*Id*., at 22 (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986))) are questions of fact. The second and third prongs of the administrative exemption test turn on the nature of an employee's primary duty, and the third prong in particular turns on the factual disputes surrounding the extent to which the Opt-Ins exercised discretion and judgment. *See* 29 C.F.R. § 541.200(a).

Plaintiff's motion exclusively cites to self-serving testimony from certain of the Opt-In Plaintiffs, and mischaracterizes the evidence in the record, including Opt-In deposition testimony, in an attempt to contort Plaintiff's allegations into undisputed facts. But this veneer cannot withstand the slightest scrutiny; the record is replete with testimony from the Opt-In Plaintiffs themselves which directly contradicts those claims. Moreover, at the summary judgment stage, Plaintiff cannot ignore the Declaration of Simon Wang, which squarely disputes the material facts on which Plaintiff bases her motion. Based on all of this evidence, there is no question that a reasonable jury could find that the Opt-In Plaintiffs exercised discretion and independent judgment with respect to matters of significance in performing their primary duty.[3]

Here, genuine disputes of material fact exist with respect to the degree to which the Opt-In Plaintiffs exercised discretion and independent judgment while training and coaching, supervising and scheduling, marketing and merchandising, preparing goals and business plans,

---

[3] Indeed, an arbitrator has ruled in favor of AT&T on this very issue on May 20, 2015.  In a consolidated arbitration filed by three individuals involving the sme jobs, the same issues, and the same counsel, Arbitrator Michael D. Young found that the RAEs and NRAEs were exempt under the administrative exemption and granted summary judgment in favor of AT&T. (*See* Dkt. No. 144-1 at 6 ("[T]he primary duty is not to make sales of particular products to individual customers; rather, it is to promote an increase in sales of AT&T products and services generally though sales training, relationship building and other business development-related activities in specific stores within their assigned territories."), 8 ("I further conclude that promotional work of the RAEs, however characterized, relates to the general business operations of AT&T. The Department of Labor ('DOL') and numerous courts have recognized that activities like those of the RAEs directly relate to the general business operations of an employer or an employer's customer and, therefore, fall within the administrative exemption."), 11 ("I find that [account executives'] activities in the areas of scheduling, training, and customer service demonstrate a sufficient use of discretion and independent judgment to support a finding that they exercised discretion and independent judgment in their job duties."), 12 ("The RAEs' work also involves matters of significance. As the liaison between AT&T and the independent retailers, the RAEs implement AT&T sales promotion and marketing practices on behalf of the Company in an effort to increase sales of AT&T products and services.").)

and exercising their managerial responsibilities and authority to address store and customer issues. A jury must decide whether the Opt-In Plaintiffs exercised discretion and independent judgment when performing their primary duty. *See Stevens v. HMSHost Corp.*, No. 10-CV-3571 (ILG)(VVP), 2015 WL 4645734, at *6 (E.D.N.Y. Aug. 5, 2015) (denying summary judgment because "there are genuine material disputes between the parties as to the contours of plaintiff's primary duty that warrant denial of summary judgment as to defendants' administrative exemption defense."); *see also Sexton v. Am. Golf Corp.*, No. 13-CV-873 (RJD)(SMG), 2015 WL 5884825, at *4 (E.D.N.Y. Oct. 8, 2015) ("it is not my role to resolve these factual disputes… there are genuine issues of material fact concerning whether [plaintiff's] "primary duty" was management, making summary judgment inappropriate.").

**A.    The record is replete with evidence that disputes the claim that the Opt-In Plaintiffs did not exercise discretion and independent judgment with respect to matters of significance.**

To satisfy the third prong of the administrative exemption, an employer need not prove that employees have total autonomy over any of their tasks. Rather, the third prong is satisfied if the employee's duties merely *include* the exercise of discretion and independent judgment—as little as 10% of their work time, or as rarely as 20 times per year. Regulatory Preamble, 69 Fed. Reg. at 22,143; *see Carlson v. C.H. Robinson Worldwide, Inc.*, Nos. 02-3780 (JNE/JGL), 02-4261 (JNE/JGL), 2005 U.S. Dist. LEXIS 5677, at *43 n.11 (D. Minn. Mar. 30, 2005) ("it is not necessary that she 'customarily and regularly' exercise discretion … [i]nstead, … [the employer] need only demonstrate that she exercises discretion and independent judgment"); *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 894 (D.C. Cir. 2010) (engaging in such discretion "even 20 times per year" satisfies the administrative exemption requirement); *Spinden v. GS Roofing Prods. Co.*, 94 F.3d 421, 427 (8th Cir. 1996) ("accept[ing] the district court's finding

5

that only 10 to 20 percent of Spinden's duties involved discretion," but "reject[ing] as clearly erroneous its finding that administration was not Spinden's primary duty").

As is explained with more detail below, the record is replete with evidence that demonstrates that Opt-In Plaintiffs regularly customized and tailored store associate training, analyzed trends and metrics, identified root causes of performance deficiencies, addressed customer issues, proposed marketing and merchandizing innovations to increase sales, made their own schedules, and operated with minimal supervision. Because there is ample evidence in the record to support a jury finding that the Opt-In Plaintiffs were properly classified under the administrative exemption, summary judgment must be denied and this issue must go to a jury to decide.

        1.    <u>The record squarely contradicts Plaintiff's claim that the Opt-In Plaintiffs delivered standardized and prescribed training.</u>

Plaintiff relies heavily on the allegations that Opt-In Plaintiffs delivered "prescribed," "standard," or "standardized" training and coaching, and that "RAEs do not have authority to alter, in any material way, AT&T's training materials or objectives." (Dkt. No. 292, at 10–11.) Plaintiff bases these allegations on the fact that some Opt-In Plaintiffs delivered training and coaching using some common *methods* (*e.g.*, role-playing, side-by-side selling), and that AT&T provided some common training *materials*. (*Id.*) But the evidence in the record clearly contradicts any claim that training was either rote or scripted. First, role-playing and side-by-side selling techniques are inherently improvisational and individualized methods, and are by no means "cookie cutter." (Dkt. No. 266-14 ¶¶ 4(a), 6(a).)

Further, contrary to Plaintiff's self-serving declaration, the Opt-In Plaintiffs themselves testified that they developed their own training materials or customized training materials available to them. For example:

- Briscoe developed her own games, quizzes, and "One sheeters" for training purposes. (Briscoe Dep. 60:20–61:14.)

- Bryant testified that although AT&T provided her with training materials, "we weren't required to use a certain training material." (Bryant Dep. 49:5-25; 51:11–23.) Bryant exercised her discretion to create and use her own training materials, which included "[q]uestions and answers, certain customer situations, benefits and objections, how to overcome… customer objections, how to handle difficult situations, things like that." (*Id.*)

- Foster testified that initially, with respect to training materials, she "made it up." (Foster Dep. 44:23–45:11.) Later, she "had materials that were provided to [her] that [she] could put together and customize for the individual new hire." (*Id.*)

In addition to developing and customizing their own training materials, the Opt-In Plaintiffs testified that they regularly decided *who* to train, *what* training methods and materials to use for each employee, *when* to train each employee, *which* products or services to focus on, and *how* to apply various training techniques under different circumstances. (*See* Bryant Dep. 49:16–25 (tailored training "[b]y doing observations and just knowing the store—the employee… and looking at their results and watching what they were doing with customers."); Martino Dep. 47:4–48:11 (tailored training based on own analysis of store performance reports); Lombard Dep. 29:15–23 (tailored training based on own observation of personnel and assessment of store performance); Walker Dep. 68:2–19 (same); Ward Dep. 88:25–90:19 (varied the content of training depending on the performance of the store); Cascioli Dep. 69:24–70:8 (varied the content of training depending on the particular knowledge of the trainee); *see also* Dkt. No. 266-14 ¶¶ 4(a), 6(a) ("Effective training often required an [account executive] to

improvise, to be creative, coach, role play, and to use effective communication skills to convey product knowledge.").) The Court cannot ignore the substantial evidence demonstrating that the Opt-In Plaintiffs used discretion and independent judgment in deciding which tools to use in any particular situation.

2.    <u>The level of supervision of the Opt-In Plaintiffs also is disputed.</u>

Plaintiff argues that the Opt-In Plaintiffs were "closely supervised by and in frequent contact with their supervis[ors]." (Dkt. No. 292, at 13.) Specifically, they allege that their supervisors: (1) provided "input" on their schedules; (2) conducted "ride-alongs" with them to their assigned stores; and (3) used Mobile Insight to electronically track store visits. (*Id*. at 12–13.) But in each respect, the Opt-In Plaintiffs' own testimony contradicts their characterizations of the extent to which they were supervised.

First, the Opt-In Plaintiffs testified that they exercised substantial autonomy with respect to their schedules.[4] (*See* Foster Dep. 36:14–21 ("Q. You set your own schedule? A. As far as which stores I visited when, at the time that I was employed there, yes. Q. Did you ever deviate from your own schedule? A. All the time. Q. Under what circumstances? A. Whatever

---

[4] AT&T notes that Plaintiff's claim that the Opt-In Plaintiffs "routinely and consistently worked far in excess of 40 hours in a given work week" (Dkt. No. 292, at 16–17) is an issue of damages and is not appropriately decided on a motion for partial summary judgment as to liability. AT&T nonetheless disputes this purported fact. There is substantial evidence that account executives typically worked eight hours per day, five days per week, even if they worked nights or weekends. (*See, e.g.*, Bryant Dep. 72:3–21 ("Q. When you were an RAE, did you typically work Monday through Fridays or on a different weekly schedule? A. For the first couple of years, it was Monday through Friday. But it changed…and we were required to work Saturdays. And if you worked Saturday, you took a day off during the week."); Daily Dep. 82:14–22 ("Q. What's an entire day? A. I would say eight hours.")) While the Opt-In Plaintiffs sometimes responded to calls and emails from their assigned stores, they had the discretion to set their own expected response time and to make other arrangements when they were unavailable. *See* Ex. PP at RESP0031206; Ex. MM at RESP0032799.

8

circumstance arose that needed me to deviate from that."); Walker Dep. 43:3–45:19 (testifying

that he set his own schedule; "I had—had visited my stores according to how I felt I needed

to."); Runnels Dep. 35:5–8 (testifying that she set her own schedule; "I made a schedule and I

did it."); *see also* Dkt. No. 266-14 ¶ 7 ("RAEs and NRAEs reporting to me had the freedom to

set their own schedules, subject to it making good business sense, and to come up with their own

plans to maximize sales in their doors.").)

       Second, the Opt-In Plaintiffs testified that they received minimal in-person supervision,

such as "ridealongs" and minimal remote supervision as well. For example, Ward described the

supervision he received from one manager as "minimal." (Ward Dep. 48:9–11.) That manager

did not tell him what do to on a daily basis and only rode along with him once or twice, just to

introduce him to his doors. (Ward Dep. 48:12–19.) Another manager rode with him "maybe, one

time" in three months, and his interaction with her was, in his words, "very limited." (Ward Dep.

49:15–50:5.) Ward estimates that he saw a third manager "once every quarter, if that." (Ward

Dep. 50:11–17.) She did not tell him what to do during his work day. (Ward Dep. 51:7–9.) A

fourth manager similarly provided, in Ward's words, "minimal supervision," did not tell him

what to do, and went on only "maybe 1 or 2" ride-alongs with him. (Ward Dep. 56:7–16.) This

absence of supervision was not unusual among the Opt-In Plaintiffs. (*See* Briscoe Dep. 50:3– 23

(estimating one in-person meeting per week and phone or email communication, "[o]n average,

once—maybe two to four times a week"); Martino Dep. 75:15–22 (estimating one ride-along

"[m]aybe once every two, three months"); Foster Dep. 43:18–44:3 ("[M]y supervisor was not a

micromanager, and I've been with the company for a long time, I knew my job. I hadn't—was

not a new RAE who had been hired three months ago who needed direction and needed to know

what to do, so she—she pretty much left me alone. I knew what I needed to do.").)

Third, while some of the Opt-In Plaintiffs used Mobile Insight to document their store visits, the parties dispute whether electronic documentation of store visits constitutes supervision or "tracking" by management. Not only does the Opt-In Plaintiffs' testimony reveal that they received minimal remote supervision, but even the testimony cited by Plaintiff in her motion does not support her allegation that they used Mobile Insight to "transmit" information directly to supervisors, that the purpose of the software was to enable supervisors to "track" NRAEs and RAEs, or that supervisors actually used the software for this purpose (or any other purpose). On the contrary, the cited testimony indicates that they were *not* actually required to use Mobile Insight, and *did not even recall* using it. (*See, e.g.,* Daily Dep. 55:17–56:4 ("I don't remember exactly how the application worked. It was very buggy, so towards the end we—I think we were asked to use it but it was almost not a requirement."); Cascioli Dep. 79:16-19 ("Q. …Do you remember logging any information regarding your store visits in any manner? A. You know what, I guess I don't.").)

Finally, the fact that Opt-In Plaintiffs may have been subject to some very limited requirements, such as the need to visit each assigned door at least once or twice a month or to provide their manager with a log of their activities, is plainly insufficient to support a finding that they are entitled to overtime. *See Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 14 (1st Cir. 1997) ("[T]o the extent that the marketing representatives receive guidance about products to emphasize and suggested points to make with agents, they nonetheless exercise discretion in applying this instruction—for instance, in determining which agent may have an interest in [a particular] product, or in fashioning bid proposals that meet the needs of the agent's customers."); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 535–38 (7th Cir. 1999) (duties include discretion and independent judgment even though plaintiff often consulted with

10

employees about his decisions and even though some of his decisions required further approval

by employer), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013);

*Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d. 1050, 1067 (D. Minn. 2011) (use of independent

judgment in how to train and address the client's needs and problems qualifies for the

administrative exemption).  Plaintiff fails to cite a single case finding that such basic

requirements trigger non-exempt status.  Indeed, many exempt employees are subject to similar

minimal requirements (associates fill out time sheets and have a budget of billable hours), but no

one would suggest that this makes them eligible for overtime. The Opt-In Plaintiffs' own

testimony thus provides substantial evidence sufficient to support a finding that they were not

actually subject to "close supervision" or "frequent contact" by their managers.

> 3.  <u>There is a genuine issue of material fact regarding whether the Opt-In Plaintiffs exercised substantial discretion with respect to marketing and merchandizing.</u>

AT&T disputes the allegation that the role of the Opt-In Plaintiffs in marketing and

merchandising was limited to merely implementing "prescribed" planograms, as well as the

related allegation that they had "no role in developing or creating AT&T's marketing materials."

(Dkt. No. 292, at 14–15.) Indeed, the Opt-In Plaintiffs' primary duty was promoting and

marketing AT&T products and services. (*See, e.g.*, Walker Dep. 74:9–15 (describing his "most

important job duty" as "build[ing] relationships and build[ing] market share and get[ting] my

accounts to sell AT&T"); Runnels Dep. 49:17–19 (confirming that her "main duty was to

manage [her] locations to increase AT&T sales"); Bryant Dep. 32:21–24 (confirming that her

"main duty as an RAE was to manage [her] locations to increase AT&T sales"); Lombard Dep.

40:12–15 (confirming that his "main duty as an account executive was to manage [his] locations

to try to increase AT&T sales"); Martino Dep. 103:24–104:5 (confirming that his "most

important job duty" as an NRAE was "to help [his] doors sell more AT&T products and services").)

To be sure, the Opt-In Plaintiffs were responsible for supervising the setup of merchandising displays according to planograms, but they were *also* expected to—and in fact did—make recommendations to the each store about ways to improve the displays' locations, given the unique characteristics of that store, in order to enhance the customer experience. (*See, e.g.,* Martino Dep. 65:15–23 (provided suggestions to store managers as to how they could improve merchandising of AT&T products); *see also* Dkt. No. 266-14 ¶¶ 4(c), 6(c) ("If the [account executive] determined that a store was falling short on its merchandising efforts, I expected that [account executive] to make recommendations to their stores concerning the merchandising displays and suggestions for improvement and enhancement for maximizing sales in the store.")

Moreover, there is substantial evidence that account executives *did* develop marketing materials on their own, including newsletters, flyers, and table displays. (*See, e.g.,* Walker Dep. 51:15–52:8 ("Q. How did you get started writing a monthly newsletter? A. I thought it would be helpful, when I visited stores, to just highlight some features. Like, for instance, on the newsletter I would put a little spot in there about a new—a new cell phone that we introduced and, you know, the different features of the new cell phone, to kind of refresh their memory and have something that I can put in front of them. Q. So was it your idea to start the monthly newsletter? A. I did bring it up. I'm not sure if other people had done those in the past. I believe I did see a newsletter at one time from somebody, and so I got the idea of doing it for my accounts."); Reyes Dep. 75:4–8 (created own marketing flyers); Amari Dep. 64:10–23 (created own marketing flyers); Briscoe Dep. 96:6–16 ("We were able to do our displays. For our tables,

12

we had to do our own designs. It was kind of make it look nice, make it, you know, fun, make it inviting, but there wasn't a really, like a real guideline to it. The actual phone displays, there was a guideline, a planogram you have to follow, but for our actual tables it was just come up with your own ideas.").)

The Opt-In Plaintiffs also negotiated with their assigned doors concerning space, product placement, promotional opportunities, and other matters concerning sales of AT&T products and services, and they exercised their discretion in making recommendations concerning marketing and merchandising within their assigned doors. (*See* Dkt. No. 266-14 ¶¶ 4(c), 6(c) ("NRAEs could always make recommendations to the store or department manager of the retailer of ways to improve displays' locations in order to enhance the customer experience. In my observation, NRAEs were often able to influence store or department managers at retailers in this way based on their personal relationship."); Martino Dep. 65:15–23 (provided suggestions to store managers as to how they could improve merchandising of AT&T products); *see also* Walker Dep. 92:12–16 ("Q. Who decided when you would do a table event? A. Between—it was kind of a mutual thing between the store manager and the RAE, from what I recall.").)

All told, the Opt-In Plaintiffs' own testimony demonstrates that they exercised a substantial amount of discretion regarding marketing and merchandizing issues, created their own marketing materials, and were not limited to merely ensuring compliance with planograms. Their testimony reveals significant factual disputes about these duties that only a jury can resolve.

                4.      <u>The Opt-In Plaintiffs developed their own performance goals and customized business plans for stores.</u>

Plaintiff alleges that the Opt-In Plaintiffs "simply relay[ed] the sales goals given to them by AT&T and/or a retailer," and that their business plans were "short, largely 'cookie-cutter'

forms prepared by AT&T." (Dkt. No. 292, at 15–16.) Both of these claims are squarely contradicted by the record.

Evidence which must be taken as true at the summary judgment stage demonstrates that account executives *developed their own* customized performance goals for their doors and for sales associates at their doors. (*See* Figuereo Dep. 83:18–84:7 (developed "personal" store-level and associate-level performance goals), 112:16–113:10, 158:13-18; Amari Dep. 80:6–11 (acknowledging responsibility for setting performance goals at doors); Briscoe Dep. 49:3–5 (same); Daily Dep. 35:3–8 (same); Brooks Dep. 107:15–109:15 (acknowledging deviation from AT&T-provided benchmarks in discussing reasonable expectations with the sales associates, developing tailored performance goals, and motivating sales associates to exceed those goals; "In building my relationship[s], I have discovered that numbers help, knowing what have you to achieve, depending on the rep's personality, if they like goals.").)

Account executives were also expected to partner with their doors and sales associates and advise them on ways they could increase the sale of AT&T products. (*See* Dkt. No. 266-14 ¶¶ 3, 5 ("I expected RAEs to act in partnership with the individuals managing the AT&T authorized retailer stores in their respective territories, as well as the sales associates working in the stores, in order to increase sales of AT&T products and services. To that end, I expected RAEs to cultivate relationships with store personnel and to consult with them on ways to improve the store's sales…. I expected NRAEs to act as AT&T ambassadors to the sales personnel at their assigned national retail stores. I expected NRAEs to cultivate good relationships with their assigned store personnel, and to consult with them on how to improve sales of AT&T products and services.").) To this end, they were expected to analyze performance issues, identify their root causes, and outline effective solutions. (Dkt. No. 266-14

¶¶ 3, 5 (discussing the expectation that NRAEs and RAEs would analyze performance metrics, identify areas for improvement and root causes of performance issues, and make effective recommendations to store management).)

Consistent with these expectations, account executives testified that they indeed engaged in substantial business-planning activities, including the preparation of customized business plans designed to meet the mutual performance goals of their doors and AT&T. Far from a "cookie cutter" task, they analyzed performance metrics and business reports from their retail accounts for trends, observed and reported on the performance of sales associates, identified operational challenges and opportunities for improvement, described marketing efforts, and recommended future action items. For example:

- Bryant prepared business plans including sales trends, challenges and opportunities for improvement, goals and objectives, current marketing efforts, and future action items. (Bryant, 57:5–58:24.)

- Walker crafted action plans to address areas in which his doors were not meeting their goals. (Walker Dep. 37:13–39:9.)

- Reyes stressed that developing business plans "involves analyzing your doors, your territory, each location looking at their trends, putting in action items that many help you and the store grow the AT&T business." He did this "alongside with the store manager so [they could] both agree on some of the action items and just create growth of the business." (Reyes Dep. 106:20–107:5)

- Figuereo designed business plans to improve his relationships with his stores, and to drive AT&T's overall growth and market share. (Figuereo Dep. 116:17–25.) The plans included his analysis of sales trends, assessment of the effectiveness of various

strategies and promotions, explanation of "certain goals that I gave the store to meet," description of any operational issues, notes on success stories, and recommendations to help maximize revenue. (Figuereo Dep. 146:13–23.)

- Brooks testified that it was important for her to understand her doors' businesses. (Brooks Dep. 73:6–74:3.) In her words, "[t]hat's how I was able to increase my numbers and that's how I was able to build relationships, and that's how I was able to let the stores, the reps know where they can improve." (Brooks Dep. 73:6–75:17.)

Plaintiff cannot ignore this testimony. Genuine disputes of material facts exist here, and summary judgment is not warranted.

5.    The Opt-In Plaintiffs exercised managerial responsibilities and the authority to address store and customer issues.

Finally, Plaintiff alleges that it is undisputed that the Opt-In Plaintiffs did "not supervise or have any managerial responsibilities…[and] lack[ed] the authority to formulate, affect, interpret, or implement AT&T's management policies or operating practices." (Dkt. No. 292, at 16–17.) They also claim to have had "very limited ability to resolve minor customer issues." (Dkt. No. 292, at 16–17.) Here again, the Opt-In Plaintiffs' own testimony contradicts this allegedly "undisputed" fact.

The Opt-In Plaintiffs testified that they made effective recommendations to store and district management concerning their business, and acknowledged that their recommendations were given particular weight. For example:

- Lombard interacted with a district manager multiple days per week, and multiple times per day. They discussed Lombard's analysis of the metrics of various stores, plans to improve those metrics, and how Lombard planned to tailor his training and coaching to meet those needs. Lombard provided feedback to store managers about

16

the performance of their sales personnel on a regular basis, and provided feedback to district managers about the performance of their store managers. (Lombard Dep. 42:21–44:4.)

- Briscoe discussed with the store-level and regional managers at her doors, plans to increase sales, "plans for customer service, plans for employee knowledge, plans for presentations, [and] plans for metrics." She worked to help them understand the relative importance of different metrics, provided feedback on improving their sales and performance, and gave accolades to management based on her observations of employee performance and sales. (Briscoe Dep. 82:8–85:6.)

- Daily met with store managers and district managers to discuss his analysis of business reports and trends, ask "questions to find the root cause" of those trends, and provide input on employee performance. Daily believes that the managers took action based on his feedback regarding employee performance. (Daily Dep. 37:7–38:13.)

Account executives further testified that they *did* address customer issues, including customer billing issues, by enforcing or seeking waivers from AT&T policies and procedures and by making escalation decisions. For example:

- Brooks testified that sales associates at her stores "counted on" her and often called her regarding various issues that arose, such as system problems, customer billing issues, and failed activations. (Brooks Dep. 39:14–40:25.)

- Figuereo admitted that he was responsible for investigating customer complaints and choosing how to resolve them. His manager instructed him to use his judgment in deciding whether to waive customer activation fees to close sales. (Figuereo Dep. 196:4-13; 199:14–17.)

17

- Amari testified that it was her job to provide a "quick resolution process" for a range of issues, including customer questions and issues, billing issues, IT issues, store owner commission issues, and general questions from stores. She managed customer services issues by handing on her own or choosing to escalate requests for customer activation fee waivers, and assisted stores in directing customers to make insurance claims to obtain replacement phones. (Amari Dep. 121:14–126:19, 145:25–148:9, 193:20–194:24.)

- Briscoe acknowledged that she had the authority to issue credits to a customer, deal with customers directly, and instruct her stores' employees on how to resolve customer issues. (Briscoe Dep. 97:6–25.)

This testimony places the Opt-In Plaintiffs' claims about their managerial responsibilities and authority to resolve customer issues squarely in dispute.

In conclusion, for the reasons detailed in Part III.A.1-5 above, there is substantial evidence in the record to dispute Plaintiff's characterization of the discretion and independent judgment exercised by the Opt-In Plaintiffs. Indeed, the FLSA regulations specify that the third prong of the administrative exemption test is satisfied in cases where two or three of the following are found:

- Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

- Whether the employee carries out major assignments in conducting the operations of the business;

- Whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

- Whether the employee has authority to commit the employer in matters that have significant financial impact;

18

- Whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

- Whether the employee has authority to negotiate and bind the company on significant matters;

- Whether the employee provides consultation or expert advice to management;

- Whether the employee is involved in planning long- or short-term business objectives;

- Whether the employee investigates and resolves matters of significance on behalf of management; and

- Whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b) (2013); 69 Fed. Reg. at 22143 ("employees who meet at least *two or three* of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required."). Here, there is substantial evidence demonstrating that the Opt-In Plaintiffs meet at least four of these factors: (1) implementing management operating practices; (2) work that affects business operations to a substantial degree; (3) consultation or expert advice to retail management; and (4) planning long- or short-term business objectives.

The Preamble lists an additional dozen factors that courts have found to be relevant to the discretion and independent judgment prong, which include the following eight factors applicable to the Opt-In Plaintiffs' duties:

1) freedom from direct supervision;

2) troubleshooting or problem-solving activities on behalf of management;

3) use of personalized communication techniques;

4) authority to handle atypical or unusual situations;

5) responsibility for assessing customer needs;

6) functioning as the primary contact to public or customers on behalf of the employer—

in this case, the primary contact between the employer AT&T and the national retailer;

7) the duty to anticipate competitive products or services and distinguish them from

competitor's products or services; and

8) advertising or promotion work.

*See* 69 Fed. Reg. at 22144. Accordingly, a reasonable jury could conclude that the Opt-In

Plaintiffs are exempt from overtime on the evidence in the record and summary judgment is

therefore inappropriate. *Pray v. Long Island Bone & Joint, LLP*, No. 14-CV-5386 (SJF)(SIL),

2016 U.S. Dist. LEXIS 107171, at *45 (E.D.N.Y. Aug. 11, 2016) ("Where, as here, the parties

disagree as to the level of discretion or judgment required to perform a particular job, summary

judgment is inappropriate."), *adopted by* 2016 U.S. Dist. LEXIS 125094 (E.D.N.Y. Sep. 14,

2016); *see also Ozawa v. Orsini Design Assocs., Inc*., No. 13-CV-1282 (JPO), 2015 U.S. Dist.

LEXIS 29933, at *15 (S.D.N.Y. Mar. 11, 2015) ("On review of the summary judgment record,

the Court concludes that the parties' disagreements go beyond the characterization of undisputed

facts in the record. Rather, the parties differ on crucial factual questions concerning the makeup

of [plaintiff's] duties and the degree of independence [plaintiff] could exercise in carrying out

those duties. A reasonable jury could decide the question of [plaintiff's] exempt status in favor of

either party, and accordingly, material factual disputes preclude a decision as a matter of law.").

**B.    There is substantial evidence that the Opt-In Plaintiffs performed work
directly related to the management or general business operations of AT&T.**

In a case predating the DOL's revisions to the regulations, the First Circuit affirmed the

finding that insurance marketing representatives, who performed duties similar to the Opt-In

Plaintiffs, were exempt administrative employees. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1,

3–5 (1st Cir. 1997). Like the Opt-In Plaintiffs, the insurance marketing representatives in that

20

case did not sell insurance to the end customers. *Id*. Rather, John Alden (the insurance company) sold its products through licensed independent insurance agents—just as AT&T sells its products and services through national retailers in its indirect sales channel. *Id*. The insurance agents could recommend the products of any one of a number of insurance carriers to the end-user clients, just as retail sales associates in national retail stores such as Best Buy, RadioShack, Target and Sam's Club may recommend the services of AT&T or any of its competitors. *Id*. Thus, the primary duty of insurance marketing representatives was found to be cultivating relationships with the independent insurance agents, in order to increase sales of their employer's insurance products. *Id*.

In furtherance of their primary duty, John Alden's insurance marketing representatives were "responsible for keeping [their insurance] agents up to date on all aspects of the [insurance carrier's] product line," including new products and price changes. *Id.* at 4. They also discussed with the insurance agents how the insurer's products might meet the needs of the agent's current or prospective customers, and advised agents on how best to market the insurer's products against competing products. *Id*. These day-to-day activities "are more in the nature of 'representing the company' and 'promoting sales,'" both of which are examples of exempt administrative work under the regulations. *See id.* at 10. As fully described Part III.A, *supra*, the Opt-In Plaintiffs had an analogous role at AT&T. (*See, e.g.*, Walker Dep. 74:9–15 (describing his "most important job duty" as "build[ing] relationships and build[ing] market share and get[ting] my accounts to sell AT&T"); Runnels Dep. 49:17–19 (confirming that her "main duty was to manage [her] locations to increase AT&T sales"); Bryant Dep. 32:21–24 (confirming that her "main duty as an RAE was to manage [her] locations to increase AT&T sales"); Lombard Dep. 40:12–15 (confirming that his "main duty as an account executive was to manage [his] locations

to try to increase AT&T sales"); Martino Dep. 103:24–104:5 (confirming that his "most important job duty" as an NRAE was "to help [his] doors sell more AT&T products and services"); Lombard Dep. 40:16–41:2 (confirming that he analyzed metrics, suggested plans to increase sales, analyzed training needs by observing people, and provided customized training to meet those needs in order to further his "main duty of increasing AT&T sales at the account [he was] managing").

The DOL specifically endorsed the *John Alden* decision in the Preamble to the revised regulations it issued in 2004. *See* 69 Fed. Reg. 22,122, at 22,145 (Apr. 23, 2004). Moreover, after the implementation of the new regulations, courts have consistently found that the type of work performed by the John Alden marketing representatives and the Opt-In Plaintiffs is exempt administrative work. *See, e.g.*, *Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 755, 758 (7th Cir. 2013) (granting summary judgment to employer; finding that employee whose primary duties involved "promoting sales, advising sales staff, and fielding questions" was properly classified under the administrative exemption); *Hines v. State Room, Inc.*, 665 F.3d 235, 237, 242 (1st Cir. 2011); *Viola v. Comprehensive Health Mgmt., Inc.*, 441 F. App'x 660, 662–63 (11th Cir. 2011) (denying plaintiff's summary judgment motion where plaintiff "worked alone more than seventy-five percent of the time and generally without supervision," was required to analyze her market, write business plans, and make decisions regarding marketing and promotional events).

Arguing that the Opt-In Plaintiffs' primary duty did *not* relate to AT&T's general business operations, Plaintiff relies on *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010). In *Reiseck*, the Second Circuit explained that an individual "making specific sales to individual customers is a [nonexempt] salesperson for purposes of the FLSA." *Id*. at 107. Administratively exempt sales promotion work, on the other hand, "consists of marketing

22

activity aimed at promoting (*i.e.*, increasing, developing, facilitating, and/or maintaining) customer sales *generally*"—which is precisely the primary duty of the Opt-In Plaintiffs here. *Id*. (emphasis in original).

Plaintiff's reliance on *Reiseck* is misplaced in light of her concession that the Opt-In Plaintiffs' primary duty was promoting AT&T sales at their assigned stores, rather than making specific sales to individual customers. Unlike the direct salespeople in *Reiseck*, the Opt-In Plaintiffs were not engaged in "sales," because they do not sell AT&T products and services to customers. They did not obtain a customer's commitment to buy AT&T's products or services, did not ring up a sale at a cash register, nor did they accept a customer's payment in exchange for providing an AT&T product or service. Instead, the Opt-In Plaintiffs promoted the AT&T brand, image, and capabilities to the intermediary sellers so that those sales personnel could in turn sell more AT&T products. (*See, e.g.*, Walker Dep. 74:9–15 (describing his "most important job duty" as "build[ing] relationships and build[ing] market share and get[ting] my accounts to sell AT&T"); Runnels Dep. 49:17–19 (confirming that her "main duty was to manage [her] locations to increase AT&T sales"); Bryant Dep. 32:21–24 (confirming that her "main duty as an RAE was to manage [her] locations to increase AT&T sales"); Lombard Dep. 40:12–15 (confirming that his "main duty as an account executive was to manage [his] locations to try to increase AT&T sales"); Martino Dep. 103:24–104:5 (confirming that his "most important job duty" as an NRAE was "to help [his] doors sell more AT&T products and services").). These efforts supported the dealers' and retailers' sales generally, not any one sale of any one product to any one customer. Thus, because the Opt-In Plaintiffs' primary duty was promoting and marketing AT&T products and services, *Reiseck* offers no support to their motion.

Simply put, "the jury needs to weigh the evidence and determine the primary duties [the employees] performed…before the court can decide the legal question of whether those duties exclude [them] from overtime pay under the FLSA." *Grage v. N. States Power Co.*, 813 F.3d 1051, 1056, 1058 (8th Cir. 2015) (reversing the district court's grant of summary judgment, "because there are factual issues that must be decided").

### C.     Plaintiff's reliance on *Beauford* is inapposite.

Arguing that the Opt-In Plaintiffs' primary duty did not involve the exercise of discretion and independent judgment with respect to matters of significance, Plaintiff relies exclusively on *Beauford v. ActionLink, LLC*, 781 F.3d 396 (8th Cir. 2015). *Beauford* is readily distinguishable from this case. Affirming summary judgment there, the Eight Circuit found that brand advocates did not exercise the discretion and independent judgment required under the administrative exemption test because they "simply follow[ed] set scripts" and "were strictly supervised." *Beauford,* 781 F.3d at 404–05. The Eight Circuit's opinion makes clear that the scripted nature of the brand advocate role determined the outcome in that case; the court specifically distinguished *John Alden* on the grounds that the employees at issue in *John Alden* "d[id] not use prepared scripts or read from a required verbatim statement[.]" *Id.* at 405 (quoting *John Alden*, 126 F.3d at 14).

By contrast, not one of the Opt-In Plaintiffs in this case claimed to read a script or a verbatim statement when conducting training. To the contrary, unlike the brand advocates in *Beauford*, they assessed the performance of sales associates, analyzed store-level performance metrics, identified performance issues, developed their own training and marketing materials, customized materials that AT&T provided to them, determined the most effective way to address each performance issue (*e.g.*, by determining what substantive training, motivational coaching, or other intervention was most appropriate to improve an individual's performance, as well as

24

the most appropriate method to deliver that intervention), prepared business plans for their doors, and provided door management with feedback and recommendations regarding sales, customer service, marketing, inventory, and similar issues. *See, supra,* Part III.A.

Nor can the Opt-In Plaintiffs establish that they were similarly supervised. The brand advocates in *Beauford* "maintained a close relationship with their supervisors[,]" "frequently spoke" with them, and "were strictly supervised." *Beauford,* 781 F.3d at 399-400, 405. The Opt-In Plaintiffs, on the other hand, testified that they had substantial autonomy with respect to their schedules, received minimal in-person supervision, and often received minimal remote supervision as well. *See, supra,* Part III.A. While the brand advocates in *Beauford* merely reported to their supervisors "exactly what the brand advocates did during their visits" (*Beauford*, 781 F.3d at 400), account executives discussed with their supervisors their custom business plans, sales trends, performance issues, challenges and opportunities for improvement, goals and objectives, marketing efforts, and future action items (*see, e.g.*, Reyes Dep. 106:20–107:5 (developing business plans "involves analyzing your doors, your territory, each location looking at their trends, putting in action items that may help you and the store grow the AT&T business. So you do that alongside with the store manager so you can both agree on some of the action items and just create growth of the business."); Brooks Dep. 73:16–75:17 ("It was important to me to understand [my retailers' business.] That's how I was able to increase my numbers and that's how I was able to build relationships, and that's how I was able to let the stores, the reps know where they can improve."); *see also supra* Part III.A.)

Indeed, in finding that three AT&T employees who held the positions at issue here were exempt from overtime after a full evidentiary hearing, Arbitrator Michael D. Young specifically

stressed the inapplicability of *Beauford* to the administrative exemption analysis of these positions:

> Claimants' reliance on [*Beauford*] in support of their assertion that RAEs do not exercise discretion and independent judgment sufficient to permit a finding of exempt status is not persuasive. In *Beauford*, the plaintiff brand advocates… did not enjoy the same level of discretion and independent judgment as the RAEs have here. There, the court found that the brand advocates… were not exempt administrative employees because they "had little training," "were strictly supervised," were required to "follow set scripts and well-established techniques, procedures or specific standards described in manuals or other sources," and were required to "seek approval before deviating from their set procedures." In contrast, here, the RAEs had extensive training, were not required to follow scripts, and were permitted to tailor their sales representative training and support to the needs of their assigned Doors.

(Dkt. No. 144-1, at 12 (citation omitted).) For all of these reasons, *Beauford* does not support summary judgment here.

### D.   Plaintiff's reliance on a proposed and unimplemented reclassification is misplaced.

Plaintiff relies heavily on a proposed reclassification of the account executive positions in May 2009—well before the applicable FLSA limitations period in this case—that AT&T never implemented. (*See* Dkt. No 292, at 1.) In doing so, Plaintiff casts aside the summary judgment standard by ignoring the need to accept as true the testimony of AT&T's Director of Compensation Curt Johnson, who explained the reasoning behind the proposed reclassification and ultimate decision to maintain the exempt classification. Johnson testified that in 2009, AT&T initially considered reclassifying the job as non-exempt. (Johnson Dep. 37:9-15.) Johnson went on to explain that AT&T ultimately did not reclassify the job based on feedback from those closest to the RAEs and NRAEs regarding the nature of the duties they performed:

26

A. . . . Later . . . *we received some clear feedback from the leaders of the sales organizations across the country that they believed that by the nature and expectations associated with that job, that it should remain exempt*. And they wanted us to take a closer look to make sure that we weren't simply being conservative, but not to conclude our classification decision as non-exempt, unless we were certain that's what it needed to be.

Q. Was there some indication about why the people who were part of the sales organization had an issue with classifying your RAEs and NAEs as non-exempt employees?

A. Yes. *Primarily because the individuals in those positions are responsible to be the primary contact and liaison representing AT&T to our clients, and they're required to make decisions on an ongoing basis that includes discretion and individual judgment in significant matters related to the general management of the client's business*.

(Johnson Dep. 37:22–38:18 (emphasis added).) In other words, AT&T decided to classify the RAE and NRAE positions as exempt from overtime under the administrative exemptions after a careful analysis of the duties that they actually performed. *See* Johnson Decl. ¶ 5. To the extent that Plaintiff challenges that decision based on the myriad disputed facts related to those duties, a jury must resolve those factual disputes.

**E.    Plaintiff Lisa LoCurto is not entitled to summary judgment on her state law claims.**

While, as Plaintiff noted in her motion, the legal analysis applicable to whether Plaintiff LoCurto is properly classified as exempt under state law will follow the same framework as the analysis under the FLSA, AT&T maintains its position that Plaintiff is not entitled to summary judgment on her state law claims for the reasons set forth in its prior opposition to summary judgment. (*See* Dkt. No.155.)

## IV.    CONCLUSION

The record is replete with testimony that directly contradicts Plaintiff's factual assertions and precludes summary judgment. Only a jury can resolve these disputes. Accordingly, the Court should deny Plaintiff's Motion for Partial Summary Judgment.

Dated:    November 17, 2017           Respectfully submitted,
          New York, New York


                                       By:    s/ Patrick W. Shea
                                              Patrick W. Shea


                                       PAUL HASTINGS LLP
                                       200 Park Avenue
                                       New York, New York 10166
                                       (212) 318-6000
                                       patrickshea@paulhastings.com

                                       *Attorneys for Defendant*