UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/20/2018

LISA LOCURTO, on behalf of herself and all others
similarly situated,

       Plaintiff,

  -against-

AT&T MOBILITY SERVICES LLC,

       Defendant.

13 Civ. 4303 (AT) (KNF)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

  Plaintiff, Lisa LoCurto, brings this putative class and collective action on behalf of herself and other similarly situated employees of Defendant, AT&T Mobility Services LLC ("AT&T"), alleging that Defendant failed to pay overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the New York Labor Law ("NYLL"), NYLL § 650 *et seq.*, and the New Jersey Wage and Hour Law ("NJWHL"), N.J. Stat. Ann. § 34:11-56a *et seq.* Plaintiff moves for final certification of the FLSA collective action, ECF No. 261, and for certification of an NYLL and NJWHL class action under Federal Rule of Civil Procedure 23, ECF No. 266. Defendant cross-moves for decertification of the FLSA collective action. ECF No. 262.[1] For the reasons stated below, Plaintiff's motion for final certification of the FLSA collective action is GRANTED, Plaintiff's motion for class certification is GRANTED, and Defendant's motion for decertification of the FLSA collective action is DENIED.

---

[1] In addition, Plaintiff moves for partial summary judgment on the FLSA claims of the individuals who opted into the FLSA collective action ("Opt-in Plaintiffs") and on her individual state law claims. ECF No. 290. Defendant also moves for an order dismissing Opt-in Plaintiff Reysan Almonte from the action for failure to prosecute, ECF No. 277, and moves for summary judgment on the claims of Opt-in Plaintiff Anthony Renzi III, ECF No. 280. The Court will address these motions in a separate order.

# BACKGROUND

I.     Factual Background

AT&T is a leading provider of wireless voice and data services in the United States. Euratte Decl. ¶ 3, ECF No. 286-15. AT&T sells its products and services directly through brick-and-mortar retail stores and indirectly through independently owned businesses. *Id.* AT&T's distribution channel to independently owned businesses is the one at issue in this litigation. *See* Def. Decert. Mem. at 2, ECF No. 287. Distribution of AT&T products and services through the indirect channel primarily occurs in one of two ways: (1) exclusive distribution arrangements with independent local dealers, which are typically small businesses (the "Local Dealer Channel"); and (2) non-exclusive distribution arrangements with national retail chain stores, such as Best Buy and Radio Shack (the "National Retail Channel"). Euratte Decl. ¶¶ 3–4; McCormack Decl. ¶ 3, ECF No. 286-16.

AT&T employs 288 Retail Account Executives ("RAEs"), who work with approximately 2,700 local dealers in the Local Dealer Channel in order to increase sales and improve customer satisfaction. McCormick Decl. ¶ 4. According to Defendant, RAEs' duties include reviewing and analyzing sales numbers, setting goals for their stores, discussing business strategy with business owners, delivering customized training to sales associates and managers, and inspecting and resolving merchandising issues. *Id.* Depending on the market and the region, RAEs may be supervised by a Director of Sales ("DOS") and one or more Area Retail Sales Managers ("ARSMs"). *Id.* ¶ 5. In some markets, AT&T employs Retail Account Managers ("RAMs"), who report to the ARSMs and directly supervise RAEs. *Id.*

In addition to RAEs, AT&T employs National Retail Account Executives ("NRAEs"), who work with nearly 13,000 retail locations in the National Retail Channel. Euratte Decl. ¶ 5.

Similar to RAEs, NRAEs' duties include reviewing and analyzing sales data, strategizing with store management, creating and updating retail sales goals, customizing and delivering training to sales associates and managers, and managing the rollout of AT&T programs. *Id.* ¶ 6. The supervision of NRAEs is also similar to that of RAEs. NRAEs are supervised by one or more DOS and a number of ARSMs, with RAMs serving as another level of management between NRAEs and ARSMs in some markets. *Id.* ¶ 11. Plaintiff was an NRAE based in New York and New Jersey from October 2006 through November 2015. LoCurto Decl. ¶ 6, ECF No. 267.

Finally, AT&T employs ninety-three "hybrid" RAEs, who support sellers in both the Local Dealer Channel and the National Dealer Channel. McCormick Decl. ¶ 6.

RAEs and NRAEs typically work with ten to twenty retail locations, which are known, individually, as "doors" or "accounts." LoCurto Dep. at 213:22, ECF No. 264-1 (nineteen accounts); Smith Dep. at 38:6–8, ECF No. 264-8 (ten to fourteen accounts); Walker Dep. at 36:12–14, ECF No. 264-9 (twelve to fifteen accounts); Briscoe Dep. 66:7–10, ECF No. 264-10 (twenty-three accounts); Cascioli Dep. at 77:9–10, ECF No. 264-11 (nine to twelve accounts); Runnels Dep. at 24:21, ECF No. 264-12 (fifteen accounts); Yowell Dep. at 36:18–19, ECF No. 264-13 (fourteen accounts); Ward Dep. at 69:5–9, ECF No. 264-16 (twelve to fifteen doors); Bryant Dep. at 36:7–8, ECF No. 264-17 (twelve to sixteen doors); Daily Dep. at 45:11–17, ECF No. 264-20 (number of dealers assigned varied from six to in excess of twenty). *But see* Martino Dep. at 45:22–25, ECF No. 264-19 (worked with thirty-six or thirty-seven stores).

RAEs and NRAEs typically spend the majority of their days visiting their accounts' brick-and-mortar locations to train sales associates and managers to sell AT&T products, and to encourage them to sell AT&T products. *See, e.g.*, LoCurto Dep. 60:7–62:7, 69:24–70:20; Walker Dep. at 42:18–45:19; Cascioli Dep. at 77:9–10, 87:9–25; Runnels Dep. at 77:7–78:5;

Yowell Dep. at 40:7–41:12; Henton Dep. at 56:5–19, ECF No. 264-15; Ward Dep. at 91:20–94:2; Bryant Dep. at 39:16–19, 42:19–23, 44:3–45:13; Martino Dep. at 82:12–83:3; Daily Dep. at 81:9–12.  In addition to site visits, RAEs and NRAEs are required to be available to answer phone calls and text messages from their accounts whenever their brick-and-mortar locations were open for business; RAEs and NRAEs were, therefore, typically "on-call" seven days per week, starting as early as 8:00 a.m. and ending as late as midnight.  *See, e.g.*, LoCurto Dep. at 235:17–236:15; Smith Dep. at 76:19–79:2; Briscoe Dep. at 130:21–133:6; Cascioli Dep. at 121:14–122:10; Lombard Dep. at 69:20–70:13; *see also* ███████████████████████ ████████████████████ at 10, ECF No. 264-39 ("██████████████████ ████████████████████████████████████████████████████.").[2]

RAEs and NRAEs are also subject to the same compensation policy.  They are paid a base salary plus commission based on sales of AT&T products at their accounts.  *See, e.g.*, LoCurto Dep. at 23:14–22, 213:6–19; Smith Dep. at 26:4–6; Briscoe Dep. at 43:17–44:6; Cascioli Dep. at 57:6–58:14.  It is undisputed that, with the exception of a brief period in 2009, Defendant classified RAEs and NRAEs as exempt from overtime pay under the FLSA, and did not pay them overtime wages.  Johnson Decl. ¶¶ 4–5, ECF No. 286-20.  Plaintiff brings this action to recover overtime wages for herself and other RAEs and NRAEs employed by Defendant.  *See generally* Compl., ECF No. 1.

II.     Procedural History

In an August 18, 2014 Memorandum and Order, the Court conditionally certified an

---

[2] Plaintiffs filed this document under seal, along with a number of other documents containing Defendant's proprietary information, pursuant to a Consent Protective Order entered by the Honorable Kevin Nathaniel Fox on September 5, 2017.  ECF No. 248.  The Court, therefore, redacts references to documents filed under seal pursuant to the Consent Protected Order in the publicly filed version of this Opinion and Order.  The Court will file an unredacted version of this Opinion and Order under seal.

FLSA collective action of all current and former RAEs who worked more than forty hours per week on or after June 20, 2010. ECF No. 11. Following conditional certification, twenty RAEs and NRAEs opted into the collective action. *See* ECF Nos. 114–33. Fifteen Opt-in Plaintiffs remain in the action: Reysan Almonte, Toni Bryant, Jasmine Briscoe, Eugene Cascioli, Dustin Daily, Cheryl Foster, Erick Henton, Devin Lombard, Aldo Martino, Anthony Renzi III, Angela Runnels, Holly Smith, John Walker, Cortland Ward, and Miranda Yowell. All of the remaining Opt-in Plaintiffs have been deposed, except for Almonte, who is the subject of Defendant's motion for an order dismissing him from this action for failure to prosecute, ECF No. 277, and Renzi III, who died in 2016, ECF No. 203.[3]

In an Order dated September 30, 2016 (the "2016 Summary Judgment Order"), the Court granted LoCurto's motion for partial summary judgment on her FLSA claim, concluding that Defendant had improperly classified her as exempt from overtime pay. Sept. 30, 2016 Order ("2016 Summary Judgment Order"), ECF No. 173. However, the Court held in abeyance Opt-in Plaintiffs' motion for summary judgment on the same ground because class-wide discovery had not yet occurred. *Id.* at 17.

Plaintiff now moves for final certification of the FLSA collective action, and Defendant cross-moves for decertification of the FLSA collective action. Plaintiff also moves for certification of a Rule 23 class action under the NYLL and NJWHL.

---

[3] On September 25, 2017, the Court granted the motion of Anthony Renzi Jr. and Pauline Renzi, as co-administrators of Renzi's estate, to be substituted as plaintiffs for Renzi. ECF No. 271.

**DISCUSSION**

I.     FLSA Collective Action

     A.  Legal Standards

          1.  Final Certification and Decertification

The FLSA authorizes a plaintiff to file suit on behalf of "other employees similarly situated," but only if such employees "consent in writing."  29 U.S.C. § 216(b).  Potential plaintiffs must, therefore, "opt in" to participate in an FLSA collective action.  The FLSA does not guarantee an initiating plaintiff a right to obtain a court-ordered notice to potential opt-in plaintiffs.  Rather, "district courts have discretion . . . to implement § 216(b) . . . by facilitating notice to potential plaintiffs of the pendency of the action and of their opportunity to opt in as represented plaintiffs."  *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (alterations and internal quotation marks omitted) (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).

Courts in this Circuit use a two-step method to assess whether to certify an FLSA collective action.  *Id.* at 554–55.  At the first stage, plaintiffs must "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'"  *Id.* at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

At the second stage—the current posture of this litigation—"the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."  *Id.* at 555 (citation omitted).  "If the record shows all putative class members are similarly situated, the conditional aspect is removed, the collective action is finally certified, and the

matter proceeds to trial." *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 367 (S.D.N.Y. 2014) (citation omitted). Conversely, the district court may "decertify" the action if it determines that the opt-in plaintiffs are not "similarly situated," in which case their claims may be dismissed without prejudice. *Id*.

In deciding whether to decertify or grant final certification of an FLSA collective action, courts in this Circuit examine three factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]." *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 639 (S.D.N.Y. 2013) (alteration in original) (quoting *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011)); *accord McGlone*, 49 F. Supp. 3d at 367. The named plaintiff bears the burden of establishing that she and other employees are similarly situated. *Indergit*, 293 F.R.D. at 639.

### 2. The FLSA Administrative Exemption

The FLSA requires all employers to pay employees one and one-half times their regular rate of pay for all hours worked in excess of forty hours per week, unless the employees are "exempt" under one of a series of statutory exemptions. 29 U.S.C. § 207. Defendant argues that Plaintiff and the Opt-in Plaintiffs are exempt because they qualify for the "administrative exemption." *See* 29 U.S.C. § 213(a)(1). Under the FLSA's implementing regulations, the administrative exemption applies to employees (1) who are compensated on a salary or fee basis at a rate no less than $455 per week; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §

541.200(a)(1)–(3).

The regulations set forth a list of ten non-exhaustive factors for courts to consider in deciding whether an employee or group of employees exercise discretion and independent judgment on the third prong:

1. Whether "the employee has authority to formulate, affect, interpret, or implement management policies or operating practices";
2. Whether "the employee carries out major assignments in conducting the operations of the business";
3. Whether "the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business";
4. Whether "the employee has authority to commit the employer in matters that have significant financial impact";
5. Whether "the employee has authority to waive or deviate from established policies and procedures without prior approval";
6. Whether "the employee has authority to negotiate and bind the company on significant matters";
7. Whether "the employee provides consultation or expert advice to management";
8. Whether "the employee is involved in planning long- or short-term business objectives";
9. Whether "the employee investigates and resolves matters of significance on behalf of management"; and
10. Whether "the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

29 C.F.R. § 541.202(b); *see also Pippins v. KPMG, LLP*, 759 F.3d 235, 240–41 (2d Cir. 2014) (analyzing and adopting, in part, the regulation's ten-factor list). Because of the number of factors involved, the application of this exemption, like the others under the FLSA, is a "complex, disputed issue" that requires the Court "to decide a number of subsidiary questions." *Myers*, 624 F.3d at 548.

3. On-Call Time

Plaintiff and Opt-in Plaintiffs in this action seek overtime compensation for their on-call time—that is, the time during which they were not physically present at the office or at their accounts' retail locations, but were nonetheless required to be available to answer phone calls from their accounts. The question of whether on-call time constitutes compensable "work" under the FLSA depends on whether it is spent "predominantly for the employer's benefit or the

employee's." *Singh v. City of New York*, 524 F.3d 361, 368 (2d Cir. 2008) (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)).  Put differently, "[t]ime spent away from the employer's premises under conditions that are so circumscribed that they restrict the employee from effectively using the time for personal pursuits [] constitutes compensable hours of work." 29 C.F.R. §553.221(c).  This analysis is fact-intensive and "dependent on all of the circumstances of the case."  *Singh*, 524 F.3d at 368 (quoting *Armour & Co.*, 323 U.S. at 133).

### B.  Analysis

#### 1.  Disparate Factual and Employment Settings

The first factor courts examine in deciding whether to grant final certification or decertify an FLSA collective action is whether the individual plaintiffs are subject to disparate factual and employment settings.  *Indergit*, 293 F.R.D. at 639.  In this analysis, Plaintiff and Opt-in Plaintiffs' employment settings "need not be identical—an 'impossible task'—to be similar enough for certification as a collective action."  *Jacob v. Duane Reade, Inc.*, No. 11 Civ. 0160, 2016 WL 3221148, at *8 (S.D.N.Y. June 9, 2016) (quoting *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 415 (S.D.N.Y. 2013)).

Defendant argues that Plaintiff and Opt-in Plaintiffs were subject to disparate factual and employment settings, including with respect to the criteria relevant to the application of the administrative exemption and their use of on-call time.  Def. Decert. Mem. at 7–21.  The Court disagrees.

As an initial matter, RAEs and NRAEs have very similar job descriptions, with numerous identical functions.  The RAE job description is:





, ECF No. 264-34.  The NRAE job description is:

, ECF No. 264-36.[4]

Plaintiff and Opt-in Plaintiffs' depositions reveal that, with rare exceptions, they all performed each of the tasks listed in the two job descriptions.  For example, Plaintiff and Opt-in Plaintiffs testified that their job duties included partnering with store management and wireless sales personnel; conducting role plays with sales associates to implement AT&T's promotions and offers; delivering trainings to retailers; analyzing sales trends and communicating findings to retailers; serving as liaisons between retail stores and AT&T; and serving as a point of escalation for customer issues.  *See* LoCurto Dep. at 32:11–34:4, 48:21–51:2, 52:18–57:14; Smith Dep. at 46:22–47:21, 50:4–51:19; Walker Dep. at 75:3–20, 76:5–17; Briscoe Dep. at 54:19–55:7, 55:16–23; Cascioli Dep. at 62:18–63:25, 64:6–25; Runnels Dep. at 37:18–39:20, 44:16–45:16, 55:6–22; Yowell Dep. at 52:17–53:12, 53:20–54:13, 54:21–55:13; Lombard Dep. at 28:23–

---

[4] These documents were also filed under seal pursuant to the Consent Protective Order.

29:23, ECF No. 264-14, 31:15–32:10; Henton Dep. at 140:14–144:2; Ward Dep. at 78:20–79:10, 84:5–24, 86:17–87:21; Bryant Dep. at 30:12–31:21; Foster Dept. at 40:23–42:20, 44:9–45:2, 47:12–49:10, ECF No. 264-18; Martino Dep. at 104:19–107:17; Daily Dep. at 34:2–36:13, 37:7–39:21.

Plaintiff and Opt-in Plaintiffs further testified that they performed these duties primarily by visiting their accounts' brick-and-mortar retail locations. *See, e.g.*, LoCurto Dep. at 60:7–62:7, 69:24–70:20 (LoCurto conducted between five and nineteen store visits per week depending on the need to introduce new products or motivate lower-performing stores, or on independent demands on her schedule); Walker Dep. at 42:18–45:19 (Walker attempted to visit each of his 12 to 15 accounts once per week, and sometimes visited more often depending on performance and need for training); Cascioli Dep. at 77:9–10, 87:9–25 (Cascioli aimed to visit each of his nine to twelve accounts five to eight times per month); Runnels Dep. at 77:7–78:5 (Runnels visited each of her fifteen accounts weekly); Yowell Dep. at 40:7–41:12 (Yowell attempted to visit each of her fourteen accounts once per week, but the frequency of visits varied depending on factors such as whether AT&T was running promotions); Lombard Dep. at 22:12–17, 67:16–18 (Lombard spent his entire work day visiting stores); Henton Dep. at 56:5–19 (Henton visited five locations per day); Ward Dep. at 91:20–94:2 (Ward visited three to four accounts per day, and visited each of his accounts once per week); Bryant Dep. at 39:16–19, 42:19–23, 44:3–45:13  (Bryant spent "most of [her] time" conducting store visits; she was required to visit each store twice per month, and more frequent visits were encouraged); Foster Dep. at 35:19–36:21 (Foster tried to visit each of his accounts once per week); Martino Dep. at 82:12–83:3 (Martino visited each of his accounts once per week); Daily Dep. at 81:9–12 (Daily visited one to six stores per day).  At first blush, therefore, Plaintiff and Opt-in Plaintiffs are

similarly situated with respect to their job duties and the manner in which they performed them.

Moreover, as already discussed, Plaintiff and Opt-in Plaintiffs were subject to a uniform policy regarding pay. With the exception of a brief period in 2009, they were classified as exempt from overtime pay and were paid a base salary plus commission. They were also subject to the same requirement that they be available to answer phone calls from their accounts while their brick-and-mortar locations were open for business. The fact that Plaintiff and Opt-in Plaintiffs were subject to "a systematically-applied company policy or practice," also supports the conclusion that they are similarly situated. *Jacob*, 2016 WL 3221148, at \*8 (quoting *Pefanis v. Westway Diner, Inc.*, No. 08 Civ. 002, 2010 WL 3564426, at \*4 (S.D.N.Y. Sept. 7, 2010)).

Defendant does not dispute that Plaintiff and Opt-in Plaintiffs had very similar job descriptions, that they actually performed the tasks listed in those descriptions, or that their day-to-day work schedules shared the same basic structure. Nor does Defendant dispute that Plaintiff and Opt-in Plaintiffs were subject to a common policy regarding pay and on-call time. Rather, Defendant argues that, in completing the tasks discussed above, Plaintiff and Opt-in Plaintiffs exercised different levels of discretion and independent judgment, meaning they are not similarly situated with respect to the application of the administrative exemption. Specifically, Defendant argues that Plaintiff and Opt-in Plaintiffs had varying levels of independence and discretion with respect to scheduling and supervision of store visits, training sales associates, marketing, and planning short- and long-term business objectives—the four areas the Court considered in concluding that the administrative exemption did not apply to LoCurto on her motion for summary judgment. Def. Decert. Mem. at 7–18; *see* 2016 Summary Judgment Order at 15–17. Defendant also argues that the collective action must be decertified because Plaintiff and Opt-in Plaintiffs had varying accounts regarding on-call time. Def. Decert. Mem. at 18–21. The Court

addresses each argument in turn.

a. Exercise of Discretion and Independent Judgment

Defendant first argues that Plaintiff and Opt-in Plaintiffs' supervisors exercised disparate levels of control over their schedules and their activities during their store visits. *Id.* at 9–10. Like LoCurto, however, most of the Opt-in Plaintiffs testified that they had authority to decide when to visit their accounts, but consulted with their managers in doing so, who often gave input and had authority to adjust their schedules. LoCurto Dep. 63:12–64:17 (LoCurto set her weekly schedule and sent it to her manager); Smith Dep. at 38:10–24, 40:23–41:17 (Smith planned her schedule in consultation with her managers at monthly staff meetings, and managers developed a system for her to visit busy stores more frequently); Walker Dep. at 42:18–45:19 (Walker set his own schedule based on a "combination between" what his managers expected and his own observations); Briscoe Dep. at 68:18–73:4 (Briscoe had "partial" authority to develop her schedule; she received directives from management concerning which stores to visit, but also used her own judgment); Cascioli Dep. at 87:9–25 (Cascioli developed his weekly schedule from reports given to him by management, and management might adjust his schedule as it saw fit); Yowell Dep. at 40:7–41:12 (Yowell set her schedule based on direction from supervisors and available AT&T promotions); Henton Dep. at 69:12–19 (Henton set her weekly schedule and sent it to managers on Monday mornings, and managers might adjust her schedule as they saw fit); Ward Dep. at 74:21–75:21 (Ward set his schedule based on analysis of sales metrics, and "sometimes" submitted it to managers on an electronic dashboard); Bryant Dep. at 44:3–45:15 (Bryant was required to make a weekly schedule and send it to her manager at the beginning of each week); Daily Dep. at 56:5–18 (Daily set his schedule based on a weekly conference call with his supervisor, but sometimes adjusted the schedule based on stores' performance).

In addition, Plaintiff and Opt-in Plaintiffs testified that their managers monitored and oversaw their store visits. Plaintiff and nine of the thirteen Opt-in Plaintiffs who submitted depositions testified that their managers went on "ride-alongs" with them to observe their store visits, typically on a monthly basis. LoCurto Dep. at 140:8–141:14 (monthly ride-alongs); Smith Dep. at 36:18–19 (monthly ride-alongs); Walker Dep. at 46:23–47:2 (ride-alongs once or twice per month); Runnels Dep. at 52:13–53:8 (approximately twenty store visits per year with manager); Lombard Dep. at 64:13–18 (ride-alongs two to four times per month); Foster Dep. at 60:20–25 (monthly ride-alongs); *see also* Cascioli Dep. at 91:23–92:6 (ride-alongs with unspecified frequency); Ward Dep. at 47:4–17 (quarterly ride-alongs); Bryant Dep. at 35:2–12 (ride-alongs with unspecified frequency); Daily Dep. at 40:21–41:10 (daily ride-alongs). Moreover, Plaintiff and eight of the Opt-in Plaintiffs testified that they were required to record the details of each of their store visits on one of two software programs, "Pronto" or "Mobile Insight." LoCurto Dep. at 298:9–24; Smith Dep. at 40:16–24; Walker Dep. at 80:7–12; Briscoe Dep. at 122:25–123:4; Yowell Dep. at 38:12–40:10; Bryant Dep. at 40:10–41:7; Foster Dep. at 35:5–18; Daily Dep. at 55:17–56:4. The Court, therefore, concludes that Plaintiff and Opt-in Plaintiffs exercised similar levels of independence and discretion with respect to scheduling and supervision of their activities during store visits.

Next, Defendant argues that Plaintiff and Opt-in Plaintiffs exercised varying levels of discretion with respect to how they conducted training at their accounts. Def. Decert. Mem. 11–13. With one exception, however, Plaintiff and Opt-in Plaintiffs testified that they conducted trainings by using materials created and provided to them by AT&T, that they did not create or customize training materials themselves, and that they sometimes tailored the training materials based on their observations of sales associates at their accounts. LoCurto Dep. at 34:4–42:20,

51:3–52:17 (LoCurto did not customize trainings or select which trainings to deliver, but did provide additional training to sales associates who were not familiar with a certain product); Smith Dep. at 47:19–48:13 (Smith tailored certain trainings based on sales associates' relative knowledge of the products); Walker Dep. at 68:2–19, 72:12–73:5 (Walker did not customize trainings but decided which trainings to give based on sales associates' performance); Briscoe Dep. at 60:15–61:14, 64:2–12, 80:22–24 (Briscoe used training materials created by AT&T to establish sales associates' knowledge on certain subjects, but developed "games" on her own to test their knowledge); Cascioli Dep. at 65:11–66:16 (Cascioli did not customize trainings and his managers decided which trainings he delivered); Runnels Dep. at 39:1–20 (Runnels conducted trainings based on materials given to her by AT&T, but might change what she said based on the account's needs); Yowell Dep. at 53:1–12 (Yowell conducted trainings but did not customize content); Lombard Dep. at 26:15–27:4, 29:15–23 (Lombard delivered uniform training materials across stores, but sometimes decided which trainings to give based on the needs of the store); Henton Dep. at 140:23–143:2 (Henton conducted trainings using AT&T training materials, and sometimes picked which trainings to deliver based on sales metrics); Ward Dep. at 89:7–90:19 (Ward conducted trainings using, "for the most part," pre-existing training materials, and varied trainings based on the location's needs); Bryant Dep. at 49:10–25 (Bryant was given training materials by AT&T and was not required to create training materials, although she did tailor training methods based on her observations and knowledge of the store); Martino Dep. at 47:9–48:12 (Martino decided which trainings to give based on observations of associates); Daily Dep. at 36:9–37:6 (Daily used different training methods based on the employees' personalities, but used training materials provided by AT&T); *cf.* Foster Dep. at 45:3–47:11 (Foster created training materials himself at the outset of his employment, but by the end conducted trainings

using AT&T materials).

To be sure, Plaintiff and Opt-in Plaintiffs' testimony concerning training was not identical. Walker, Henton, Lombard, and Martino, testified that they at least sometimes decided which trainings to deliver, while LoCurto and Cascioli testified that their managers decided. Given, however, that Plaintiff and Opt-in Plaintiffs uniformly testified that they were required to train sales associates, that they did so using training materials created by AT&T, and that they tailored training materials based on observations of sales associates, this distinction does not establish a disparate factual and employment setting. The Court, therefore, rejects Defendant's contention that Plaintiff and Opt-in Plaintiffs had disparate levels of discretion and independence with respect to the delivery and customization of trainings.

Turning to marketing duties, Defendant argues that Plaintiff and Opt-in Plaintiffs had differing levels of responsibility to increase sales at their accounts and varying levels of discretion with respect to the development of promotions and contests. Def. Decert. Mem. at 13–15. With regard to responsibility to increase sales, Defendant relies primarily on certain Opt-in Plaintiffs' subjective belief that their efforts led to increased sales. *See* Lombard Dep. at 17:3–18:8 (explaining that his analysis of sales metrics and suggested action plans led to his accounts' "success"); Bryant Dep. at 36:25–37:6 (explaining that sales at the dealers she worked with increased "I guess because of the work that I did with them"). That some Opt-in Plaintiffs subjectively believed that their efforts led to increased sales, however, does not establish that they exercised different levels of discretion or independent judgment than others. Indeed, an AT&T Director of Sales Operations explained that the purpose of the RAE position is to "increase sales and achieve high levels of customer satisfaction." McCormick Decl. ¶ 4.

As for promotions and contests, Defendant exaggerates differences in Plaintiff and Opt-in

Plaintiffs' deposition testimony and overemphasizes the testimony of a few outliers. *See Indergit*, 293 F.R.D. at 644 ("Of course, in any group there will always be outliers."). Other than Smith, who devised "two or three" promotions in three years as an NRAE, Smith Dep. at 54:5–56:12; Ward, who designed minor promotions and contests such as a "bean bag toss," Ward Dep. at 63:13–65:8; and Bryant, who was allowed to run promotions such as free lunches at her discretion for a "brief period," Bryant Dep. at 47:19–49:5, Plaintiff and Opt-in Plaintiffs uniformly testified that they either did not run promotions and contests or that they ran promotions and contests only at the direction of their managers, LoCurto Dep. at 153:9–18 (LoCurto did not run promotions and contests); Walker Dep. at 95:7–22 (Walker did not initiate sales contests); Briscoe Dep. at 94:14–95:20 (Briscoe ran promotions and contests at the direction of supervisors, and could not recall creating promotions and contests herself); Cascioli Dep. at 108:5–18 (Cascioli did not run promotions); Runnels Dep. at 44:4–16 (Runnels was not encouraged to come up with promotions and contests, and only ran promotions and contests that were approved by AT&T); Yowell Dep. at 62:5–72:11 (Yowell did not recall coming up with promotions or contests); Lombard Dep. at 67:1–15 (Lombard ran promotions and contests suggested by his boss); Foster Dep. at 56:11–59:10 (Foster only ran promotions she designed with approval of management and store agent); Martino Dep. at 70:10–71:22 (Martino organized a free dinner promotion with approval of management). Accordingly, the differences in Plaintiff and Opt-in Plaintiffs' exercise of discretion and independent judgment with respect to marketing are minimal and immaterial.

Finally, with regard to setting short-term and long-term business objectives, Defendant argues that Plaintiff and Opt-in Plaintiffs exercised varying levels of independence and discretion in preparing business plans for their accounts and in their analysis of sales metrics. Def. Decert.

Mem. at 17–18. Plaintiff and Opt-in Plaintiffs testified, however, that were required to submit business plans with the same or similar frequency and that the business plans included the same categories of information. They typically submitted the business plans twice annually, and the plans included filling in a template of sales data for each of their accounts as well as a discussion of sales trends and operational challenges. LoCurto Dep. at 199:6–208:15 (LoCurto prepared business plans for each retailer by copying and pasting data and identifying key action items and performance objectives for each retailer); Smith Dep. at 60:8–62:25 (Smith prepared "cookie cutter" business plans for each retailer that identified operational challenges and merchandising efforts); Walker Dep. at 36:4–38:10 (Walker prepared semi-annual business plans based on template from AT&T that discussed points of improvement for retailers); Briscoe Dep. at 61:15– 62:8; 98:1–98:25 (Briscoe developed "roadmap" for retailers based on template); Cascioli Dep. at 79:20–80:16 (Cascioli produced business plans twice per year for each account that included trend analysis and identified operational challenges); Lombard Dep. at 34:14–36:3 (Lombard drafted business plans that listed sales goals that were developed by management); Henton Dep. at 110:10–112:1 (Henton prepared semi-annual business plans for each account that included action plans based on sales metrics); Ward Dep. at 80:4–84:4 (Ward prepared business reviews for each account twice per year and proposed action items that were based on discussions with management); Bryant Dep. at 56:5–59:9 (Bryant created business plans twice per year that considered operational challenges and sales metrics); Foster Dep. at 49:19–54:23 (Foster created business plans for every account based on a template on which she "filled in blanks" that included analysis of sales trends and operational challenges); Martino Dep. at 86:2–87:7, 88:9– 22 (Martino prepared semi-annual business plans that examined trends and identified operational challenges, which he presented to an AT&T Vice President).

To be sure, there is some variation with respect to managerial review of the business plans. For example, Martino presented his business plans to an AT&T Vice President, Martino Dep. at 86:14–18, while LoCurto testified she did not present her business plans to anyone, LoCurto Dep. at 201:11–12. Given the consistency between Plaintiff and Opt-in Plaintiffs' testimony regarding the frequency and content of the business plans, however, the difference in presentation to management does not establish a disparate factual or employment setting.

In addition, Plaintiff and Opt-in Plaintiffs' level of discretion with respect to analysis of sales metrics was highly consistent. They testified that they analyzed sales reports to determine which of their accounts were performing well and to consider strategies for improving performance. *See, e.g.*, LoCurto Dep. at 48:21–51:2 (LoCurto analyzed reports to determine areas where retailers are selling well); Walker Dep. at 63:9–73:12, 76:5–9 (Walker analyzed sales metrics and communicated results to stores to encourage them to sell more); Briscoe Dep. at 55:16–19, 73:1–74:11 (Briscoe analyzed data and "devised strategies" for improving sales, but did not specify strategies); Runnels Dep. at 42:6–22 (Runnels analyzed data and discussed ways to improve sales with retailers); Lombard Dep. at 17:13–18:8, 31:15–20 (Lombard analyzed sales metrics and suggested strategies for improving sales); Ward Dep. at 86:17–87:21 (Ward analyzed sales metrics and devised strategies for improving sales based on the results); Bryant Dep. at 31:7–11, 45:12–46:18 (Bryant examined sales reports for trends); Foster Dep. at 47:12–48:20 (Foster analyzed data and tracked whether stores were meeting sales targets). The Court, therefore, concludes that Plaintiff and Opt-in Plaintiffs exercised similar levels of discretion and independent judgment with respect to short-term and long-term business planning.

In sum, Plaintiff and Opt-in Plaintiffs' testimony reveals substantial similarity with respect to their levels of discretion and independence in completing their job duties.

b.   On-Call Time

Defendant also argues that Plaintiff and Opt-in Plaintiffs had different experiences with respect to their on-call time.  Def. Decert. Mem. at 18–21.  A number of Opt-in Plaintiffs were not asked in their depositions about they spent their on-call time.  Those who were asked testified that the number of calls they received in a given week during non-working hours varied, but they usually received between zero and five calls per day.  *See* LoCurto Dep. at 254:12–258:16 (LoCurto received between zero and eight calls per day during non-working hours); Smith Dep. at 77:23–78:3 (Smith received five to twenty-five calls per week); Walker Dep. at 85:13–20 (Walker typically received more than five calls per week, but the number varied a lot); Yowell Dep. at 70:4–15 (Yowell received phone calls on weekends with varying frequency); Lombard Dep. at 69:20–70:13 (Lombard received calls outside working hours more than once per day, and the frequency was "very variable"); Henton Dep. at 161:8–163:14 (Henton sometimes received only a few calls per week, and sometimes received calls every day of the week).

Defendant contends that the Court should infer from the variability in the number of calls that Plaintiff and Opt-in Plaintiffs had disparate experiences with respect to on-call time.  But Defendant confuses variability in the number of calls with variability in their individual experiences.  Plaintiff and Opt-in Plaintiffs' testimony on this issue was highly consistent—the volume of calls was hard to predict, but could range from just a few to more than a dozen in a given week.  Plaintiff and Opt-in Plaintiffs' testimony, therefore, demonstrates substantial similarity with respect to whether their on-call time is compensable under the FLSA.  Because the testimony also reveals substantial similarity with respect to the criteria relevant to the application of the administrative exemption, the Court concludes that Plaintiff and Opt-in

Plaintiffs were not subject to disparate factual and employment settings. Accordingly, the first factor favors final certification of the collective action.

### 2. Available Defenses

The second factor courts consider in determining whether to grant final certification of an FLSA collective action is whether the defenses available to Defendant are individual to each Opt-in Plaintiff. *Indergit*, 293 F.R.D. at 649. Defendant asserts that three of its defenses are individual to different Opt-in Plaintiffs: (1) the applicability of the administrative exemption; (2) challenges to the credibility of Opt-in Plaintiffs' testimony; and (3) that Opt-in Plaintiffs who described certain job duties as non-exempt were "misperforming" their jobs. Def. Decert. Mem. 21–24. None of these arguments is availing.

Beginning with the applicability of the administrative exemption, Defendant argues that its defenses are individualized because the Court must conduct a "fact-intensive" inquiry to determine whether the exemption applies. *Id.* at 21–22. The cases cited by Defendant, however, involve employees whose "job duties and employment experiences vary dramatically," *Knott v. Dollar Tree Stores Inc.*, 897 F. Supp. 2d 1230, 1240–41 (N.D. Ala. 2012), or who share no more than "an employer, a job title, and a professed entitlement to additional wages," *Scott v. Chipotle Mexican Grill, Inc.*, No. 12 Civ. 8333, 2017 WL 1287512, at *9 (S.D.N.Y. Mar. 29, 2017), *appeal filed*, No. 17-2208 (2d Cir. July 18, 2017). Here, by contrast, the Court has found that Plaintiff and Opt-in Plaintiffs had the same job duties, executed these duties in largely the same manner, and exercised comparable levels of discretion and independent judgment in the areas of scheduling, training, marketing, and planning business objectives. If one RAE or NRAE is properly classified as exempt, therefore, it follows that all RAEs and NRAEs are properly classified as exempt. *See Indergit*, 293 F.R.D. at 650 (holding that because "the record

testimony has revealed the consistency of [plaintiffs'] duties, responsibilities, and discretionary exercise . . . , the Court is persuaded that if one [plaintiff] is properly classified as exempt . . . , so too must all [plaintiffs]").

Defendant's argument with respect to credibility defenses also fails to defeat final certification. If a credibility defense were alone sufficient to decertify a collective action, "FLSA actions could never proceed on a collective basis whenever witness credibility was at issue. Such an extreme view contravenes the well-settled principle that the FLSA should be liberally construed to achieve its purpose." *Rivet v. Office Depot, Inc.*, 207 F. Supp. 3d 417, 427 (D.N.J. 2016). Finally, Defendant's purported individualized defenses with respect to Opt-in Plaintiffs' "misperformance" of exempt job duties boil down to citations to two performance reviews for Ward and Cascioli that encouraged them, respectively, to "think outside the box more" and "tak[e] initiative." *See* Def. Decert. Reply at 17–18 (citations omitted). Such vague assertions regarding two of the fifteen Opt-in Plaintiffs do not warrant decertification of the entire collective action.

Accordingly, Defendant has not pointed to defenses that are individualized to different Opt-in Plaintiffs. Rather, the substantial similarity in Plaintiff and Opt-in Plaintiffs' job responsibilities, pay, and exercise of discretion and independent judgment demonstrate that the available defenses in this action will be collective in nature.

### 3. Procedural Fairness

The third and final factor courts consider in determining whether to grant final certification of an FLSA collective action is procedural fairness. *Indergit*, 293 F.R.D. at 650. Addressing procedural fairness, the Supreme Court has explained that the FLSA collective action allows employees to take "advantage of lower individual costs to vindicate rights by the pooling

of resources," and allows the judicial system to benefit by "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [violation]." *Hoffmann-La Roche*, 493 U.S. at 170. The Court's analysis of procedural fairness "is guided by its resolution of the first two decertification elements." *Indergit*, 293 F.R.D. at 650. That is, where "there appears to be substantially different employment experiences among the various [opt-ins] the procedural advantages of a collective action cannot be realized." *Id.* (alteration in original) (citation omitted). Conversely, where employees have similar employment settings, "[l]itigating overtime claims for each of the[] Plaintiffs individually would be burdensome on Plaintiffs, Defendants, and the courts." *McGlone*, 49 F. Supp. 3d at 369. Here, as already discussed, Plaintiff and Opt-in Plaintiffs had similar levels of discretion with respect to scheduling, training, marketing, and planning business objectives, and were subject to the same policy with respect to on-call time. Accordingly, procedural fairness weighs in favor of final certification of the collective action.

Because each of the three factors favors final certification, Plaintiff's motion for final certification of the FLSA collective action is GRANTED, and Defendant's motion to decertify the collective is DENIED.

The Court will now address Plaintiff's motion to certify the Rule 23 class action.

II.    Rule 23 Class Action

A.  Legal Standards

1.  Class Certification

Plaintiff moves to certify an NYLL and NJWHL class action under Federal Rule of Civil Procedure 23(b)(3) consisting of:

> Current and former employees of AT&T Mobility Services, LLC ("AT&T") who performed any work as a Retail Account Executive ("RAE") for AT&T in either

New York State or New Jersey at any time beginning on June 20, 2007 and thereafter through the entry of final judgment in this case (the "Class Period"), and who worked in excess of forty (40) hours in a given work week and who have not been paid all wages owed to them, including overtime premiums, in violation of the New York Labor Law and the New Jersey Wage and Hour Law (the "Class"), with the exception of RAEs who: (a) agreed to arbitrate their overtime claims with Defendant; (b) settled their State law overtime claims with Defendant that accrued during the Class Period; or (c) annually earned during the Class Period compensation (including base salary and commissions) of $100,000 or more, which includes at least $455/week paid on a salary basis.

Pl. Class. Mem. at 4–5, ECF No. 268.

A class may only be certified under Rule 23(b)(3) if it meets the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a)–(b). If all four Rule 23(a) factors are satisfied, the Court will proceed to consider whether "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). If all four Rule 23(a) requirements and Rule 23(b)(3) are satisfied, the Court may certify the class. *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 361 (S.D.N.Y. 2014).

A party seeking class certification bears the burden of establishing by a preponderance of the evidence that the proposed class meets each of the requirements of Rule 23. *Id.* In making this determination, the Court must consider "all of the relevant evidence admitted at the class certification stage." *Miles v. Merrill Lynch & Co. (In re Initial Public Offerings Sec. Litig.)*, 471 F.3d 24, 42 (2d Cir. 2006). Where, as here, a party is seeking certification of an FLSA collective action and NYLL class action based on the same set of facts, courts in this Circuit favor certification of the NYLL class where the court grants certification of the FLSA collective. *See Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 163 (S.D.N.Y. 2008) ("[C]ourts in the Second

Circuit routinely certify class actions . . . so that New York State and federal wage and hour claims are considered together.") (collecting cases); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 202–03 (S.D.N.Y. 2006) ("[W]here a collective action under the FLSA that is based on the same set of facts has been approved, there is an inclination to grant class certification of state labor law claims.").

2. Overtime Pay under the NYLL and NJWHL

Like the FLSA, the NYLL and the NJWHL require employers to pay employees one and one-half times their regular rate of pay for all hours worked in excess of forty hours per week. *See* NYLL § 650 *et seq.*; N.J. Stat. Ann. § 34:11-56a4. Both the NYLL and the NJWHL adopt the FLSA's statutory exemptions from the requirement to pay overtime wages. *See* N.Y. Comp. Codes R. & Regs. tit. 12 § 142-2.2 (adopting the FLSA's provisions and exemptions); *Cooper v. Green Pond Animal Care Ctr.*, Civ. Action No. 12–7903, 2015 WL 3385541, at *2 (D.N.J. May 22, 2015) ("Both the FLSA and NJWHL exempt 'bona fide executive, professional and administrative' [employees] from overtime pay requirements, and New Jersey's law adopts federal regulations defining those categories." (quoting 29 U.S.C. § 213(a)(1)). The question of whether Plaintiff and Opt-in Plaintiffs are exempt from the NYLL and NJWHL's overtime requirements, therefore, mirrors whether they are exempt under the FLSA.

B. Analysis

1. Rule 23(a)

a. Numerosity

The first Rule 23(a) factor is whether "the class is so numerous that joinder is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is generally presumed when the size of the class exceeds forty members. *Alcantara v. CNA Mgmt., Inc.*, 264 F.R.D. 61, 64 (S.D.N.Y.

2009). Here, Plaintiff, who worked as an NRAE in the five boroughs of New York City, three other counties in New York, and four counties in New Jersey, asserts that she worked with fifty-three other RAEs and NRAEs in those counties. LoCurto Decl. ¶¶ 7–8. Defendant does not dispute this assertion or that Plaintiff has satisfied the numerosity prong. Accordingly, the Court concludes that Plaintiff has established numerosity.

b. Commonality and Typicality

Rule 23(a)(2) requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (citation and quotation marks omitted). It asks not simply whether there are questions of law or fact common to the class, but whether a class action is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)). "Importantly, '[c]ommonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment.'" *Indergit*, 293 F.R.D. at 651 (alterations in original) (quoting *Damassia*, 250 F.R.D. at 156).

Rule 23(a)(3) requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A plaintiff establishes typicality where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro–N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001), *abrogated on other grounds by Dukes*, 564 U.S. 338. "Rather than focusing on the precise nature of plaintiffs' injuries, the typicality

requirement may be satisfied where 'injuries derive from a unitary course of conduct by a single system.'" *Floyd v. City of New York*, 283 F.R.D. 153, 161 (S.D.N.Y. 2013) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)). Because "the commonality and typicality requirements of Rule 23(a) tend to merge," *id.* (quoting *Wal-Mart*, 554 U.S. at 349 n.5), the Court will consider them together.

Here, as already discussed, it is undisputed that the members of the putative class were paid a base salary plus commission, were classified as exempt from overtime pay, and were required to be available to answer phone calls while their accounts' retail locations were open for business. The putative class members, therefore, share two common questions: (1) whether Defendant properly classified them as exempt under the NYLL and NJWHL, and (2) whether their on-call time is compensable. For the purposes of commonality, the Court must decide whether answering those questions requires "analysis of independent facts attributable only to individual plaintiffs." *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 615 (S.D.N.Y. 2018).

The Court has already concluded that LoCurto, Cascioli, Ward, Henton, and Martino—the members of the FLSA collective who worked in New York and New Jersey during the limitations period and are, therefore, part of the class[5]—are similarly situated with respect to on-call time and the level of independent judgment and discretion they exercise in the areas of scheduling, training, marketing, and planning business objectives. *See supra* § I.B.1.a. In addition to those class members, Defendant has submitted declarations of Patricia Medrano and James O'Brien, two NRAEs based in New York who did not opt into the FLSA collective action. Medrano Decl. ¶ 3, ECF No. 286-18; O'Brien Decl. ¶ 3, ECF No. 286-19.

---

[5] *See* LoCurto Decl. ¶ 6; Cascioli Dep. at 71:2–11; Henton Dep. at 16:12–16; Ward Dep. at 30:23–31:11; Martino Dep. at 54:22–53:4.

Medrano's declaration is consistent with Plaintiff and Opt-in Plaintiffs' account of their job duties. Medrano set her own schedule, with some constraints from her manager, Medrano Decl. ¶ 5 (Medrano sets her own schedule but was required to visit each of her stores twice per month); received training materials from AT&T to deliver at her accounts, *id.* ¶ 7; and prepared annual or semi-annual business plans for each of her accounts, for which AT&T generated sales goals, *id.* ¶ 10.[6] O'Brien, on the other hand, appears to be an outlier. Although O'Brien was also required to prepare semi-annual business plans, O'Brien Decl. ¶ 11, he asserts that he set his own schedule without any managerial oversight or tracking, *id.* ¶ 4; that he customized training documents by "compil[ing] information from different sources," *id.* ¶ 9; that he worked with his accounts to devise incentive contests for sales associates, *id.* ¶ 4; and that he was not required to answer phone calls on nights and weekends, *id.* ¶ 13. O'Brien's claim that he was not required to answer phone calls on nights and weekends, however, is inconsistent with AT&T documents summarizing the duties of NRAEs, which require them ███████████████████████████ ████████████████████████████████████████████████████ at 10. Regardless, the presence of a single outlier does not defeat class certification. *See Jacob*, 2016 WL 3221148 ("Kudrna, the only [plaintiff] to make independent hiring decisions, is an outlier who does not defeat class certification."). As a whole, therefore, class members' testimony regarding their scheduling, training, marketing, and business planning duties remains highly consistent.

Defendant also argues that members of the class had varying levels of authority to address customer service issues, such as the power to issue customer credits. Def. Class Opp. at

---

[6] Medrano does not address marketing duties or provide details about the nature of her on-call time in her declaration.

18–19, ECF No. 287; *see* Euratte Decl. ¶ 14 (noting that RAEs and NRAEs in some markets had authority to issue customer credits, while others did not). As an initial matter, LoCurto, Cascioli, Henton, Ward, and Martino all testified that addressing customer service issues was part of their job. LoCurto Dep. at 54:2–57:14; Cascioli Dep. at 64:16–25, 111:4–112:11; Henton Dep. at 143:19–144:2; Ward Dep. at 84:20–24; Martino Dep. at 106:11–107:17. Of this group, only Ward testified that he had the authority to issue customer credits without managerial approval. Ward Dep. at 84:20–24. This single difference within a specific component of one of RAEs' and NRAEs' numerous job duties does not negate the existence of common questions that are amenable to classwide resolution.

Finally, Defendant argues that the RAE and NRAE positions differ significantly, meaning a class comprised of both RAEs and NRAEs cannot share common questions. Def. Class Opp. at 22–24. These arguments, however, focus on two distinctions that are unrelated to the legal issues at the heart of this litigation: first, that RAEs had exclusive distribution arrangements in the Local Dealer Channel, whereas NRAEs had non-exclusive distribution arrangements in the National Retail Channel; and second, that RAEs offered some products to their dealers that NRAEs did not offer to them. These facts do not concern how RAEs and NRAEs exercise discretion and independent judgment or the demands of their on-call time, and are, therefore, irrelevant to the commonality inquiry.

Because the record demonstrates that members of the putative class exercised similar levels of discretion and independent judgment in connection with their job duties and were subject to the same policy regarding on-call time, the Court concludes that two central questions apt to drive the resolution of this litigation are subject to common answers: (1) whether Defendant properly classified RAEs and NRAEs as exempt from overtime pay; and (2) whether

RAEs' and NRAEs' on-call time is compensable. Accordingly, Plaintiff has established commonality.

For the same reasons, the Court concludes that Plaintiff has established typicality. As discussed above, the members of the putative class were subject to the same policies regarding pay and on-call time, and exercised similar levels of discretion and independent judgment in performing their job duties. Their claims, therefore, arise from the same course of events, and they will make similar legal arguments to prove Defendant's liability—the crux of the typicality analysis. *See Robinson*, 267 F.3d at 155.

### c. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining whether Plaintiff is an adequate representative, the Court must consider whether (1) class counsel is "qualified, experienced, and generally able to conduct the litigation"; and (2) Plaintiff has "interests that are antagonistic" to members of the class. *Ramirez*, 39 F. Supp. 3d at 365 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)). Defendant does not challenge class counsel's qualifications, and there are no apparent conflicts of interest between Plaintiff and the members of the putative class. Accordingly, the Court concludes that Plaintiff is an adequate class representative, and proceeds to the Rule 23(b)(3) analysis.

### 2. Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

a. Predominance

A question predominates when "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (citation omitted). Although "commonality, typicality, and predominance overlap," *Wynn v. N.Y.C. Hous. Auth.*, 314 F.R.D. 122, 128 (S.D.N.Y. 2016), predominance is "'more stringent' than the requirements of Rule 23(a)," *Indergit*, 293 F.R.D. at 655 (quoting Charles Allen Wright & Arthur R. Miller, 7A Federal Practice & Procedure § 1763 (3d ed.)). The application of the administrative exemption under the FLSA, as adopted by the NYLL and NJHWL, is a "complex, disputed issue" which requires the Court "to decide a number of subsidiary questions." *Myers*, 624 F.3d at 548. The Court must therefore, examine the employees' "actual duties" to decide whether issues of individualized or generalized proof predominate. *Indergit*, 293 F.R.D. at 655 (emphasis omitted).

The Court concludes that issues subject to generalized proof predominate over those subject to individualized proof. As discussed above, the record establishes that class members had similar levels of independence and discretion with respect to setting their schedules, training sale associates at their accounts, marketing AT&T products, and planning short- and long-term business objectives. They each set their own schedules with similar degrees of managerial oversight; conducted trainings based on materials designed by AT&T, but sometimes tailored training materials based on their observation of sales associates; delivered promotions and contests created by AT&T at the direction of their managers; and prepared semi-annual business plans for each account that included sales data and analysis of sales trends and operational

challenges.  *See supra* § I.B.1.a.  The record also establishes that putative class members were subject to the same policy regarding on-call time, as they were required to be available to answer calls from their accounts at all times while the stores were open for business.  *See* ██████ ████████████ at 10.

To be sure, class members' jobs were not identical.  For example, LoCurto, Cascioli, and Henton each submitted their schedules to their managers on a weekly basis, and Cascioli's and Henton's managers sometimes altered their schedules.  LoCurto Dep. at 63:12–64:17; Cascioli Dep. at 87:9–25; Henton Dep. at 69:12–19.  By contrast, Ward only "sometimes" submitted his weekly schedule to his managers.  Ward Dep. at 74:21–75:21.  In addition, although class members all tailored AT&T training materials to meet sales associates' needs, LoCurto and Cascioli were told by their managers which trainings to deliver, LoCurto Dep. at 34:4–42:20, 51:3–52:17; Cascioli Dep. at 65:11–66:16, whereas Henton and Martino at least sometimes chose which trainings to deliver, Henton Dep. at 140:23–143:2; Martino Dep. at 47:9–48:12.  Finally, Ward testified that he had authority to issue customer credits as part of his responsibility to resolve customer issues, Ward Dep. at 84:20–24, which other class members did not.

These distinctions are minor, and concern the degree of supervision exercised over a few discrete job duties that were consistent across the class.  The distinctions do not, therefore, overwhelm the numerous factual consistencies in class members' job duties and the level of discretion and independent judgment they exercised in performing those duties.  Accordingly, the Court concludes that the factual issues subject to classwide proof concerning the applicability of the administrative exemption and the compensability of on-call time predominate over those subject to individualized proof.

b.  Superiority

In determining whether a class action is superior to other available methods of fairly and

efficiently adjudicating the controversy, Rule 23 directs the Court to consider four factors:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Here, the relatively small recovery available to each prospective

class member makes the class action a more efficient mechanism.  Defendant points to no

ongoing litigation involving class members that pertains to this controversy.  Prospective

class members' claims all arose in New York and New Jersey, making the Southern

District of New York a convenient and appropriate forum.  And nothing in the record

suggests that the class action will be difficult or unwieldy to manage.  *See Indergit*, 293

F.R.D. at 658.  Accordingly, the Court concludes that Plaintiff has established that the

class action is superior to other available methods of adjudicating this controversy.

Because Plaintiff has established each of the Rule 23(a) factors and satisfied Rule

23(b)(3), her motion to certify the NYLL and NJWHL class action is GRANTED.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for final certification of the FLSA

collective action is GRANTED, Plaintiff's motion for certification of the NYLL and

NJHWL class action is GRANTED, and Defendant's motion for decertification of the

FLSA collective action is DENIED.  The Clerk of Court is directed to terminate the

motions at ECF Nos. 261, 262, and 266.

SO ORDERED.

Dated: September 20, 2018
New York, New York

_____
ANALISA TORRES
United States District Judge